**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE HUMANA INC. SECURITIES LITIGATION | Case No. 1:24-CV-00655-JLH |
| | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................2

II.     JURISDICTION AND VENUE ............................................................9

III.    PARTIES ..............................................................................................10

        A.    Lead Plaintiff ...........................................................................10

        B.    Defendants ...............................................................................10

IV.     FORMER HUMANA EMPLOYEES...................................................12

V.      FACTUAL ALLEGATIONS OF DEFENDANTS' FRAUD ...............18

        A.    Company Background ..............................................................18

        B.    Medicare Advantage ................................................................21

              1.    Medicare Advantage Payment Structure .......................22

              2.    Medical Loss Ratio .......................................................23

              3.    Risk Adjustment Data Validation .................................25

              4.    The Star Rating System ................................................26

        C.    The COVID Pandemic Significantly Impacted Humana's Core Business ...........29

        D.    Leading Into The Class Period, Defendants Announced Cost Cuts To
              Reverse A Trend Of Declining Membership Growth...............................32

        E.    Humana Actively Tracked Member Demand, Activity, And Utilization As
              Part Of Its Regular Business Operations ...................................35

        F.    Defendants Knew That COVID Significantly Suppressed Utilization.................41

        G.    Unbeknownst To Investors, Prior To And Throughout The Class Period,
              Defendants Knew Of And Expected Increased Utilization As Humana
              Emerged From The Pandemic, And Actively Suppressed That Demand..............44

              1.    Defendants' Knowledge Of Increased Demand As COVID
                    Subsided....................................................................44

              2.    Defendants' Knowledge Of The Company's Active Suppression
                    Of Utilization, Including Through Widespread Denials Of Claims
                    And Prior Authorizations..............................................53

i

H.     Defendants Engaged In Widespread Cost-Cutting Measures To Offset Higher Utilization, Which Reduced The Quality Of Humana's Medicare Advantage Plans ............................................................................................. 62

I.     Unbeknownst To Investors, Defendants Knew The Company's Cost-Cutting And Undisclosed Efforts To Suppress Demand Negatively Impacted Critical Star Rating Metrics ..................................................... 65

   1.     Defendants Tracked And Analyzed Star Metrics ...................................... 66

   2.     Defendants' Knowledge Of Deteriorating Star Rating Metrics ................ 69

J.     From July 2022 To June 2023, Defendants Misled The Market About The Risk Of Pent-up Demand, The Causes Of Decreased Utilization, And Humana's Star Ratings ............................................................................. 79

K.     Following Defendants' Continuous Misrepresentations, Defendant Diamond Reaped Millions In Insider Sales ............................................... 87

L.     Beginning In June 2023, Defendants Were Forced To Belatedly Acknowledge Increased Utilization, But Continued To Mislead And Falsely Assure Investors ........................................................................... 87

   1.     June 13, 2023: UnitedHealth Acknowledges Increased Utilization, Leading Humana Investors To Question Defendants' Claims About The Company's Utilization Trends ................................................. 88

   2.     June 16, 2023: Humana Admits To Increased Utilization, But Defendants Continue To Conceal The Full Truth From Investors ........... 91

M.     After Acknowledging Increased Utilization, Defendants Falsely Claimed Utilization Had Stabilized And That They Could Offset Utilization Through Other Cost Levers, While Also Touting Humana's Favorable Star Ratings ................................................................................................ 94

N.     On The Heels Of Defendants' False Assurances, Humana Disclosed Persistent And Worsening Elevated Utilization While Issuing Additional False Statements About Purported "Offsets" And Its Star Ratings ................ 97

   1.     November 1-2, 2023: Humana Discloses Continued Elevated Utilization, But Defendants Point To "Incremental Mitigation" As An "Offset" While Continuing To Tout Humana's Star Ratings ............. 97

   2.     January 18, 2024: Humana Announces Higher Fourth Quarter 2023 And FY 2023 MLR And Lowers FY 2023 Adjusted EPS, But Defendants Downplay Investor Concerns ................................................ 102

   3.     January 25, 2024: Humana Reports Further Increases In Inpatient And Outpatient Utilization, But Defendants Again Falsely Reassure Investors ................................................................................... 104

O.     Undeterred, Throughout 2024, Defendants Continued To Falsely Reassure Investors About The Strength Of The Company's Star Ratings ......................... 109

ii

P.      In October 2024, The Consequences Of Humana's Class Period Efforts To Offset Increased Utilization Were Finally Revealed Through A Dramatic Decline In The Company's Star Ratings ..............................................................110

Q.      Scathing Governmental Reports Have Shined More Light On Defendants' Misconduct.....................................................................................................114

    1.      The PSI Report Confirmed That Humana Artificially Depressed Utilization And MLR Through Denial Of Prior Authorizations .............114

    2.      The OIG Report Confirmed That During The Class Period, Humana Could Not Rely On One Of The Tools It Had Historically Used To Inflate Its Medicare Revenue ....................................................121

VI.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ....................................................124

A.      July 27, 2022 – 2Q 2022 Earnings Call ..............................................124

B.      September 15, 2022 – Humana Investor Day ......................................127

C.      January 9, 2023 – JPMorgan Healthcare Conference .........................130

D.      February 1, 2023 – 4Q 2022 Earnings Call ........................................135

E.      March 7, 2023 – Cowen Health Care Conference ..............................137

F.      March 8, 2023 – Proxy Statement.......................................................139

G.      April 20, 2023 – Annual General Meeting .........................................140

H.      April 26, 2023 – Earnings Release And 1Q 2023 Earnings Call........142

I.      May 9, 2023 – Bank of America Healthcare Conference ...................146

J.      June 16, 2023 – Form 8-K ..................................................................151

K.      August 2, 2023 – Earnings Release And 2Q 2023 Earnings Call.......152

L.      September 6, 2023 – Wells Fargo Healthcare Conference .................157

M.      October 13, 2023 – Press Release.......................................................159

N.      November 1, 2023 – Earnings Release And 3Q 2023 Earnings Call .................160

O.      January 18, 2024 – Form 8-K .............................................................164

P.      January 25, 2024 – Earnings Release, Prepared Remarks, And 4Q 2023 Earnings Call..........................................................................................166

Q.      March 8, 2024 – Proxy Statement.......................................................170

R.      September 4, 2024 – Wells Fargo Healthcare Conference .................171

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER.........................................................173

    A.    Defendants Had Actual Knowledge Of And Access To Information About Humana's Undisclosed Increases In Medicare Advantage Demand And Utilization .........................................................................................................173

    B.    Defendants Had Actual Knowledge Of And Access To Information About The Company's Faltering Star Ratings.............................................................180

    C.    Defendants Knew That They Would Be Unable To Implement Cost Cuts To Offset Higher Utilization Without Undermining The Quality Of The Company's Medicare Advantage Plans .................................................................182

    D.    The Alleged Fraud Directly Concerned Humana's Core Operations .................184

    E.    Defendants Repeatedly Spoke About The Issues At The Center Of The Alleged Fraud, Including In Response To Direct Analyst Questions.................186

    F.    The Individual Defendants Controlled The Company And Its Public Statements And Had Access To Material, Nonpublic Information Contradicting Those Statements ..........................................................................188

    G.    The Temporal Proximity Between Defendants' Material Misrepresentations, Including Affirmative Denials, And Subsequent Disclosures Supports A Strong Inference Of Scienter.........................................189

    H.    Defendants Were Financially Motivated And Had The Opportunity To Mislead Investors ..............................................................................................190

VIII.   LOSS CAUSATION..............................................................................................192

    A.    First Partial Disclosure: June 13, 2023 .............................................................193

    B.    Second Partial Disclosure: June 16, 2023 .........................................................194

    C.    Third Partial Disclosure: November 1-2, 2023..................................................195

    D.    Fourth Partial Disclosure: January 18, 2024.....................................................197

    E.    Fifth Partial Disclosure: January 25, 2024........................................................199

    F.    Sixth Partial Disclosure: October 1-2, 2024 .....................................................202

IX.    CLASS ACTION ALLEGATIONS ........................................................................206

X.    A PRESUMPTION OF RELIANCE APPLIES .......................................................208

XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ...........................................................................209

XII.    CAUSES OF ACTION ...........................................................................................210

XIII.    PRAYER FOR RELIEF .........................................................................................213

XIV.   JURY TRIAL DEMANDED ................................................................................214

Court-appointed Lead Plaintiff SEB Investment Management AB ("SEB" or "Plaintiff"), by and through its counsel, files this Consolidated Class Action Complaint for Violations of the Federal Securities Laws individually and on behalf of a class ("Class") consisting of all persons and entities who purchased or otherwise acquired the securities of Humana Inc. ("Humana" or the "Company"), including persons and entities who purchased or otherwise acquired Humana common stock or call options, or sold Humana put options, between July 27, 2022 through October 1, 2024, inclusive (the "Class Period"), and were damaged thereby. Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on the ongoing investigation of its undersigned counsel. This investigation includes review and analysis of, among other things: (i) Humana's filings with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) Humana presentations, press releases and reports; (iv) research reports by securities and financial analysts; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Humana's securities; (vii) information provided by former Humana employees ("FEs"); (viii) government reports concerning Humana, including by the U.S. Senate Permanent Subcommittee on Investigations ("PSI") and U.S. Department of Health & Human Services, Office of Inspector General ("OIG"); and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants

or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  INTRODUCTION

1.      This securities fraud class action arises from material misrepresentations and omissions that Humana, its former Chief Executive Officer Bruce D. Broussard, and its Chief Financial Officer Susan M. Diamond made during the Class Period about the Company's core Medicare Advantage business.

2.      As the country emerged from the COVID-19 pandemic in mid-2022, investors were hyper-focused on healthcare utilization trends (i.e., patient demand for services) for companies like Humana. During the pandemic's peak, the Company had enjoyed record profits because its members had deferred medical care, leading to abnormally low utilization. This meant Humana paid out fewer claims, and reported more as profits. As such, investors questioned whether a pendulum-like spike in utilization would lead to a sharp decline in Humana's recent profitability.

3.      At every turn, Defendants assured investors during the Class Period that the Company was continuing to experience favorable trends in its Medicare Advantage business, which accounted for over 70% of Humana's total revenue. They further assured investors that any pent-up demand—Medicare Advantage members seeking healthcare services they had deferred during the pandemic—had already worked through the system. In fact, Defendants emphasized lower-than-expected demand and downplayed concerns about future utilization increases.

4.      To further ease investor concern, Defendants touted as a competitive advantage and value-driver for Humana its purportedly strong Star ratings—an industry measure that the U.S. Centers for Medicare & Medicaid Services ("CMS") calculates and assigns to assess the quality of Medicare Advantage plans. Star ratings significantly impact Humana's Medicare revenue, as higher ratings can (and did) result in billions of dollars in payments to Humana from CMS.

5.    Unbeknownst to investors though, as the effects of the pandemic dissipated, Defendants knew that the depressed utilization had led to a massive backlog of healthcare needs, including costly elective surgical procedures. Defendants knew this because they closely monitored Medicare Advantage utilization trends, which directly impacted the Company's profitability through its medical loss ratio ("MLR")—the percentage of premium revenues Humana receives and spends on medical care. And Defendants knew that by the beginning of the Class Period, there was a surge in Medicare Advantage members seeking previously deferred medical care, which was significantly increasing healthcare utilization among the Company's members. Moreover, Defendants knew from Humana's internal Star rating analysis that the Company faced an impending decline in its Star ratings, which would drive down its revenue.

6.    Rather than disclose these facts, Defendants actively concealed them by suppressing and attempting to offset rising utilization costs through improper denials of claims and prior authorizations for healthcare services. At the same time, Defendants implemented destructive cost-cutting measures and headcount reductions. These measures further imperiled customer service, the quality of Humana's Medicare Advantage plans, and its Star ratings, leaving critical departments and functions understaffed and alienating providers and patients.

7.    None of these facts—confirmed by *more than 20* former Humana employees situated throughout the Company, including in management roles—were disclosed. Instead, Defendants lied, time and again. When the relevant truth was gradually revealed to the market over six partial corrective disclosures beginning in June 2023, the price of the Company's securities cratered, causing substantial damage to investors.

8.    Humana is a health insurance company that provides medical benefit plans to approximately 17 million members across the United States. The Company regularly refers to Medicare Advantage as "[t]he core franchise of our business[.]" Medicare Advantage plans provide an alternative for health and drug coverage for those typically covered by Medicare— people over 65 and those with particular disabilities. These plans cover all benefits of original Medicare, such as hospital-related care, doctor visits, outpatient procedures, and preventive care,

while commonly offering additional benefits, such as vision, dental and hearing benefits, often with no additional premium.

9.      As of October 2024, Humana offered 39 Medicare Advantage plans across the nation, including both individual and group Medicare plans. On an annual basis, the vast majority of Humana's revenue is generated by its Insurance segment, primarily from these Medicare Advantage plans. More than 80% of Humana's total revenue came from Medicare-related revenue in 2021, 2022 and 2023, with Individual Medicare Advantage alone generating more than 70%.

10.     Humana is one of a handful of companies that dominate the heavily concentrated market for Medicare Advantage plans. In 2024, just four companies—Humana, UnitedHealth Group Inc. ("UnitedHealth"), Blue Cross and Blue Shield affiliates and CVS Health—accounted for 73% of all Medicare Advantage enrollees. The two largest players are Humana and UnitedHealth, with 18% and 29% market share, respectively.

11.     Medicare Advantage is overseen by CMS, which contracts with public and private organizations to offer various types of health plans to Medicare-qualified beneficiaries. Medicare Advantage organizations like Humana receive monthly CMS payments calculated using a multi-part payment system, discussed below. Since payments from CMS remain fixed in a given year regardless of actual care costs, Humana's profits—the spread between CMS payments and premiums and actual medical costs Humana must pay—depend on its ability to accurately monitor and manage its Medicare Advantage enrollees' healthcare needs and demand for services.

12.     In addition to these monthly CMS payments, Humana generates significant revenue in the form of bonus payments and rebates tied to its Star ratings. The Star ratings system is CMS's comprehensive quality evaluation system for Medicare Advantage plans. Operating on a 1-to-5 scale, the system serves two critical functions: providing Medicare-eligible consumers with comparative quality information to aid plan selection, and determining quality bonus payments and rebates paid to Medicare Advantage organizations. As Humana put it, "Medicare Star ratings offer a clear and simple overview of a plan's quality and performance."

13.     Of particular importance to investors, high Star ratings provide significant financial benefits to Medicare Advantage organizations like Humana. Plans achieving four stars or higher receive a 5% increase on their CMS benchmark payment (the maximum payment for a Medicare Advantage enrollee) and generate larger rebates. This additional revenue is substantial: across 2023 and 2024, Humana received $4.8 billion in Star rating bonus payments, averaging over $400 per enrollee. Thus, Star rating-based quality bonus payments materially impact Humana's revenues.

14.     The COVID pandemic had a significant impact on the United States healthcare system, including reduced overall healthcare utilization, changes in the way costs were incurred by insurance companies, and a growing healthcare labor shortage. Beginning in 2020, Humana's Medicare Advantage members deferred seeking various forms of healthcare, such as elective procedures (i.e., services that are not immediately medically necessary) and dental treatment. As a result, the Company paid out significantly fewer benefits relative to premiums and recorded booming profits. Despite the significant disruptions caused by the pandemic, Humana's Medicare Advantage membership grew. All told, from 2020 to 2021, while Humana's Medicare Advantage utilization declined significantly, its Medicare Advantage enrollment increased by more than 11%.

15.     Investors embraced these positive results, and Humana's stock price hit a series of record highs, closing at $563 in November 2022—an increase of over 22% from the previous year and an all-time high. At the same time, investors questioned whether Humana could maintain its impressive performance as the pandemic wound down. These concerns were amplified by Humana's announcement in January 2022 that it was cutting its outlook for member growth for 2022, signaling a weakening competitive position. In response, in February 2022, Humana announced a plan to achieve $1 billion in "sustainable cost reductions."

16.     From there, beginning at the start of the Class Period in July 2022 and continuing until June 2023, Defendants assured investors that utilization remained lower than expected and that Humana was not seeing a surge in pent-up demand as pandemic effects dissipated. For example, on July 27, 2022, Defendant Diamond touted the "***outperformance particularly in our***

*individual MA business*," claiming that "*we are seeing better-than-expected results . . . based on the—primarily the lower inpatient utilization*." On September 15, 2022, Diamond assured investors that utilization "*continue[d] to trend lower than what we would consider baseline trend levels*." On January 9, 2023, Diamond emphatically claimed that "*there really isn't pent-up demand that we have to be concerned about*." And on February 1, 2023, Diamond stated in no uncertain terms that "*based on all the analysis we've done, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system*."

17.     These statements were materially false or misleading, and Defendants knew it. As alleged herein, including from the consistent and corroborative accounts of former Humana employees, the Company experienced a massive, internally-anticipated increase in utilization as COVID wound down. These former Humana employees establish that throughout this period, the Company tracked Medicare Advantage utilization in real-time through sophisticated monitoring systems, which showed sharp increases in both inpatient and outpatient utilization. The former employees also establish that Humana took aggressive, undisclosed actions to artificially suppress this surge, including by diverting and denying patient care by denying claims and prior authorizations.

18.     Defendants Broussard and Diamond had direct knowledge of these facts. Among the Company's many internal reporting systems, Humana maintained a Tableau-based dashboard that generated weekly and monthly utilization reports for senior management. Additionally, Broussard and Diamond received "Weekly COVID Reports" tracking member utilization data, and Broussard personally attended monthly Special Projects meetings and quarterly Joint Operation Committee meetings in which employees presented current utilization data showing dramatic increases. By 2023, Broussard openly acknowledged the problem in internal "townhall" meetings and sent emails within Humana blaming its financial issues and ongoing layoffs on increasing pent-up demand for healthcare services. Each of these facts is confirmed by former Humana employees.

19.     As a result of the measures Defendants took to suppress the burgeoning costs of rising demand, they were able to maintain a false narrative that Humana's record profitability seen at the height of the pandemic was sustainable.

20.     To further this façade, alongside their misstatements denying any pent-up demand, Defendants repeatedly touted Humana's Star ratings as a "***durable***" competitive advantage in press releases, conference calls, and SEC filings. For example, on January 9, 2023, Diamond touted the Company's "stars results" as "***durable***" and a "***differentiated advantage***." On March 7, 2023, Broussard proclaimed Humana's Star ratings "***created this ability not only to compete by the product itself, but also the ability to have dependability over multiple years***," adding that "***our Stars performance will carry us farther than others in [] 2024***." Similarly, in the Company's March 8, 2023 Proxy Statement, Defendants stated that Humana's "***Star Ratings continue to reflect the Company's unwavering focus on high quality of care, patient-centered clinical outcomes and reliable customer service for members***."

21.     Here, too, the truth behind the scenes stood in stark contrast to Defendants' representations. Though they had promised the market that Humana would deliver "sustainable cost reductions," Defendants concealed that their aggressive cost-cutting measures and utilization management practices were actively undermining the quality of Humana's Medicare Advantage plans. Here, former employees revealed that Humana: (i) dismantled units that had historically driven incremental quality improvements; (ii) eliminated local outreach programs that helped ensure patient compliance; (iii) reduced staff in care coordination roles affecting patient outcomes; and (iv) cut preventive care initiatives critical to maintaining Star metrics. These cuts led to growing backlogs, appointment delays, and declining customer service levels that directly impacted Humana's Star ratings. The results of these efforts were reflected in internal reports, including Quarterly Stars Updates in 2023 that showed "significant" underperformance in various segments of the Company.

22.     Investors only began to learn the truth about Humana's declining Medicare Advantage profitability on June 13, 2023, when UnitedHealth, Humana's primary competitor,

revealed that it was seeing "higher levels" of outpatient care activity and suggested that higher utilization rates were due to "pent-up demand or delayed demand being satisfied." As confirmed by investment analysts, given the similarities in Humana's and UnitedHealth's businesses, and the likelihood that Humana was also suffering from increased utilization and costs due to pent-up demand, the price of Humana common stock declined $57.63 per share, or more than 11%.

23.    Three days later, on June 16, 2023, Humana admitted that it was also seeing "higher than anticipated non-inpatient utilization trends." Although the Company re-affirmed its full year insurance segment benefits expense ratio guidance (a key measure of profitability) of between 86.3% and 87.3%, it warned investors that it "now expects to be at the top end of this full year range"—i.e., reduced profitability. Additionally, Humana explained that it now "assume[d] it will continue to experience moderately higher-than-expected trends for the remainder of the year." On this news, the price of Humana common stock declined $18.20 per share, or almost 4%.

24.    In partial disclosures that followed in November 2023 and January 2024, Humana revealed that its Medicare Advantage utilization had continued to rise unabated, ultimately forcing the Company to report a net loss for 4Q 2023 and to lower its earnings per share guidance. These disclosures caused Humana's common stock price to decline 8% on November 1 and 2, 2023, 7.99 on January 18, 2024 and 11.69% on January 25, 2024.

25.    Still, Defendants gave comfort to investors and stemmed Humana's stock price declines from these disclosures by continuing to misrepresent Humana's ability to offset increased utilization and by concealing the known risks inherent in this strategy. For example, Diamond told investors on November 1, 2023 that Humana could offset rising utilization costs through "***incremental mitigation***," and on January 25, 2024, claimed that "***we were able to successfully mitigate that pressure*** . . . ***through multiple levers, including administrative cost -- further administrative cost reductions***." Alongside these assurances, Defendants continued to tout Humana's "***industry leading Stars scores***" as a purported bright spot. For example, in Humana's March 8, 2024 Proxy Statement, Defendants again claimed that "***Our commitment to quality of***

***care, patient-centered clinical outcomes and customer service is reflected in the consistent strength of our MA plan's Star Ratings*.**"

26.     But Defendants failed to disclose that the cost-cutting measures they claimed would offset the growing costs from increased utilization were already severely undermining services that were critical to Humana's Star ratings. And, contrary to their misrepresentations, Defendants had no operational levers left to pull to offset escalating utilization costs without further sacrificing the quality of Humana's plans, and thereby its much-touted Star ratings. With investors left in the dark, these continued misrepresentations ensured that the price of Humana securities remained artificially inflated.

27.     The full consequences of Defendants' efforts to conceal Humana's declining profitability only became fully apparent to the market in October 2024. At that time, the Company confirmed a shocking decline in many of its plans' Star ratings—94% of its members in Medicare Advantage plans rated 4 Stars or better had declined to a meager 25%—leading to a further stock price decline of $70.25 per share, or 22.18%. The decline in Humana's Star ratings directly resulted from Defendants' actions during the Class Period to suppress utilization and cut costs to offset rising utilization expenses.

28.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of Humana's securities following the disclosure of the relevant truth, Plaintiff and other members of the Class (defined below) suffered significant damages. This lawsuit followed.

## II.     JURISDICTION AND VENUE

29.     Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Humana is incorporated in this District and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

32.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

33.     Plaintiff SEB Investment Management AB is one of the largest asset managers in Northern Europe. Headquartered in Stockholm, Sweden (corporate identity number 556197-3719), SEB offers a broad range of funds and tailored portfolios for institutional investors, as well as for retail and private banking clients. As set forth in the certification attached hereto as Exhibit A, SEB purchased or otherwise acquired Humana securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Defendants

34.     Defendant Humana Inc. is a Delaware corporation, with its principal executive offices at 500 West Main Street, Louisville, Kentucky 40202. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HUM."

35.     Defendant Bruce D. Broussard is the Company's former Chief Executive Officer ("CEO"), serving in that role from January 1, 2013 until July 2024. During that period, Broussard

also served as a Director on Humana's Board. Prior to those roles, Broussard served as President of Humana from December 2011 through December 2012. Since stepping down as CEO, Broussard has served as a strategic advisor to Humana.

36.     Defendant Susan M. Diamond is the Company's Chief Financial Officer ("CFO"), having served in this role since June 2021. Diamond joined Humana in June 2004, and has spent the majority of her career in various leadership roles in the Medicare and Home businesses, with a particular focus on the Company's individual Medicare Advantage and Stand-Alone Medicare Part D offerings. Prior to becoming CFO, Diamond was Segment President, Home Business. Diamond also served for two and a half years as the Enterprise Vice President of Finance, where she was responsible for enterprise planning and forecasting, trend analytics and had responsibility for each of Humana's line of business CFOs and controllers.

37.     Broussard and Diamond are collectively referred to herein as the "Individual Defendants." Humana and the Individual Defendants are collectively referred to herein as "Defendants."

38.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control, and did in fact control, Humana's public statements, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, the Individual Defendants were directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market, including their own personal prepared remarks on Humana's quarterly earnings calls. In addition, each Individual Defendant was provided with copies of the Company's statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

## IV.    FORMER HUMANA EMPLOYEES[1]

39.    FE-1 was employed at Humana for over ten years, including in a Special Projects role from 1Q 2022 through 2Q 2023. In this role, FE-1 reported to a Senior Vice President, who reported directly to Alan Wheatley, the President of Humana's Retail segment (which included Medicare Advantage) and who was a member of Humana's executive team. FE-1 stated that the Special Projects unit held monthly meetings with Humana executives to provide updates on various areas of the Company's operations, including utilization management, the CMS Stars program, Call Center operations, research, and clinical matters. FE-1 stated that these meetings were held virtually via Zoom. FE-1 said that Defendant Broussard would attend many of these meetings as would multiple members of the executive team. FE-1 specifically recalled that in addition to Broussard, the following Humana executives participated in the Special Projects monthly meetings: Senior Vice President of Medicare and Medicaid Jim Moore, who was "in almost all meetings"; Senior Vice President Erika Pabo, who was "in a lot of them"; Retail Segment President Wheatley, who was "in some meetings"; George Renaudin, who was "in some meetings after taking over for Wheatley" as President of the Insurance Segment; Senior Vice President in Clinical Strategy & Analytics Cary Trainor; and Associate Vice President of Humana's Author subsidiary, Kristi Cooper, who was "involved in a lot" of the meetings. FE-1

---

[1] All former Humana employees ("FE") are referred to using masculine pronouns to protect their anonymity.

stated that Broussard's "handlers"—Corporate Director Dr. Deb Clary Gmelin and Associate Vice President Margie Nieman—also attended the Special Projects monthly meetings. Through these meetings, FE-1 learned of the anticipated decline in the Company's Star ratings, increased utilization, and efforts to suppress and manage demand through claim denials and redirecting members to less costly care settings.

40.     FE-2 was employed by Humana in numerous roles for over nine years, including as a Regional Vice President from 1Q 2019 through 1Q 2022 and as a National Director in the area of Utilization Management from 1Q 2022 into 2Q 2024. During his time as a Regional Vice President, FE-2 served on the Company's Trend Committee, which consisted of high-level corporate and Vice President segment leaders that monitored the Company's financial and operational performance, including over- and under-utilization trends. Among other responsibilities, FE-2 oversaw a team of nurses and physicians tasked with reviewing all outpatient denials and all appeals of prior authorization denials, including denials of inpatient, outpatient, and post-acute care (i.e., care after recovery from an illness or injury that would be treated in a hospital).

41.     FE-3 was employed by Humana for over ten years until 1Q 2021. From 2019 until his departure from the Company, FE-3 was Health Services Director for one of Humana's Medicare Regions. In this role, FE-3 tracked weekly and monthly utilization and cost trends and worked to keep the Region within the budget set at the corporate level. FE-3 oversaw a team of approximately 200 members that was responsible for reviewing cases for inpatient hospital stays, inpatient rehab, long-term care, and Skilled Nursing Facility admissions. FE-3 reported to an Associate Vice President, who reported to the Region's Medicare President.

42.     FE-4 was employed by Humana as an actuary from late 2015 until the end of 2022. In this role, FE-4 was responsible for, among other things, working on the Company's actuarial models for statutory reserving for Medicare Advantage, which focused on ensuring that Humana reserved enough revenue to cover members' medical expenses for the year. FE-4 reported to an Actuary Director.

43.     FE-5 was employed by Humana for over ten years, including as an Enterprise Analytics Strategy Advancement Manager and Analyst from early 2023 to 2Q 2024. FE-5 reported to a Director, Strategy Advancement, who reported to the Vice President, Enterprise Analytics and after July 2023, to the Senior Vice President and Chief Information Officer – Digital, Data, and Analytics. Prior to working in Enterprise Analytics, FE-5 worked in Humana's Health Care Quality Reporting and Improvement group ("HQRI"), which supported the Medicare and Medicaid units, including Humana's Medicare risk adjustment function. In that role, FE-5 reported to Wheatley (Retail Segment President).

44.     FE-6 was employed by Humana in various roles for over ten years until 1Q 2023, including as Stars Improvement Lead for the one of Humana's regions from 1Q 2020 until 1Q 2023. As a Stars Improvement Lead, FE-6 led a team of eight nurses working with providers to improve their Star ratings. FE-6's region covered at least 65 providers, including large provider groups. FE-6's regional leadership included a Director, Go-to Market Strategies and Sales Enablement, an Associate Vice President, Stars Program Delivery and Director, Stars Innovation Portfolio Strategy, and a Director – Stars Improvement.

45.     FE-7 was employed by Humana from 2015 to late 2024, including as a Provider Engagement Executive from before the Class Period to early 1Q 2024. From 2022 to the end of 2023, FE-7 supported approximately ten groups of primary care physicians, who oversaw

approximately 10,000-15,000 Humana Medicare Advantage patients. FE-7 served as the liaison between physician groups and Humana and dealt with claims issues, risk adjustment issues, and contracting issues. During 1Q 2024 and until 3Q 2024, FE-7 worked as a Manager of Care Coordination and then as an Associate Director of Care Coordination in a midwestern market.

46.     FE-8 was employed by Humana as a Utilization Review Nurse from late 2022 to mid-2023, covering hospital systems in several states and worked primarily with acute care inpatients. In this role, FE-8 reviewed Medicare Advantage member claims to recommend approval or denial.

47.     FE-9 was employed by Humana from prior to the Class Period until 2Q 2023, first in Service Alignment and then in a senior role in Value Based Programs. In the latter role, FE-9 managed a national team of eight employees who performed audits of Value-Based contract language, mostly for Humana's large primary care physician group partners. In FE-9's Service Alignment role, FE-9 worked on the Operations side, including by supporting physician groups and hospitals with operational issues.

48.     FE-10 was employed by Humana for over ten years, through 3Q 2023, as a Principal Data Scientist. FE-10's responsibilities included: (i) analyzing healthcare data and reviewing diagnostic codes to help Humana better understand where care needs were coming from and what treatments were effective; (ii) using risk adjustments to assess members' care needs; and (iii) developing quality measures for risk adjusted assessments of physician practices. FE-10 reported to a Manager of Clinical Analytics & Outcomes.

49.     FE-11 was employed by Humana as a Senior Stars Improvement Clinical Professional from 2016 until mid-2024. FE-11's role involved ensuring that Humana's Medicare Advantage plans achieved quality outcomes in care. FE-11 worked with network providers to

ensure sure they fulfilled CMS requirements and metrics of service. FE-11 reported to a Manager of Humana's Southeast division, who reported to a Regional Vice President, Network Performance.

50.    FE-12 was employed by Humana for over twelve years, including as an Associate Director of Stars Improvement from 2Q 2020 through 1Q 2023. In this role, FE-12 was responsible for Medicare Advantage Stars performance in a mid-Atlantic region with roughly 450,000 beneficiaries. FE-12 was responsible for a number of provider contracts in this territory. FE-12 had several direct reports working under him and reported to the region's Provider Engagement Director, who reported to a Regional Vice President and the East Region President of Medicare Operations.

51.    FE-13 was employed by Humana as a Field Sales Agent from 2017 through the summer of 2023 in a large Southwestern market. In this role, FE-13 handled a sales book of roughly 1,000 Medicare Advantage members and served as the point of contact for customer service, which included helping Medicare Advantage members obtain benefits under their plan. As part of FE-13's responsibilities, he assisted clients in senior centers and assisted living facilities with changes in primary care doctors, medication, prior authorizations for service and interactions with the network of home healthcare providers. FE-13 reported to the Senior Market Manager.

52.    FE-14 was employed by Humana from before the Class Period until the fall of 2022, including as a Director, Medicare Stars and Risk Adjustment. In this role, FE-14 worked in Humana's Central Region, which included several states, and oversaw record retrieval, assessment forms, electronic medical record connectivity, and acted as a Project Manager for risk adjustment activities involving Humana's Star rating teams. FE-14 reported to the Region President.

53.     FE-15 was employed by Humana in various roles for nearly twenty years until 1Q 2024, including as a Market Finance Lead from before the Class Period to the end of his tenure. In that role, FE-15 worked with a team of three to four finance professionals that supported each of the five states in FE-15's region, which included roughly 100 benefits plans and 600,000 members. FE-15 reported to a Regional Vice President of Operations and Regional CFO, who reported to the East Region President of Medicare Operations.

54.     FE-16 was employed by Humana in Medicare post-appeals from 3Q 2021 to 1Q 2023. In this role, FE-16 reviewed appeals on claims that had been denied or adjusted after the service was rendered by the provider. FE-16 worked with approximately 20 others in his group and estimated that Humana had 100-200 post-appeals staff across the entire Company.

55.     FE-17 was employed by Humana as a senior MarketPoint employee from 2014 until the fall of 2023. FE-17 worked under a Director, Market Integration and a Regional Vice President of Sales, MarketPoint. FE-17 worked in Northeast Texas, which had one of the largest Medicare Advantage-eligible populations in the country.

56.     FE-18 was employed by Humana from the fall of 2016 to 2Q 2023 as a Coordinator in Utilization Management. FE-18 worked at a Humana subsidiary in Florida, which offers HMO (Health Maintenance Organization) plans to Medicare beneficiaries. HMOs provide care through a participating network of providers. FE-18 was responsible for the pre-authorization process of submitted claims for medication and other treatments, including review of claims documentation to make recommendations to approve or deny, based on Humana's internal guidelines. FE-18 reported to the Director of Utilization Management for his market.

57.     FE-19 was employed by Humana as a Provider Engagement Executive in the Southeast and, later, the Northeast region, from before the Class Period until 4Q 2023, when FE-

19 was laid off (with many others). In the latter role, FE-19 was responsible for providers in several Northeast states, and analyzed and accounted for provider production, financials and Star ratings. He also analyzed providers' utilization. FE-19 reported to a Director of Provider Engagement.

58.     FE-20 worked at Humana as a mid-level manager from prior to the Class Period to 2Q 2023. FE-20 worked in the Pacific Southwest Region and reported to a Health Care Director, who reported to the Regional Medical Director, who reported to a Regional Vice President. As part of his responsibilities, FE-20 reviewed authorizations submitted by medical groups, and assessed the quality, sufficiency, and accuracy of the documentation. FE-20 and his team dealt mainly with Medicare Advantage.

59.     FE-21 was employed by Humana as a Stars Program Director for a western region from before the Class Period through 1Q 2023. FE-21 was responsible for the Clinical Quality afforded Medicare Advantage patients in his three states. FE-21 supervised 18 direct reports, and reported to a Vice President in his territory.

60.     FE-22 was employed by Humana in several remote positions from 2016 on, including as a manager in the Home Health Utilization Management group from the fall of 2022 through the summer of 2023. In this role, FE-22 had approximately 14 direct reports, and reported to associate directors for the Home Health group. Prior to that role, FE-22 worked as a Stars Improvement Professional during 2022, and before that, in Utilization Management for acute care in one of Humana's regions.

## V.    FACTUAL ALLEGATIONS OF DEFENDANTS' FRAUD

### A.    Company Background

61.     Founded in 1961, Humana is an insurance and healthcare company that, since the early 2000's, has transformed from a traditional insurer to a company focused primarily on

administering Medicare Advantage programs. Humana also administers pharmacies, primary care facilities, and home care.

62.    Humana began offering insurance plans in 1984. Following the Medicare Modernization Act of 2003 (described further below in Section V.B), the Company reinvented itself as a provider of healthcare benefits to seniors through Medicare Part C ("Medicare Advantage" or "MA") and Medicare Part D Prescription Drug Plans ("PDP"). As of September 2024, Humana had approximately 16.3 million total members in its medical benefit plans and 5.6 million members in its individual Medicare Advantage plans.

63.    In December 2022, Humana reorganized its operations from three segments into two. Previously, the Company operated Retail, Group and Specialty, and Healthcare Services segments. The Retail segment included Humana's individual insurance products, including Medicare Advantage plans, standalone Medicare prescription drug plans, and state-based Medicaid. Whereas Medicare is federal health insurance for anyone age 65 and older (and people under 65 with certain disabilities or conditions), Medicaid is a joint federal and state program that provides health coverage for people with limited income and assets.

64.    The Group and Specialty segment included employer group commercial fully-insured medical and specialty health insurance benefits, including dental, vision, and life insurance. The Healthcare Services segment provided pharmacy, primary care, and home services.

65.    Under the Company's current structure, Humana operates through two segments: Insurance and CenterWell. The Insurance segment, formed by consolidating the Retail and Group and Specialty segments, oversees all insurance plans, including Medicare Advantage, and the pharmacy benefit manager program. The CenterWell segment (formerly Healthcare Services) provides pharmacy, primary care, and home services. CenterWell also operates senior-focused

primary care centers in multiple states. When announcing its reorganization in July 2022, Humana characterized it as creating a "simpler structure [that] will create greater collaboration across the Insurance and CenterWell business and will accelerate work that is underway to centralize and integrate operations."

66.    The vast majority of Humana's revenue is generated by the Company's Insurance segment, primarily from Medicare Advantage plans. As of October 2024, Humana offered 39 such plans across the nation. The Company regularly refers to Medicare Advantage as "[t]he core franchise of our business[.]" The below table shows the contribution of Individual Medicare Advantage and all Medicare-related revenue to Humana's total revenue in 2021, 2022 and 2023:

| Revenue (in billions) | 2021 | 2022 | 2023 |
|---|---|---|---|
| Total Revenue | $83.064 | $92.870 | $106.374 |
| Insurance Segment Revenue (% of Total) | $80.675 (97.1%) | $88.562 (95.4%) | $102.272 (96.1%) |
| Individual Medicare Advantage Premium Revenue (% of Total) | $58.654 (70.6%) | $65.591 (70.6%) | $78.837 (74.1%) |
| Total Medicare-Related Premium Revenue (% of Total) | $67.980 (81.8%) | $75.157 (80.9%) | $87.895 (82.6%) |

67.    Humana's annual reports filed on Form 10-K with the SEC emphasize that the growth of its Medicare business is "an important part of [its] business strategy," note "the concentration of [its] revenues in these products," and state that the Company has made "substantial investments" to "enhance [its] ability to participate in these programs."

68.    In addition to Individual Medicare Advantage plans, Humana offers Group Medicare Advantage plans and Medicare stand-alone prescription drug plans. Group Medicare plans enable employers to replace traditional Medicare or supplement products with Medicare Advantage, and typically offer enhanced benefits, including prescription drug gap coverage, to

match pre-retirement benefit structures. Group Medicare premium revenue comprised 6.5% of total Company revenue in 2023. Stand-alone Medicare prescription drug plans ("PDP") consist of plans offering basic coverage with benefits mandated by Congress, as well as plans providing enhanced coverage with varying degrees of out-of-pocket costs for premiums, deductibles, and co-insurance. Standalone PDPs comprised approximately 2% of total Company revenue in 2023.

69.    Humana also generated a small portion of its Insurance segment revenues from various non-Medicare Advantage sources, including contracts with state governments—such as Florida and Ohio—to cover Medicaid-eligible persons. Humana generated approximately 8% of total revenue in 2023 from these Medicaid contracts.

**B.    Medicare Advantage**

70.    Medicare was established in 1965 as a way to allow retirees to keep their doctor when they lost employer-provided coverage. Originally known as Medicare+Choice, Medicare Advantage was established as part of the Balanced Budget Act of 1997 and became effective in January of 1999. Medicare Advantage enabled CMS to contract with public and private organizations to offer various types of health plans to Medicare-qualified beneficiaries.

71.    Medicare Advantage plans cover all benefits of original Medicare Part A (hospital-related care) and Part B (doctor visits, outpatient, and preventive care) while commonly offering additional benefits, such as vision, dental and hearing benefits, often with no additional premium.

72.    Unlike original Medicare, which covers care at any hospital accepting Medicare, Medicare Advantage beneficiaries typically can only receive care from doctors and hospitals within their plan's network. These beneficiaries must pay both the Medicare Part B monthly premium and any premium charged by their Medicare Advantage plan.

73.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA") significantly transformed the program, including by renaming it from

Medicare+Choice to Medicare Advantage. The MMA expanded plan options to include regional

Preferred Provider Organizations and special needs plans, while mandating that all Medicare

Advantage coordinated care plans offer prescription drug coverage. It also dramatically increased

private organization participation incentives, leading to extraordinary growth for companies

offering Medicare Advantage plans. By 2023, Medicare Advantage enrollment reached 31 million

beneficiaries, representing more than half of all Medicare-eligible individuals.

74.    The market for Medicare Advantage plans is heavily concentrated, with a handful

of dominant companies. In 2024, four companies—Humana, UnitedHealth, Blue Cross and Blue

Shield affiliates and CVS Health—accounted for 73% of all Medicare Advantage enrollees. The

two largest players are Humana and UnitedHealth, with 18% and 29% market share, respectively.

### 1.    Medicare Advantage Payment Structure

75.    CMS compensates Medicare Advantage companies like Humana through monthly

payments based on estimated enrollee care costs, calculated using two key factors: (i) the base rate

and (ii) certain risk adjustments. The base rate is the fixed rate that CMS pays to Medicare

Advantage plans to cover each beneficiary's care. After the base rate is determined, CMS uses a

risk adjustment system to modify a plan's base rate to reflect the health status of each enrollee.

This ensures capitated payments made to Medicare Advantage plans reflect the expected cost of

providing healthcare to each beneficiary.

76.    Companies submit bids to CMS reflecting their estimated monthly revenue

requirements for an average-risk enrollee. CMS compares these bids against actuarially

determined benchmark amounts for each geographic area. These benchmarks, representing the

maximum federal payment for a Medicare Advantage enrollee, range from 95% to 115% of

estimated original Medicare spending in the same area. Plans bidding above the benchmark must

charge the enrollee the difference as a premium, while those bidding below the benchmark receive 50% to 70% of the savings as a rebate from CMS.

77.    The risk adjustment component of the monthly CMS payments, calculated annually for each enrollee based on health and demographics, measures expected individual member costs compared to average enrollees, taking into account enrollee-specific factors like disease. This measure is fundamental to a Medicare Advantage organization's business model, as monthly CMS payments remain fixed regardless of actual care costs. Therefore, Medicare Advantage organizations' profitability depends on the accuracy of risk adjustment calculations, determining whether they profit or lose money on the spread, or difference, between CMS payments and premiums they receive and actual medical care costs they pay out.

78.    Accurate risk adjustment calculation at the individual level relies on diagnoses made during face-to-face provider-patient interactions, supported by medical documentation. Organizations assign codes to diagnoses, which CMS maps into condition categories based on clinical characteristics, severity, and cost implications. Only the most severe condition category factors into the risk score calculation. For certain diagnosis combinations, such as lung cancer with an immune disorder, CMS also assigns a "disease interaction" factor.

79.    Importantly, risk adjustment measures change only in the year following a diagnosis, making it crucial for Medicare Advantage organizations to ensure proper patient evaluation and diagnosis, which allows for accurate revenue prediction.

### 2.    Medical Loss Ratio

80.    Humana describes MLR as one of "two key statistics to measure [its] performance." Also referred to as benefit ratio, benefit expense ratio and medical expense ratio, MLR is the percentage of premium revenues that an insurance company spends on medical services provided to its members. MLR is calculated by taking total benefits expense—i.e., utilization, which is the

cost of medical care utilized by plan members in a given period—plus quality improvement expenses as a percentage of premiums revenue, which is the amount Humana receives from CMS and from members during that period. Humana's other key performance metric is operating cost ratio, which is used to measure administrative spending efficiency.

81.    A substantial portion of Humana's premiums revenue is used to cover member healthcare costs, including claims, estimated future payments to hospitals, and capitation payments to providers (a risk sharing model under which Humana prepays providers a monthly fixed fee per member to cover all or a defined portion of benefits to the member). In 2023, Humana generated over $101 billion in premium revenue and spent over $88 billion on benefits expenses.

82.    Because premiums are fixed for one-year periods, costs exceeding benefit cost projections typically cannot be recovered within that contract year. Several factors may cause actual healthcare costs to exceed estimated future claim costs, including: (i) increased medical facility use and service costs, referred to as "patient utilization"; (ii) increased prescription drug use or costs, including specialty drugs; (iii) new or more expensive treatments, drugs, and technologies; (iv) variances between actual and estimated costs for new products, benefits, or business lines; and (v) changes to utilization-affecting functions like preauthorization requirements.

83.    During the Class Period, Humana actively monitored and sought to manage the level of utilization among its Medicare Advantage members in an effort to contain benefit expenses, a practice referred to as "utilization management." Indeed, Defendants stated throughout the Class Period that Humana engages in "utilization management functions such as preauthorization of services, concurrent review or requirements for physician referrals."

84.     The Affordable Care Act of 2010 established a requirement that plans spend at least 80-85% of premiums revenue, depending on plan size, on care and adjusted risk measures to counter more intensive diagnostic risk coding by plans relative to traditional Medicare. Despite analyst predictions of plan withdrawals, Medicare Advantage enrollment increased 80% from 2009 to 2017.

### 3.     Risk Adjustment Data Validation

85.     Federal law mandates that payments made to Medicare Advantage organizations be based on the anticipated cost of providing Medicare benefits to a given beneficiary, with larger payouts given where there is a documented need for more intensive use of healthcare resources. To determine these estimated costs, CMS requires Medicare Advantage organizations to collect diagnosis codes from healthcare providers based on information documented in medical records and submit the codes to CMS. CMS then maps diagnoses into categories based on similar clinical characteristics, severity and cost implications, and assigns a weight to be used in calculating risk scores (as discussed above in ¶ 78).

86.     CMS calculates an individualized risk score using the values from diagnoses for each enrollee on an annual basis, and then makes monthly payments to Medicare Advantage organizations based on the risk scores. This process determines the risk score payment from CMS, which is made in addition to payments made on a plan's base rate.

87.     CMS and OIG conduct Risk Adjustment Data Validation ("RADV") audits to verify Medicare Advantage organizations' risk adjustment submission accuracy. These audits enable CMS to claw back overpayments for unsupported or inappropriate diagnosis codes. RADV is the primary system for detecting risk adjustment abuse through inappropriately severe diagnosis code submissions, i.e., "upcoding," by Medicare Advantage organizations seeking to garner higher monthly payments.

88.    On January 30, 2023, rule CMS-4185-F2 codified CMS's authority to extrapolate RADV audit findings beginning with payment year 2018. Overpayment amounts are determined by applying error rates from small enrollee data samples across entire plans. In addition, the rule removed a Fee-for-Service Adjuster ("FFS Adjuster") that had operated to offset the preliminary recovery amounts determined by RADV audits. The FFS Adjuster was supposed to account for differences in coding between Medicare Advantage plans and traditional Medicare environments, resulting in documentation requirements that were more in line with Medicare's FFS structure, and lowering alleged overpayments. CMS estimated that the new rule would allow for the recovery of more than $4.7 billion in alleged overpayments made to Medicare Advantage organizations over the ensuing nine years. These changes significantly increased the exposure of Humana and its Medicare Advantage peers based upon alleged overpayment findings and greatly reduced the profitability of overcharging CMS based on incorrect coding practices.

89.    Recognizing the potential negative effect of the new rules, Broussard stated on February 1, 2023 that Humana was "disappointed CMS' final rule did not include a fee-for-service adjuster in the process."

### 4.    The Star Rating System

90.    The Star rating system is CMS's comprehensive quality evaluation system for Medicare Advantage plans. Reflecting the importance of its Star ratings, Humana told the market that "Medicare Star ratings offer a clear and simple overview of a plan's quality and performance."

91.    Operating on a 1-to-5 scale, the system serves two critical functions: providing beneficiaries with comparative quality information for informed plan selection and determining quality bonus payments to Medicare Advantage organizations. These Star rating-based quality bonus payments substantially impact Medicare Advantage organizations' revenues—as Humana acknowledged in its Annual Reports on Form 10-K, "[o]ur Medicare Advantage plans' operating

results may be significantly affected by their star ratings." The Company received total bonus payments of $2.3 billion and $2.5 billion in 2023 and 2024, respectively—an average bonus of $412 and $422 per enrollee.

92.     The CMS comprehensive quality evaluation system assesses five primary categories, weighted to reflect CMS priorities: (i) Outcomes (improvements in beneficiary health); (ii) Intermediate outcomes (actions taken which can assist in improving beneficiary health status, such as controlling blood sugar for a patient with diabetes); (iii) Patient experience (beneficiaries' perspectives on care received); (iv) Access (processes and issues that could create barriers to receiving care); and (v) Process (services provided that assist in maintaining, monitoring, or improving health status).

93.     Plans that provide Medicare Advantage and prescription drug plans are measured on nine "domains" with 42 specific measures. Key individual measures include customer service, member experience, member complaints, getting appointments, quality of care, and plan member attrition. These measures are grouped to create an overall rating, which is calculated from the weighted average Star rating of the measures.

94.     The Star rating system operates on a four-year cycle. In **Year 1** (Measurement Year), Medicare Advantage plans collect performance data on their plans. This includes gathering clinical quality measures using the Healthcare Effectiveness Data and Information Set ("HEDIS"), which is a comprehensive set of standardized performance measures used to evaluate health plan performance. In addition, larger Medicare Advantage plans (such as those Humana offers) must conduct: (i) Consumer Assessment of Healthcare Providers and Systems ("CAHPS") surveys, which is a standardized survey program that collects, analyzes and reports on members'

experiences with healthcare providers, plans, and systems, and (ii) the Health Outcomes Survey, which is a patient-reported outcomes measure used in Medicare Advantage quality assessment.

95.    In **Year 2**, plans submit their compiled data to CMS, which then conducts rating calculations, culminating in the publication of ratings in October of each year. In **Year 3** (Rating Year), Medicare advantage organizations market their plans on the basis of the published Star ratings during the annual election period. In **Year 4** ("Bonus Year"), CMS quality bonus payments and rebates take effect, which, as discussed further below, significantly impact the revenue Medicare Advantage organizations receive from CMS.

96.    As an illustrative example, data collected by Humana in 2023 (Year 1) was used by CMS to calculate the Company's Star ratings in 2024 (Year 2), which were announced in October 2024. Those Star ratings will be in effect throughout 2025 (Year 3), and will be the basis for any quality bonus payments Humana receives in 2026 (Year 4).

97.    The Stars program provides significant financial incentives to Medicare Advantage organizations like Humana through its quality bonus payment structure. Plans achieving four stars or higher receive a 5% increase on their CMS benchmark payment (which is the maximum payment available for a Medicare Advantage enrollee), while plans falling below four stars receive no bonus payment. *See* 42 C.F.R. § 422.258. The amounts are doubled in low-cost counties with higher Medicare Advantage penetration to encourage competition.

98.    Star ratings also affect rebate calculations, with 4.5-star and 5-star plans receiving 70% of the bid-benchmark differential, 3.5- and 4.4-star plans receiving 65%, and those below 3.5 stars receiving 50%. *See* 42 C.F.R. § 422.266. Higher Star ratings thus allow plans to earn more from each Medicare Advantage enrollee, through both a bonus payment and a higher rebate from CMS. In addition, 5-star plans enjoy special marketing privileges, including the ability to enroll

new members outside of the formal annual enrollment periods. Star ratings also can help insurers boost enrollment, as they feature their Star ratings in marketing materials. As Humana told the market during the Class Period, insurers "may use those rewards to reduce member premiums, copays, deductibles or to beef up a plan's added benefits," thereby lowering members' out-of-pocket costs.

99. To achieve and maintain Star ratings, Medicare Advantage organizations are required to implement comprehensive quality improvement programs, including continuous assessments using health information systems that collect and analyze medical data, intervention programs, chronic care improvement programs, provider engagement strategies, and member outreach initiatives. In addition, CMS regulations require that Medicare Advantage organizations conduct annual evaluations of "the impact and effectiveness of [their] quality improvement programs, . . . correct all problems that come to [their] attention through internal surveillance, complaints, or other mechanisms," and make all information collected through these efforts available to CMS. *See* 42 C.F.R. § 422.152.

### C. The COVID Pandemic Significantly Impacted Humana's Core Business

100. The pandemic had several significant impacts on the United States healthcare system, including overall reduced healthcare utilization, changes in the way costs were incurred by insurance companies, and a resulting healthcare labor shortage. The first COVID case was documented in the United States on January 20, 2020, and the pandemic was declared a national emergency on March 13, 2020. By June 10, 2022, United States COVID cases had surpassed two million. The Department of Health & Human Services declared an end to the national emergency on May 11, 2023.

101. From 2020 to 2021, overall use of medical care declined, but Medicare Advantage saw an overall increase in enrollment of 9%. In some parts of the country, demand for hospital

care increased dramatically, while demand for elective or necessary but not urgent care fell across the board. Among the challenges faced by healthcare providers were temporary closures that restricted access for patients, reduced demand for preventive and chronic condition management care, infection screening protocols that increased administrative costs, and a loss of employees. Critical for Medicare Advantage plans was the fact that access restrictions resulted in less patient contact for the purposes of diagnosing and documenting conditions, the essential first step in submitting risk assessments to CMS, which determines the CMS payment for each beneficiary.

102.    The spread of COVID beginning in 2020 significantly affected Humana's business. On one hand, COVID was infecting Humana's Medicare Advantage members—mostly older and more susceptible to severe COVID symptoms—and causing them to seek treatment in inpatient hospital settings. On the other hand, COVID was causing Humana's Medicare members to defer seeking other healthcare, such as discretionary elective surgeries and dental treatment.

103.    As a result of these factors, Humana paid out significantly fewer benefits relative to premiums. In 2020, Humana's MLR was 83.1%, down 2.5% from 2019, due to the "significantly depressed non-COVID utilization." Based on these cost trends, Humana recorded sharply increased profits: 2020 adjusted Earnings Per Share ("EPS") rose $5.21 compared to 2019, climbing to a record high of $25.31 per diluted common share. Its stock price also hit a series of record highs. For example, on November 4, 2020, Humana's stock price closed at $452.01, representing an increase of approximately 52.2% from the previous year and an all-time high.

104.    During this period, journalists and industry analysts commented on the earnings boom that COVID created for Humana and other insurers. On August 5, 2020, *The New York Times* reported that the "staggering pandemic profits [of insurers] stand in stark contrast to the scores of small medical practices and rural hospitals that are struggling to stay open." RBC Capital

Markets, LLC ("RBC") published a report on November 3, 2020, stating "lower utilization in the provider services businesses more than offset[ ] higher COVID related costs."

105.    In 2021, Defendants explained that discrepancy between COVID and non-COVID utilization continued. At the same time, Defendants assured investors that there was no cause for concern about a surge in utilization due to pent-up demand for medical services that had been deferred as a result of the pandemic. During a July 28, 2021 earnings call, Defendant Diamond stated that "*because of the length of time the country has largely been open, that pent-up demand has worked through*." At the November 10, 2021 Credit Suisse Healthcare Conference, Defendant Broussard similarly stated that what "we've seen in the historical aspects of COVID is that when you have a spike in COVID, you have a reduction in the healthcare utilization in the nonessential care." Diamond further assured investors during a November 3, 2021 3Q 2021 earnings call that they did not need to worry about the long-term impact of these trends because "as the COVID utilization comes down," they expected to see "a 1:1 offset in the non-COVID hospitalization." During the December 6, 2021 Bank of America Securities Home Care Conference, Diamond observed that "we have seen consistently that any COVID surge was offset by depression in non-COVID utilization." In other words, Defendants assured investors that there would not be an asymmetrical surge in non-COVID utilization as the effects of the COVID pandemic dissipated, leading to abnormally high overall utilization and lower profitability.

106.    Analysts took note of Defendants' claims and assurances that deferred utilization due to COVID was not a cause for concern. For example, Stephens Inc. ("Stephens") wrote in a report on September 15, 2021: "HUM's guidance assumes that the anticipated declines in non-COVID inpatient and outpatient costs will fully offset the increase in COVID-related costs

experienced from the delta variant." Evercore ISI similarly wrote the following day: "HUM echoed similar commentary, with COVID/non-COVID utilization offsetting each other."

107.    Humana's Medicare Advantage membership growth, financial performance and stock price gains during the periods overlapping with the most significant healthcare disruptions due to the pandemic are reflected in the chart below.

|  | Individual MA Enrollment (Members Added) | Insurance Premium Revenue (in billions) | MLR (Benefit Ratio) | Adjusted EPS | Stock Price High (At Close) During Fiscal Year |
|---|---|---|---|---|---|
| FY 2019 | 3,587,200 (523,200) | $62.9 | 85.6% | $20.10 | $371.00 |
| FY 2020 | 3,962,700 (375,500) | $74.2 | 83.1% | $25.31 | $452.01 |
| FY 2021 | 4,409,100 (446,400) | $79.8 | 86.7% | $22.67 | $471.22 |
| FY 2022 | 4,565,600 (156,500) | $87.7 | 86.3% | $22.08 | $563.00 |

108.    Importantly, at the same time, Defendants emphasized their constant monitoring of member utilization rates and the tools at their disposal to study utilization activity. In response to an analyst question about non-COVID utilization in September 2021, Diamond responded that "[w]e do continue to watch the trends very closely in terms of the type of care our patients are receiving" and that Humana would "continue to monitor [depressed utilization] closely and evaluate it." As described below, numerous former employees confirmed that Defendants closely monitored the Company's Medicare Advantage utilization throughout the Class Period.

**D.    Leading Into The Class Period, Defendants Announced Cost Cuts To Reverse A Trend Of Declining Membership Growth**

109.    As noted above, in 2020 and 2021, Humana saw a surge in individual Medicare Advantage membership. In 2020, enrollment jumped approximately 10.5% to nearly 4 million

Medicare Advantage members. In 2021, Humana's Medicare Advantage membership increased another 11% as the Company added 446,400 new members.

110.    For 2022, Humana stated that the Company expected to grow membership by 325,000 to 375,000 new members. But in January 2022, Humana filed a SEC Form 8-K stating that it was cutting its outlook for member growth for 2022 plans to a range of 150,000 to 200,000, a significant reduction. BMO Capital Markets ("BMO") referred to this miss as "a sharp (and historically unprecedented) cut to its outlook for 2022 [Medicare Advantage] enrollment growth."

111.    After this news, analysts began questioning Humana's outlook. On January 6, 2022, UBS Securities LLC ("UBS") "estimate[d] the updated membership guide could be a potential ~2% EPS headwind versus our [expected] 2022 EPS which had built in membership growth consistent with prior guidance." On January 7, 2022, BMO wrote: "We think HUM's lower guidance for 2022 Medicare Advantage growth is mostly a manifestation of increasing industry competition (i.e., mostly not a company-specific issue). That said, HUM (as the most Medicare Advantage concentrated name in the sector) clearly has the most downside to an incrementally tougher outlook for MA." (emphasis in original).

112.    Defendant Broussard sought to ameliorate these investor concerns on Humana's February 2, 2022 earnings call. In his opening remarks, Broussard emphasized that "a key element of our plan is to return to industry-leading membership growth without negatively impacting earnings growth." To achieve this, Broussard explained that Defendants were "committed to delivering *sustainable cost reductions* in order to create the needed capacity to improve our competitive positioning." Broussard continued that Defendants were "commit[ed] to driv[ing] $1 billion of additional value for the enterprise through cost savings, productivity initiatives and value acceleration from previous investments." Broussard explained that the efforts would "span several

33

areas," highlighting cost cuts to "streamline our operating structure, standardize work and simplify certain processes to eliminate low-value work."

113.    In response to a question about whether the $1 billion was in addition to typical cost saving measures, Broussard confirmed that the $1 billion was "in addition to what we normally have seen over the year [i.e., $300 million]," but that "focusing on investing in our customer is the top priority for us." When asked whether the "growth acceleration could be sustained as we move past 2023," Broussard stated that "our objective in this $1 billion goal is to have a significant amount of the savings to have a sustainable year-by-year." In other words, prior to the Class Period, Defendants sold investors on the notion that they could promote efficiencies within the Company without sacrificing Humana's long-term prospects. However, as alleged below, Defendants did not implement sustainable cost-cutting measures—to the contrary, Defendants' aggressive cuts impaired or removed the Company's core functions that supported patient and provider quality, while simultaneously restricting Humana's ability to implement future cost savings.

114.    Reacting to this initiative, analysts responded favorably, but noted that they expected the Company to implement sustainable actions. For example, on February 3, 2022, Credit Suisse Securities (USA) LLC ("Credit Suisse) stated that "[a]s for timing, the goal is to get to a realized run rate for 2023 but also ensuring the company identifies sustainable initiatives. As such HUM will take an appropriate amount of time to conduct this and will measure itself against external benchmarks." The same day, RBC noted that it was "encouraged by HUM's commitment to sustainable long-term MA growth . . . [m]anagement expected to unlock $1B of incremental value across the enterprise . . . including ~$750MM through headcount, operational, and third-party cost-efficiencies, as well as ~$250MM from prioritization of high ROE initiative."

E.    **Humana Actively Tracked Member Demand, Activity, And Utilization As Part Of Its Regular Business Operations**

115.    The reports of former Humana employees situated throughout the Company, including in management roles, establish that Humana maintained and employed numerous systems for modeling and tracking member activity and monitoring utilization in real-time. These reports also establish, alongside the facts set forth in Section VII, that Defendants and other members of senior management had knowledge of, were directly provided, or had unfettered access to this information prior to and throughout the Class Period.

116.    In his role as Health Services Director for one of Humana's Medicare Regions, FE-3 tracked weekly and monthly utilization and cost trends and worked to keep the Region within the budget set at the corporate level. The Utilization Management side of the approximately 200-member team that FE-3 oversaw was responsible for reviewing cases for inpatient hospital stays, inpatient rehab, long-term care, and skilled nursing facility admissions. FE-3 stated his team was also responsible for meeting targets for and reporting on all kinds of key metrics, including metrics for Humana's benefit expense ratio and keeping utilization under control. FE-3 further stated these metrics were reported to senior leadership for each of Humana's markets and would factor into reporting for Humana's earnings per share and performance. FE-3 also attended quarterly or semi-annual market review meetings with Insurance Segment President George Renaudin to review utilization data and met with Corporate Analytics and Compliance at the end of each year to receive targets for the region for the following year.

117.    Based on the foregoing, FE-3 described how Humana maintained internal systems and processes for tracking and monitoring healthcare utilization data at the corporate level. At the core was a Tableau-based (a visual analytics platform) dashboard system that compiled utilization metrics for all of Humana's thirteen regional markets. FE-3 explained that weekly updates were

generated every Thursday, and monthly "roll-ups" were produced on the Tuesday of the second week in each month. FE-3 further explained that when new metrics data was loaded into Tableau, Corporate would notify FE-3 and others via email about the refresh. FE-3 stated that Renaudin, director level employees, and certain supervisors all had access to the Tableau system. FE-3 stated that regional market teams had access to even more granular daily analytics through their local analysts. FE-3 stated that Renaudin received all the information included in Tableau, plus the outpatient claims data prepared as part of FE-3's more detailed daily assessments.

118.    FE-3 said that each market team received yearly targets from Corporate Analytics and Compliance for metrics like hospital admissions, ER visits, and length of stay, which tied directly to annual budgets and underwriting margins. The better FE-3's team performed at hitting those targets, the better Humana's MLR and EPS. FE-3 stated that performance with respect to these metrics for all of Humana's markets would ultimately be rolled up to senior leadership and factor into Humana's financial reporting.

119.    In addition to these regular reports, FE-3 explained that Humana actively managed utilization through front-end reviews of cases when patients were admitted to the hospital. FE-3 further explained that this real-time review process allowed Humana to manage claims proactively rather than waiting for claims to arrive 30-90 days after treatment, which could impact underwriting margins.

120.    FE-7, a Provider Engagement Executive during the Class Period until January 2024, stated that Humana used a program called Service Fund to monitor utilization. FE-7 described Service Fund as a "banking system" that could show spending, track the flow of claims, and run reports to look at data for specific regions or see membership attribution (which providers are primarily responsible for a patient's health, which aids in analysis of healthcare costs). FE-7 further

explained that everyone at Humana had access to Service Fund, which contained different information for inpatient utilization and outpatient utilization, but reported both in sync.

121.    FE-9 also explained that Humana used Service Fund, which he explained contained information on providers, including the number of members per provider and what services those members had received. FE-9 described Service Fund as an accounting system that could pull reports on the number of members for any given primary care provider within the system.

122.    As Director, Medicare Stars and Risk Adjustment, FE-14 participated in tracking utilization from the standpoint of provider visits. FE-14 stated that there were matrices available that indicated the number of visits per member, including the total percentage of members that attended a primary care provider visit and the number of visits for each diagnosed condition. FE-14 stated that almost every employee from the front line up to the Regional Vice President and President had access to this information.

123.    FE-19, whose responsibilities as Provider Engagement Executive in late 2022 included analyzing providers' utilization, described how the Company tracked utilization: "They're on it every day, every Region has people to track it." FE-19 stated that Humana updates the system and runs reports frequently, some weekly, some monthly, but some executives, like his Regional President, Julie Mascari, review utilization daily.

124.    FE-5, who served as an Enterprise Analytics Strategy Advancement Manager and Analyst in Health Care Quality Reporting and Improvement through much of the Class Period, stated that Enterprise Analytics' responsibility was to share analytics tools and software with other departments and enable them to perform their own analytics. FE-5 explained that Humana's data analysis included: (i) Utilization Management, which examined how frequently members were using medical services; (ii) Care Management, which examined whether the members were

receiving the right care; (iii) Risk Management, which tracked member health conditions and whether the members were seeing providers annually; (iv) Star Analytics; and (v) Pharmacy Analytics. FE-5 stated that each area used Enterprise Analytics.

125.    FE-20 reported that Humana maintained a data entry system called Clinical Guidance Exchange, or CGX, which FE-20 used for utilization analysis and to generate reports on utilization. FE-20 stated that CGX is used in every Humana region. FE-20 explained that CGX was used for anything regarding medical services; for example, doctor name, procedure, and procedure description could be sorted and retrieved by CGX. FE-20 stated that some of the data would auto-populate based on the entry of a diagnostic code. FE-20 recalled that many reports were regularly generated from CGX, including: (i) readmission rates; (ii) procedures performed; (iii) hospitals utilized; (iv) month over month reports; (v) year over year reports; and other trend analysis. When FE-20 generated any CGX reports, he would forward them up through his direct manager, the Health Care Director, to the Regional Medical Director, and the Regional Vice Presidents, who he stated "definitely" looked at the reports. FE-20 stated that the Health Care Director also received reports from a data analysis team.

126.    FE-12 explained that Humana has databases that track various metrics including screenings conducted (such as diabetic or colorectal screenings), the rate of screenings, enrollees, and other metrics. FE-12 stated that all this data could be monitored throughout the year by any employee needing them, such as regional team members as well as corporate-level managers and above.

127.    FE-18 similarly explained that there was a system for tracking each Humana member's activity by their member ID. FE-18 stated that the system was accessible to everyone at Humana, and that utilization is reported up the chain at Humana to upper management, as a matter

of course. FE-18 recalled that the system could be used to focus on specific procedures and that this data was part of regular back and forth communications with management.

128.    FE-4 stated that roughly 70% of his job was actuarial modeling for Medicare Advantage. As part of his job, FE-4 was responsible for ensuring that Humana reserved enough revenue to cover the medical expenses of members for the year, and was the "owner" of a reserving model that was used for this purpose that was based on historical data of paid claims, visits, cost per admission, and other metrics. FE-4 stated that, generally, paid claims were relied upon more for outpatient visits. FE-4 further explained that the reserves would be set for the first four months of the year and then auto-set for subsequent months, unless a claims processing issue arose that required manual adjustment.

129.    FE-15 explained that, with regard to expenses, he had access to a dashboard that contained centralized data for the Market President and regional leaders. FE-15 stated he would look at premiums and claims to see how they compared to the budget target and identify outliers in the plans. This data was reported to regional and divisional leadership. FE-15 explained that regional leaders would assess what regions were not meeting the budget and try to determine what factors might cause that. The data went down to the level of inpatient and outpatient costs and was used by divisions to see trends and patterns.

130.    FE-15 was also involved in the annual Medicare Advantage bid process, which was based on analyses conducted by senior leadership and price targets set by actuaries. As discussed above in Section V.B, determining bids required Humana to estimate total medical expenses for its members during the upcoming year. FE-15 stated that based on his personal responsibilities and involvement in the process, the bid targets were set at the Senior Vice President level and above, and involved the actuarial team, the Financial Planning and Analysis team, and the executive team.

FE-15 explained that the pricing model was maintained by the actuarial team and was consistently on the radar of the executive team.

131.    Numerous former employees also described regular meetings focused on reviewing utilization trends and data. For example, FE-3 described the structure and cadence of how utilization metric data was reported and reviewed by executive management. FE-3 attended quarterly and semi-annual Market Review meetings in which Renaudin would conduct detailed reviews of each market's performance. FE-3 described these meetings as "deep dives" that involved extensive presentation decks (50-75 slides) plus supporting documentation (100-150 additional slides) covering performance metrics. FE-3 described these as particularly intense meetings where Renaudin, who was known to study the metrics closely, would directly challenge team members about their performance.

132.    FE-7 explained that he participated in quarterly Joint Operation Committee meetings that were attended, at different times depending on the focus of the meeting, by Defendant Broussard, a Medical Director, the quality team, the financial team, and others. FE-7 further stated that Kathy Grauer (Director, Provider Experience) also attended the meetings and reported up her management chain to Renaudin. FE-7 recalled needing to have a pre-meeting before the Joint Operation Committee meeting to discuss how to explain the utilization data present in reports.

133.    FE-20 participated in weekly virtual meetings with the Health Care Director to review data. Also present in these meetings were the Utilization Management nurse manager, a representative from the data analyst team, and a business consultant. FE-20 stated that the Utilization Management nurse manager would guide the meeting from a medical perspective and would analyze and discuss metrics such as the rate of claim denials, claim approvals, and hospital

readmissions. FE-20 and the others present at the meetings would discuss how to reduce the rate of admissions and improve medical performance, and would review and evaluate Medicare Advantage costs month over month and year over year. They would also discuss various corporate initiatives such as compliance and financial performance.

134. The numerous data streams and internal reporting systems described above provided Defendants real-time information concerning and insight into Humana's Medicare Advantage utilization. This information contradicted Defendants' contemporaneous representations to investors about the impact of pent-up demand on Humana's Medicare Advantage utilization, as discussed below in Section V.G.

### F. Defendants Knew That COVID Significantly Suppressed Utilization

135. Lower overall Medicare Advantage utilization during the height of the COVID pandemic allowed Humana to report record financial results during this period, as discussed above in Section V.C. Defendants openly acknowledged that Medicare Advantage members' utilization of healthcare services was down during the pandemic, as patients were seeing care providers at below-normal levels. Humana's quarterly and annual reports in 2022, for example, stated that "[d]uring periods of increased incidences of COVID-19, a reduction in non-COVID-19 hospital admissions for non-emergent and elective medical care have resulted in lower overall healthcare system utilization."

136. Numerous former Humana employees described how, internally, the Company actively tracked the trend of depressed demand due to COVID. As discussed below in Section V.G, these efforts gave Defendants direct insight into the factors driving spiking utilization from pent-up demand during the Class Period.

137. FE-5 explained that during the height of COVID from April through November 2020, Humana members were not getting in to see their doctors, which caused a decrease in visits

or "encounters." During this time, encounters were down significantly, but it was anticipated that there would be a pronounced increase in encounters when COVID restrictions lifted.

138.    With respect to Humana's tracking of utilization, FE-5 stated that during the COVID pandemic, the Company generated weekly reports on the behavior of Humana's Medicare Advantage members, which were called COVID Weekly Reports. FE-5 stated that his direct supervisor, Wheatley (Retail Segment President) requested these reports starting in or around April 2020. FE-5 stated that the COVID Weekly Reports continued to be generated and submitted well into 2021, and contained metrics and information including the number of conditions per member per week, and bid targets. FE-5 stated that the COVID Weekly Reports prepared for Wheatley tracked data to enable Humana to get in front of the expected increase in member/doctor encounters as the pandemic subsided. FE-5 further stated that during COVID, Humana assessed how members sought and obtained care, and compared that information to a normal year, using 2019 as a benchmark.

139.    FE-5 understood that these COVID Weekly Reports were used by Defendants Diamond and Broussard, and others on the executive team, in the formulation of Humana's 2021 Medicare Advantage bids. FE-5 also recalled that there were weekly reporting calls on Friday or Saturday mornings, depending on Wheatley's schedule, that included Wheatley, Jessica Clark, Senior Vice President of Health Care Quality and Improvement, Nicole Wilcox, Vice President of Payment Integrity, and Carrie Milby, Vice President of HQRI Operations.

140.    During this same time period—March 2020 to 2022—FE-12 commented that "it was hard to schedule a routine test," meaning there would be much fewer claims than in the past years even as enrollment increased. FE-12 noted that there was a huge growth in annual enrollment and, in particular, there was a big push to expand Humana's D-SNP (dual-eligible special needs)

coverage. D-SNP refers to people eligible for both Medicare and Medicaid. FE-12 noted that these beneficiaries are usually more in need of care than average members and cost Humana much more. FE-12 stated that the Company increased the number of "covered lives" at the same time that fewer and fewer claims were being filed.

141.    FE-10's regular responsibilities included providing data-driven answers to questions within Humana on topics including patient care, programs of care and efficiency of care within the Company's network. For example, FE-10 noted answering inquiries on clinical interventions and the efficacy of preventive care programs—often with the purpose of proving whether an initiative saved Humana money. For his work, FE-10 accessed and used data submitted to the Company through hospitals, lab work, doctor visits, and pharmacy claims. According to FE-10, the major issue that occurred during the pandemic was the lack of good utilization. FE-10 described good utilization as people visiting their primary care physicians regularly, which produces the data required to perform accurate risk adjustments. Humana is partially paid by these quality measures. FE-10 further stated that a lack of routine visits could result in an increase in inpatient costs and deaths, particularly in January, when the level of antibiotic-resistant infections in hospitals is higher.

142.    As these accounts and Defendants' own statements demonstrate, Defendants knew by the start of the Class Period that Humana's Medicare Advantage utilization had been significantly depressed as a result of the COVID pandemic. As discussed in detail below, as the effects of the pandemic on healthcare utilization faded, the Company experienced a surge in demand for care among its Medicare Advantage members, which Defendants both actively tracked and sought to suppress.

G. **Unbeknownst To Investors, Prior To And Throughout The Class Period, Defendants Knew Of And Expected Increased Utilization As Humana Emerged From The Pandemic, And Actively Suppressed That Demand**

143.   Consistent and corroborative accounts from Humana former employees establish that Defendants understood that Medicare Advantage members were deferring care services during the COVID pandemic. These accounts further establish that by the beginning of the Class Period, Defendants knew pent-up demand would lead and, in fact, was leading to increased utilization of healthcare services, and actively tracked this trend (which negatively affected Humana's MLR) long before disclosing it to investors. Still more, these former employees establish that Humana artificially suppressed utilization through widespread improper denials of claims and prior authorizations and engaged in drastic, indiscriminate cost-cutting that imperiled the quality of Humana's Medicare Advantage plans, including layoffs that left critical departments and functions understaffed and alienated providers and patients.

144.   Defendants did not disclose any of these facts to investors. Thus, Humana's true circumstances stood in stark contrast to Defendants' public statements during the Class Period, set forth below in Sections V.J, V.M, V.N, and VI.

1. **Defendants' Knowledge Of Increased Demand As COVID Subsided**

145.   The accounts in Section V.E demonstrate that Humana used an array of systems and processes to track Medicare Advantage utilization in real-time. As the effects of the COVID pandemic subsided, these systems reflected that the Medicare Advantage demand for healthcare services had returned—and increased dramatically. This was because the members that had deferred care included those with chronic conditions or serious illnesses that had not been properly diagnosed or treated during the pandemic. As recounted by multiple former Humana employees, Defendants had clear visibility into this trend through multiple channels, including actuarial reports, utilization reports, and direct data analysis. This resurgence in demand intensified in 2022

44

to 2023, with utilization reports showing sharp increases across multiple categories of care. In fact, by 2023, Defendants openly acknowledged Humana's higher utilization in Company-wide meetings and communications.

146.    As COVID subsided, FE-12 stated that "everything went up." FE-12 further stated that "everybody came back" when COVID wound down and many enrollees were getting overdue tests and procedures. FE-12 said this had a "snowball effect" with a huge volume of claims and costs incurred by providers. FE-12 explained that there were a lot of services that enrollees had deferred because those services were either shut down or the enrollees were reluctant to schedule them during the pandemic. FE-12 further explained that this increased Humana's medical costs once enrollees resumed receiving care. For example, FE-12 said that there were more cases of advanced cancers because many patients had not been screened for a length of time during the pandemic.

147.    FE-4—whose responsibilities included assessing and determining how much money Humana would need to pay all claims for the year—explained that the Company's profits were "insane" during 2020 because people were not utilizing costly inpatient care or otherwise using their health insurance. As noted above, inpatient care refers to formal admission to a hospital with a doctor's order. FE-4 stated that the actuaries were aware of "claim suppression" (or deferred medical treatments and claims) during 2020 and attempted to account for it. FE-4 further stated that the actuaries knew the utilization, particularly for elective inpatient procedures, would bounce back in 2022 to the baseline and above it. FE-4 recalled that Humana was tracking by how many millions of dollars it was beating its budget in 2020 due to the lack of utilization. FE-4 stated that the Company knew those people would come back, and noted that other teams prepared analyses indicating the expectation of higher claims in the future.

148.    FE-17 stated that in 2020 to 2021, during COVID, members in his region—Northeast Texas, one of the largest Medicare Advantage-eligible populations in the country—were not having tests done or going to see their doctors as normal. FE-17 stated that pent-up utilization was expected in 2022 and 2023 with the decline of COVID. FE-17 stated that increased utilization as discussed in bid meeting discussions related to pricing for the upcoming year, which were run by the Regional Medicare President for the South Central Region.

149.    FE-17 recalled that in 2022 and 2023, plans were monitored by Operations Management and any that were "running hot" would be flagged. FE-17 explained that "running hot" meant incurring expenses in excess of the monthly payment received from CMS. FE-17 stated that trouble areas, like Houston and Dallas, were a constant topic of discussion due to high utilization and overall poorer member health.

150.    FE-1 recalled that utilization was a topic that was discussed during monthly Special Projects meetings with Defendant Broussard. FE-1 confirmed that conversations about utilization "had been going on for over a year" before FE-1 left Humana in 2Q 2023.

151.    Elaborating on the discussions that took place in 2022 and 2023, FE-1 pointed to knowledge of backlogs in elective procedures that had already received Humana's prior authorization. FE-1 explained that prior authorizations for elective procedures, like knee or hip replacements, can happen months in advance depending on supply and demand. FE-1 stated that before COVID, a member would be able to schedule a hip or knee replacement within a month after Humana authorized the procedure. After the COVID pandemic, however, there were more members asking doctors to perform knee replacements and members were having to wait six to eight months to have the procedure because the schedule was so full. This meant that Humana was authorizing procedures in October to December that would not be performed and paid for until the

next plan year. Because the Company understood the backlog of members waiting for their elective procedures to take place, FE-1 stated that the Company saw the increased elective procedure utilization coming "from a mile away."

152.    FE-1 confirmed that Humana maintained a database that tracked prior authorization decisions. FE-1 stated that this data is very easily retrievable and is available on a real-time basis. Although FE-1 did not run the reports, FE-1 stated that any interested party could pull the data and see the backlog of procedures that had been approved but not yet performed. Confirming FE-1's account, Humana's website states that "[p]rior authorization for orthopedic surgery . . . is required for all patients" with Humana Medicare coverage, including for "orthopedic surgeries: hip, knee and shoulder arthroplasty [or arthroscopy]."

153.    FE-1 stated that during the monthly Special Projects meetings described above that were attended by Broussard, a Utilization Management team was responsible for reporting on prior authorization backlog. In reporting on the backlog of procedures that had received prior authorization but had not yet been performed, FE-1 explained that the utilization management team would typically provide a status update on the lead time for procedures. FE-1 recalled that during at least two monthly meetings in the summer to fall of 2022 that Defendant Broussard attended, the Utilization Management team specifically reported the backlog figures related to authorized but not yet performed elective procedures. FE-1 recalled that the backlog was discussed in the context of it impacting Humana's financials and how the backlog related to the capacity of certain providers.

154.    FE-10, whose work involved reviewing data submitted to Humana through hospitals, lab work, doctor visits, and pharmacy claims, said that the return of utilization when COVID restrictions eased was common sense and should have been predicted. FE-10 reported that

47

routine care was not happening during COVID and so Humana was seeing underutilization. FE-10 explained that the pent-up demand was like stepping on a garden hose—when the foot is taken off the hose, there will be an overshoot because of the built-up pressure.

155.    FE-5 stated that, based on the data and information he worked with in HQRI, member utilization began to come back in 2Q 2021. FE-5 said Humana was expecting and planning for the pent-up demand that occurred when members who had delayed optional procedures began to come back in for them. In 2021, FE-5 stated that the COVID Weekly Reports his team prepared for Wheatley examined how far behind the utilization level was in comparison to the same time in previous years, what was expected regarding pent-up demand, and approximately when Humana would catch up with the demand.

156.    FE-15 explained that Humana was expecting a bounce-back of demand in 2021 and 2022. Beginning in 2022 and into 2023, FE-15 recalled an increase in demand due to people who had deferred services in 2020 coming back for care. FE-15 stated that accurately projecting expenses is essential for formulating the next year's bid because Humana cannot make changes to benefits or premiums during the year. FE-15 stated that his team was incorporating the bounce back in utilization as a factor in the projections starting in 2022.

157.    FE-6 likewise stated that when the fear of COVID began to subside in 2022, there was an expectation of increased demand, including for elective surgeries and mammograms. From a Stars perspective, FE-6 also explained that the Stars team worked to get members back into the healthcare system, so Humana should have anticipated increased utilization following the pandemic. From FE-6's perspective, there were no plans to manage the return of delayed care.

158.    FE-9 similarly stated that when the pandemic subsided, Humana struggled to handle the number of elective procedures being done, and FE-9 attributed Humana's climbing

costs to people returning for care they had deferred. FE-9 recalled that Humana's members were not seeking out health services during the pandemic.

159.    As discussed above, FE-7 stated that Humana used the Service Fund Program to monitor utilization and that the program could show spending, track the flow of claims, and could be utilized to run specific reports to look at things like specific regions and membership attribution. FE-7 stated that everyone at Humana had access to this system. During 2022 and 2023, FE-7 recalled the utilization reports were very volatile. FE-7 stated that in 2023 signs of increased senior care utilization were evident as Skilled Nursing Facility was up, Pharmacy utilization costs were up, Medicare service utilization was up, and Home Health Care Specialist usage was also up. FE-7 specifically remembered one report he saw during that time period that showed a provider group's utilization numbers jumping by approximately 150%, and needing to have a pre-meeting to discuss how to explain the numbers at the quarterly Joint Operation Committee meeting. FE-7 stated that Humana's message to providers was that the numbers would even out over time, and the finance team would tell providers that the volatility was due to a lag in claims processing.

160.    FE-7 also attended Humana townhall meetings virtually on Zoom. At the townhalls, FE-7 stated that Defendant Broussard and Renaudin would provide information and respond to pre-scripted questions. FE-7 stated that in 2023, pent-up demand and increased utilization were acknowledged at these meetings. FE-7 also recalled receiving company-wide emails in 2023, including from Defendant Broussard, that blamed Humana's financial issues and ongoing layoffs on increasing pent-up demand.

161.    FE-19 stated that a surge in utilization was evident from late 2022 through the end of his employment in late 2023. FE-19 recalled that, after COVID, in 2023, the utilization returned to pre-COVID levels and yet there were also now very sick people with long COVID and

respiratory issues that needed expensive treatment. Concerning the North East region, FE-19 stated there was also a surge in membership growth, with members growing by 50% from 2022 through early 2024. One of FE-19's responsibilities was to look at things like "are there too many frequent flyers in the hospital," and he reported that utilization was high because of frequent flyers and the cost per visit was increasing.

162.    FE-2 had access to internal tracking data concerning utilization rates through the Trend Committee's meetings "pre-read" materials, meeting minutes and reports. FE-2 stated that part of the Trend Committee's purpose was to identify negative trends and work toward mitigating or managing the causes. FE-2 stated the Trend Committee created different initiatives specific to disease categories in an effort to change in-patient hospitalization trends. FE-2 explained that while a Regional Vice President, he attended meetings of the Company's Trend Committee. After transitioning to a National Director role, FE-2 stated he no longer attended Trend Committee meetings, but continued to receive the Trend Committee materials. FE-2 stated that in April 2023, there was an "inexorable progressive" monthly increase of inpatient admission rates. FE-2 explained that admission rate increases were recorded as higher admissions per thousand patients, and that this trend was visible in the internal trackers that were discussed in Trend Committee meetings, pre-read materials and reports.

163.    FE-2 stated that the admission rate "continued to just tick up" first by one, then two and then three admissions per thousand, and that "it was clear on the internal trackers that the admissions were going up." FE-2 noted that even a small increase (e.g., "one admits per thousand") was materially important due to the millions of members on Humana's Medicare Advantage plans. FE-2 stated that it appeared that people were getting sick across all markets with various different

explanations cited as causes. FE-2 explained that admission rates were viewed by others in the Company as well, as it was "a key indicator how the bonus payout is going to work."

164.    FE-21 attended bi-weekly leadership meetings with executives, including Directors in areas such as Finance, Network Management and Risk. Based on FE-21's attendance at these meetings, FE-21 learned through conversations, charts, and graphs that the MLR was rising in 2022. He recalled that the attendees strategized about how to lower MLR, including analyzing high utilization patients and discussed how to bring their costs down. FE-21 said this issue was troubling for him because he felt it was contrary to the purpose of care.

165.    FE-4 stated that Humana knew 2022 would be a difficult year financially because of various factors, including the claim suppression from 2020. FE-4 recalled that 2022, especially the third quarter, was a difficult time for claims because there was increase in claims across the board that lowered earnings. FE-4 noted that 2022 was the first full year people felt comfortable going back to the doctor and that there was a lot of pent-up demand. FE-4 worked on developing tools to break down the models by different inpatient and outpatient procedures to better understand the rise in utilization. FE-4 stated that the increased utilization was discussed in finance and actuarial meetings, which included finance analysts and actuaries, finance senior managers and directors and their counterparts in the actuarial department, the Vice President of Finance, FE-4's director, and the second highest ranking actuary, who he stated was at the Senior Vice President level. At the meetings, they would go over 100 different models across Humana's lines of business, each containing various blocks for different geographic areas and products.

166.    FE-4 stated that, generally speaking, the model he used to reserve funds to pay claims would account for the increase in claims within a month or two. In the third quarter of 2022, FE-4 believed that Humana was still forecasting the bounce back, because it took senior citizens a

51

while to come back for services. FE-4 recalled that the return of utilization was a constant part of discussions, and that the scale would have been in the hundreds of millions.

167.    FE-4 stated that an additional team handled Trend Analytics and Forecasting. That team supported both the pricing process and the actuarial team through high level reports on admissions, the level of suppressed claims, and how many members they expected to return and what months to allocate the utilization to. FE-4 stated that Trend Analytics and Forecasting focused on the expectations versus the month-over-month trends, and FE-4 recalled that they attributed the changes to pent-up demand.

168.    FE-5 recalled that his team was brought in to assist Enterprise Analytics in the summer of 2023 to analyze the increased costs for healthcare procedures that Humana was seeing. His team came in after Defendants Broussard and Diamond had made public statements regarding higher than anticipated non-inpatient trends. FE-5 and his team supported the Clinical Analytics Team, which was seeing pent-up demand for non-inpatient procedures, with increased costs primarily in the ambulance/Emergency Room and hospital outpatient areas. FE-5 stated that his Director requested that his team get involved in supporting the Clinical Analytics team's analysis of increased utilization costs to identify the driver of the increase. FE-5 explained that Clinical Analytics' role included examining trends in Medicare utilization costs, excluding Medicare Part D. This assignment lasted approximately one month, during which FE-5 worked with Humana's Clinical Trend Forecasting Department to look at utilization trend data. FE-5 stated that he observed increased utilization, and that utilization costs were trending up. FE-5 reported that an increase had been observed in the average number of Emergency Room visits and in ambulance utilization, as well as a significant spike in utilization costs for Medicare Advantage members under 65 years of age. FE-5 explained that this group included those on disability and with end

stage renal disease, a population that tends to be sicker than average. FE-5 observed both increased

costs and higher than expected utilization within this population.

169.    As these accounts from multiple former employees demonstrate, Defendants were

well aware that pent-up demand for healthcare services had led to a sharp increase in healthcare

utilization starting in 2022 and continuing throughout 2023. Nevertheless, Defendants concealed

and suppressed Humana's elevated utilization, including through denying medical care to the

Company's elderly and disabled Medicare Advantage members.

> **2.    Defendants' Knowledge Of The Company's Active Suppression Of Utilization, Including Through Widespread Denials Of Claims And Prior Authorizations**

170.    Former Humana employees confirm that, as pent-up demand for healthcare services

emerged, Humana artificially throttled utilization from such demand through denial of claims and

prior authorizations, including for some of the most expensive types of care used by Medicare

Advantage beneficiaries.

171.    FE-1 stated that as part of Humana's cost-containment strategy, the executive team

attempted to find ways to save money by either denying claims or denying prior authorizations. In

FE-1's view, such claims should not have been denied. FE-1 stated that this topic was often

discussed at the monthly Special Projects meetings attended by Defendant Broussard. FE-1 stated

that Utilization Management was specifically discussed during these meetings as a way to

counterbalance Humana's revenue issues. FE-1 further stated that there were multiple discussions

in the monthly meetings regarding the outer limits of claim denials. FE-1 said that management

asked questions about where the outer bounds of the law lay, how they could push right up to the

limits of the law, and whether the consequence would be a fine or the loss of CMS contracts. FE-

1 stated that this issue was laid out multiple times in discussions with the executive team during FE-1's time in Special Projects (i.e., 1Q 2022 to 2Q 2023).

172.    FE-1 stated that this approach to controlling costs created turmoil among Utilization Management personnel as well as many members of the Special Projects team. FE-1 further stated that management's approach to these issues was making a lot of people feel "uncomfortable." FE-1 recalled that although the practices pushed by management may not have been illegal, many team members felt that it was "so against our ethical fabric" that they could not go along with it. FE-1 further recalled that multiple Special Projects employees, who had been with Humana for over a decade, quit or volunteered to be included in a Reduction in Force as a result. FE-1 explained that it was "not a safe environment" to bring up these concerns. FE-1 recalled that there were meetings held before the monthly Special Projects meetings where Senior Vice Presidents told the Special Projects staff not to voice specific ethical concerns because they were trying to reduce the amount of that feedback Broussard was receiving. FE-1 stated that if anyone questioned the practice of denying or limiting claims, they were taken off the team and either "let go" or just kept on the rolls but not given any work.

173.    FE-1 stated that the Senior Vice Presidents present at the Special Projects meetings occasionally tried to prevent the participants from voicing their ethical concerns about some of the practices that were being promoted in these meetings, particularly denials and prior authorizations. FE-1 recalled that on occasion, an employee would raise an issue they had been told not to discuss. FE-1 stated that this usually resulted in the person who addressed the issue not being invited to the next meeting or being fired outright. FE-1 further stated that the meetings initially included 30-60 participants, but that the numbers of attendees at these meetings continued to dwindle, and eventually the meetings were discontinued around May 2023.

174.    FE-8 explained that Humana would "deny, deny, deny" and recalled receiving training materials including a policy to deny a certain number of claims. As a Utilization Review Nurse, FE-8's primary responsibility was to review patient cases to determine if they met the established criteria for the care or procedure requested. If the case met the criteria, the required paperwork would be completed and submitted for approval. If the case did not meet the criteria, FE-8 would send a request to the provider for additional documentation. If a claim was denied, a denial letter would be sent to the patient and provider with an explanation.

175.    FE-8 recalled that management's instruction was that if there was sufficient information to make the decision to approve or deny a claim, but that decision was not obvious based on a five-minute review, he should deny it. FE-8 recalled that the case notes for a particular patient could be hundreds of pages. FE-8 said if a decision could not be reached within five minutes, it would be escalated to the Medical Director, who FE-8 estimated denied claims 80% of the time.

176.    FE-8 believed that Humana did not want to pay the cost for inpatient care and was intentionally dragging out the claims process. He further recalled that the push to deny claims was constant, but intensified in January 2023, March 2023, and in May 2023, in which FE-8 stated the push to deny claims was particularly pronounced.

177.    FE-8 explained that Humana uses two programs, InterQual and Milliman, to provide guidance in approving or denying claims. The program guidelines were used to determine the standards of care, acuity of care, and anticipated recovery timelines. FE-8 stated that everyone at Humana had access to both InterQual and Milliman. FE-8 was required to compare the patient's situation to the criteria in the system. The patient's circumstances and the criteria had to be an exact match. This was particularly difficult because of the limited time to review claims. FE-8

recalled seeing critically ill patients' claims denied because there was insufficient time to review the documentation to match the criteria exactly.

178.    FE-8 stated that the criteria for claim approval seemed to become increasingly strict over time. FE-8 recalled that Humana took items off the automatic approval list. For instance, a patient who had been on a ventilator for 30 days was previously an automatic approval, but the rule was changed so that people who were able to be off the ventilator for even two days could no longer be classified as inpatient. The changes were never explained to FE-8 or the other Utilization Review Nurses. FE-8 stated that his compensation was tied to the number of claims reviewed per day. FE-8 also stated that his direct supervisors had set expectations for the unit to deny a certain number of claims per day.

179.    FE-8 recalled that Humana would often push patients who should have been inpatient to outpatient, or would arrange follow-up care, like physical therapy, in facilities that were too far away for the member to utilize. FE-8 believed this was an intentional means of creating challenges that would prevent a member from using the benefits, ultimately saving Humana money.

180.    FE-22 stated that his teams overseeing utilization management for both Home Health and Acute care were also instructed to "chase the denial rate." FE-22 described this as his teams being told that denial rates were not what Humana wanted to see, and so managers would need to increase these numbers. FE-22 said how at meetings with his managers, associate directors, directors, and Associate Vice Presidents, leadership would discuss how denials were not high enough and set specific percentages to aim for. FE-22 stated that utilization management teams were given mandatory "routes" with the goal of achieving more denials. FE-22 explained routes as a requirement that cases with certain diagnoses had to be sent to a medical director for review.

181.    FE-22 stated that denial rates were included in reports prepared by the Company. FE-22 explained that during his time doing Acute utilization management, he was able to access these reports directly, and while doing Home Health utilization management, his leadership would discuss the contents with him as part of his job. FE-22 stated that these reports displayed both approval and denial rates, and could be filtered by specific nurses, denial rates or regions. FE-22 reported that upper management had access to data for all regions.

182.    FE-22 said that by the time he left the Company in the summer of 2023, the practice of "chasing denials" was happening in Home Health, as it had in Acute and Skilled Nursing Facilities when he was assigned to those areas. FE-22 stated that the push for denials was communicated to employees by his Associate Directors, and by an Associate Vice President.

183.    FE-13 stated that there was "constantly a disconnect" in obtaining prior authorizations for many of his clients. FE-13 explained that Humana engaged third party companies to review prior authorization requests and make determinations. FE-13 recalled the company "Silverback" was regularly denying authorizations for services to many of his clients. FE-13 noted that while third parties such as Silverback were supposed to use the Medicare guidelines for prior authorization denials, they would give patients a hard time in virtually every case.

184.    FE-13 recalled that as a result of Humana's prior authorization practices, many patients would receive coverage for a shorter amount of time than what was expected from skilled nursing and home healthcare providers. FE-13 explained that some Humana plans, pursuant to Medicare guidelines, provided for up to 100 days of skilled nursing, with the first 20 days provided at no cost. FE-13 stated that he noticed patients not even being covered for the initial 20 days that Medicare covers, and that Humana would authorize a portion of the expected length of coverage,

and then require a request for additional coverage. FE-13 stated that once this shorter than expected coverage ended, patients would be discharged "prematurely."

185.    FE-13 stated that he and many other employees raised their concerns regarding home healthcare services and prior authorizations. FE-13 specifically reported these issues to his manager and the Regional Vice President of Sales. FE-13 stated that the situation regarding denials of prior authorizations improved during the pandemic, but was worse afterwards, and continued to get worse near the end of his tenure at Humana during the summer of 2023.

186.    FE-13 noted that, when a prior authorization was denied, patients seeking to appeal would need to go to the Humana "Patient Portal" to appeal the decision. FE-13 recalled that appeals could take between 3-7 days to be decided upon, and that many patients, who were elderly and sick, did not have the wherewithal to properly pursue appeals, if they pursued them at all. FE-13 stated he was aware these denials occurred quite often because members were calling him and agents located in other regions all the time.

187.    While working in Utilization Management from the start of the Class Period through 2Q 2023, FE-18 was responsible for the pre-authorization process of submitted claims for medication and other treatments, including review of claims documentation to make recommendations to approve or deny, based on Humana's internal guidelines. FE-18 understood his role was to be on the lookout for chances to deny claims. Particularly in Florida, FE-18 stated it was "crazy" how much claims were denied. Notably, according to Humana's 2023 10-K, 14% of Humana's total premium and services revenue was derived from "government contracts with the Centers for Medicare and Medicaid Services, or CMS, to provide health insurance coverage for individual Medicare Advantage members in Florida." FE-18 further stated that Humana's approval/denial guidelines were very strict and deviating from them was heavily discouraged. FE-

58

18 recalled receiving feedback that it was his job to be tough on approvals because every penny counted for the Company. FE-18's impression was that Utilization Management employees would "get in trouble" for approving certain claims.

188.    FE-18 estimated that he handled about 40 claims per day, totaling in the hundreds per week. FE-18 recalled that he would deny roughly 50% of the claims and that more costly claims were denied more often than not. FE-18 explained that when a claim is denied, the patient is sent a notification letter and has the option of appealing, but appeals can be a lengthy process.

189.    In 2022 and 2023, FE-16 recalled the volume of denials of appeals being high. FE-16 explained that CMS imposes a 60-day window for decisions on appeals, but FE-16 would often not receive an appeal until at least 30 days had lapsed, making it almost impossible to collect the necessary documentation to grant the appeal. FE-16 stated that the decisions on appeals were guided by a workflow that mostly provided reasons to deny the appeal. FE-16 was required to complete roughly 140 appeals per month and estimated that 60% of them were denied. FE-16 stated that this denial rate was average for his team. FE-16 stated that he would have to hunt for small reasons to approve an appeal. FE-16 attributed the increased pressure to close out appeals in 2022 and 2023 to an overall increase in the volume of appeals. FE-16 explained that Humana uses a program called MedHOK to process appeals, which is an independent program contracted by CMS. FE-16 explained that MedHOK documents every appeal received and has the ability to generate reports on the appeals.

190.    Also during 2022 and 2023, FE-16 noticed that hospital stays became more expensive and the maximum out-of-pocket costs for members increased. In particular, FE-16 recalled that there was a change in what hospital stays would be covered as inpatient, based on an assessment of whether the patient came in from the emergency room and whether the situation was

"really an emergency." FE-16 also recalled that only about half of inpatient stays were approved for inpatient billing. FE-16 was notified of these changes through adjustments to the workflow and was never provided an explanation for the changes.

191.    In 2023, FE-19 observed his Regional President, Julie Mascari, cut providers, or cap their "Panels" (list of members) in underperforming regions like certain areas of New York City and New Jersey where people were disadvantaged and in poor health. FE-19 indicated that if the providers were not responsive, or did not become more profitable, the Regional President would cap the panel or classify the provider as "Out of Network." FE-19 cited an example: "If Dr. Smith's patients (panel) have a high utilization score, incurring costs, say, $1.50 over revenue of a $1, [the Regional President] would close the panel preventing him from taking more patients." FE-19 continued that "Dr. Smith" could still keep the patients he had but the Regional President might also try to transfer them to another (more cost sensitive) provider. FE-19 further explained that the Regional President would take unprofitable doctors Out of Network. FE-19 never saw panels closed until he saw the Regional President take this action. FE-19 said this happened much more frequently in 2023.

192.    FE-7 stated that, at one point, it appeared to him that Humana was denying claims as a means to reduce utilization in one of the provider groups he monitored. FE-7 stated this was an ongoing problem with the group.

193.    FE-9, who worked in Service Alignment in Operations, observed that Humana shifted to the use of front-end reviews to deny claims prior to paying them, which allowed the Company to avoid the process of recouping money at the end of the year. FE-9 stated that front-end reviews were a "hot point" with providers, who hated the practice.

194.    With regard to utilization costs, FE-20 explained that the goal of utilization management was "to reduce cost to Humana." FE-20 added that utilization management would look at the following metrics to identify areas where Humana could save money: (i) clinical rates; (ii) observation rates; (iii) readmission rates; and (iv) length of stay. FE-20 stated that, on observation rates, one of the team's responsibilities was to compare the number of members that entered the hospital but were not formally admitted to the number of members observed and then admitted. FE-20 further stated that, for readmissions, the Utilization Management team looked at members who had been admitted to the hospital three or four times to determine if there were other treatment strategies to avoid readmission and reduce cost. For length of stay, FE-20 gave the example of a patient who had stayed in a Skilled Nursing Facility 15 or more days. For patients like those, FE-20 said the team would assess if there was a way to discharge that person earlier.

195.    Regarding utilization management, FE-2 stated that the Company employed various mitigation strategies, including both short-term (e.g., reviewing claims from an outlier provider) and long-term (e.g., preventive care initiatives) strategies. FE-2 explained that his team worked in tandem with other interdisciplinary committees to create templates for discussing denials with providers. FE-2 explained that when he was a Regional Vice President, he had detailed visibility into market-specific admission data, partially due to his ability to get on the phone with the Company's business partners to analyze the trends that were being observed.

196.    Notwithstanding Humana's concerted efforts to suppress utilization, such measures were insufficient to offset the increased demand for medical services among the Company's Medicare Advantage members during the Class Period. As a result, Humana resorted to other cost-saving measures in an effort to mitigate the impact of increased Medicare Advantage utilization.

H. **Defendants Engaged In Widespread Cost-Cutting Measures To Offset Higher Utilization, Which Reduced The Quality Of Humana's Medicare Advantage Plans**

197. Humana former employees detail how, in the face of rising demand, throughout 2022 and 2023 the Company implemented drastic cost-cutting measures that hurt the quality of Humana's Medicare Advantage plans, including by implementing "bloodbath" layoffs that left critical departments and functions understaffed and alienated providers and patients.

198. FE-9 explained that throughout 2022, Humana had an initiative called Project Growth. Specifically, FE-9 recalled a SharePoint site, accessible company-wide, that displayed a thermometer that filled up as the Company made progress toward its goal of saving $1 billion.

199. FE-9 stated that, sometime in 2022, the Project Growth thermometer on the SharePoint site reached halfway. FE-9 was aware that Humana had done all it could to save money and the only thing left at that point was layoffs. FE-9 recalled seeing the thermometer fill up as employees were fired. FE-9 stated that Project Growth was in effect for the majority of 2022. FE-9 described the layoffs as a "bloodbath."

200. FE-9 recalled that the explanation for the layoffs was that Humana needed to save money. Prior to the layoffs, FE-9 stated that Humana attempted to save money through changes to the Associate Incentive Plan, including reducing the bonus structure, eliminating some employees from the plan, and capping raises in 2022 at two percent. FE-9 stated that Renaudin (President, Insurance) would personally call Humana's higher-up leaders to terminate their employment. FE-9 was aware that the decision on layoffs was happening at a very high level because his department head did not know who in the department would get to keep their job.

201. According to FE-9, the layoffs that happened as part of Project Growth caused Humana's level of service on the Operations side where he used to work to decline due to the loss of knowledge and experience. FE-9 stated that Humana even cut the Service Alignment team.

202.    FE-1 stated that Humana engaged in a second round of layoffs in 2023. FE-1 further stated that Deloitte was brought in to facilitate the Reduction in Force. FE-1 explained that Jim Moore was the Humana representative that was responsible for handling the Reduction in Force internally. FE-1 stated that Moore never questioned the layoffs and took the attitude of "I'm doing what I am told." FE-1 further stated that many raised concerns with Moore about the downstream impacts of the lay-offs. FE-1 recalled Moore stating that they were acting on a recommendation to save money, but others would warn him that the impact would eventually cost more money. FE-1 stated that Moore essentially ignored the comments and eventually reduced the number of people that he would interact with who pushed back on any of his decisions. FE-1 recalled that he sat in on a couple of meetings with Moore regarding this topic, but eventually stopped attending the meetings because FE-1 realized that his feedback "wasn't listened to or respected" and that Deloitte was going to do what they wanted, regardless of his input.

203.    FE-15 also recalled that Humana underwent a major restructuring in 2022 through 2023. He said that first Humana restructured to save money, and when that was not sufficient, turned to layoffs.

204.    FE-7 said he became aware of rumors that Humana needed to cover a billion-dollar financial loss at the end of 2022 or early 2023. This rumor was then confirmed in Company-wide emails from Defendant Broussard that discussed the loss and the need for Humana to cut costs.

205.    In 2022 and 2023, FE-18 also observed cost-cutting at Humana, which resulted in many employees being let go, especially at the upper levels, and a reduction in member benefits. FE-18 specifically recalled speaking with many upset members whose benefits had been reduced. FE-18 was adamant that the agents who sold the plans to members were lying about the coverage, and stated that "100% they would cheat" to sign up new members.

206.    FE-21 recalled that Humana merged markets and instituted Company-wide layoffs beginning in September 2022, with effects being finalized through the summer of 2023. FE-21 indicated that had he stayed with Humana, he would have been responsible for more than 600,000 members, up from the 300,000 members before the merger. FE-21 further indicated that instead of just quality, he would have the added responsibility of Risk Management (coding). FE-21 stated that all this added responsibility would have to be accomplished with a much smaller staff in light of the merger and job cuts by Humana.

207.    FE-6 recalled that layoffs began in the Stars Improvement group in October 2022. FE-6 attended a large Zoom meeting in December 2022 where the realignment of Humana's Stars system was discussed. FE-6 recalled that the idea was to merge risk analysis and Star ratings responsibilities into one program and that, during the same time period, Humana combined FE-6's region with several others to create the East region. FE-6 was aware that district leaders had been asked to reapply for new positions in the reorganized region, which indicated to FE-6 that the October 2022 layoffs had been in the works for four or five months.

208.    FE-11, a Senior Stars Improvement Clinical Professional, similarly stated that as part of Humana's cost-cutting efforts, Humana restructured care teams and combined regions around the country. In 2023, FE-11 observed a backlog of cases and patients having issues getting appointments due to the number of requests, and stated that specialist appointments in particular were the most overwhelmed, as Humana was poorly staffed in this service area.

209.    Further corroborating these accounts, FE-20 recalled that Humana underwent restructuring in 2022 and 2023, during which his Health Care Director, Regional Medical Director, data analysts and many others were let go. FE-20 recalled this occurring starting in October 2022. FE-20 stated that his role was preserved, but the cuts in staff made it difficult for him to perform

his job. FE-20 further stated that during this time, the Pacific Southwest region was merged with several others to create the West region.

210.    FE-13 stated that in early 2023, many captive sales agents were either laid off or reassigned to the broker side of the business. FE-13 explained that captive sales agents are paid a base salary and only sell Humana products. FE-13 said that broker agents are only paid commissions and sell various companies' products including Aetna, UnitedHealth, Humana and others. FE-13 stated that the cost-cutting measures implemented by Humana resulted in increased complaints about customer service.

211.    FE-17 similarly stated that Humana reduced staff in 2022 and 2023. High-performing sales agents were asked to transfer to the brokerage, which was less expensive for Humana, and that low-performing agents were fired.

212.    FE-8 stated that from the beginning of his tenure in December 2022, Humana was rapidly expanding by entering new contracts with hospitals but not hiring new staff to handle the increased workload. In addition, FE-8 stated that Humana was cutting experienced staff, which increased the workload for FE-8's team.

213.    As discussed below, Humana's cost-cutting efforts had far-reaching negative consequences. While the impact of Humana's restructuring was felt most directly by Humana's Medicare Advantage members—who faced declining service quality and reduced access to healthcare providers—the cuts also affected Humana's ability to maintain its key Star rating metrics.

I.    **Unbeknownst To Investors, Defendants Knew The Company's Cost-Cutting And Undisclosed Efforts To Suppress Demand Negatively Impacted Critical Star Rating Metrics**

214.    In addition to concealing and downplaying the impact of rising demand on Humana's utilization, Defendants also falsely touted the strength of the Company's processes

designed to ensure favorable Star ratings and its advantages over competitors based on historical Star ratings, as set forth in Sections V.J, V.M and V.O.

215.    Former Humana employees establish that Defendants understood, but failed to disclose, that the drastic, undisclosed measures the Company was taking during the Class Period to offset and conceal pent-up demand and utilization were imperiling Humana's Medicare Advantage plans' Star ratings. Thus, the true state of affairs at Humana in this regard also stood in direct contrast to Defendants' public statements during the Class Period, including regular statements touting the Company's Star ratings and characterizing them as a "durable" competitive advantage. In truth, during the course of 2022 and 2023, Defendants eroded or dismantled processes essential to the Company's ability to maintain favorable Star ratings.

### 1.    Defendants Tracked And Analyzed Star Metrics

216.    FE-1 stated that Humana internally forecasted Star ratings for its various Medicare Advantage plans. Core to these efforts, FE-1 explained that for at least the last decade, Humana regularly conducted "mock surveys" which generally mirrored CMS's Stars surveys. FE-1 explained that these surveys are essentially "mock ups" of the Star metric surveys that are conducted by CMS. FE-1 said that Humana conducts its own internal surveys to do a "pulse check" on customer satisfaction and assess the Company's Star ratings for upcoming years. FE-1 stated that based on these surveys, Humana can predict their Star ratings one or two years in the future. In addition to these surveys, FE-1 further stated that Humana also reviewed claims information to develop data on preventive care utilization and medication adherence by members, which are important indicators for Star metrics.

217.    FE-1 stated that Humana's internal surveys are typically "pretty spot on" in terms of predicting actual Star ratings. FE-1 said that these mock surveys were conducted 2-2.5 years ahead of the projected Star ratings year, and that although these surveys were far in advance of the

final Star ratings, the results were generally accurate with regard to how CMS would rate a particular plan. FE-1 stated that the surveys are generally a pretty good prediction of "what's going to happen" down the road.

218.    As explained by FE-12, an Associate Director of Stars Improvement, many criteria are looked at in the Medicare Star ratings system, including compliance with CMS rules, customer service, "membership experience," "transition care," and other metrics. FE-12 explained that the Star ratings score in a given year would determine the following year's reimbursement rates, as well as the "Bonus Award," which is also a critical revenue component for Humana. FE-12 also explained that Medicare Advantage organizations strive to obtain high Star ratings because it improves their ability to increase enrollment.

219.    FE-14 stated that the corporate Stars team worked with all regions to report metrics using a suite of dashboards with near real time tracking of performance data. FE-14 estimated that the lag on data could fluctuate between a few days and a few weeks but generally did not affect reporting. FE-14 explained that his team's focus was on closing clinical gaps by providing needed services, like mammograms. FE-14 stated that the Star score is calculated using the number of gaps closed divided by the combined total of open and closed gaps.

220.    FE-14 further explained that member experience data was acquired through a 15-question survey delivered to members by mail, email, text, or automated phone call. The ratings measured whether a member was able to see a provider in a timely manner, the ease of scheduling an appointment, provider knowledge of the medical condition being treated, whether the member received the treatment needed, and other related questions. FE-14 stated that the surveys were driven and managed by the corporate team, which would collect, aggregate, analyze, consolidate, and report the data to find common problems and complaints that providers could address.

221.   FE-12 said that Humana's Regional Stars Improvement teams were tasked with improving the performance metrics, vis-à-vis the Medicare Star ratings criteria, of the Medicare Advantage contracts administered by Humana. FE-12 stated that the job of his team was to ensure continuous improvements in Stars performance, year-over-year, for their region. FE-12 offered the example of 2021-22, during which Humana put "a lot of focus" on improving the "membership experience" because it was presumed that CMS would more "highly weight" the membership experience in determining the Medicare Advantage providers' overall CAHPS (i.e., Consumer Assessment of Healthcare Providers and Systems) scores. FE-12 said that his team also concentrated on improving customer service and transition care.

222.   FE-12 participated in strategy forecasting meetings at Humana during which there were forecasting-related discussions regarding items such as projected medical visits, new members versus dual eligible members, inpatient claims, medical costs, and other expenses related to the Medicare Advantage enrollees, as well as the amount of "bonus money" awards that would be given by CMS based on the Providers' Stars Performance rating. FE-12 said that these meetings also included topics such as identifying in which counties enrollment should be aggressively expanded. FE-12 said Humana conducts an analysis of geographical areas and then determines that some counties cost more to do business in than others, and there will be decisions made on focusing efforts to expand in the counties where Humana can make the largest profit.

223.   FE-12 stated that the metrics are boiled down to cost per member per month for each enrollee, and that he understands that Humana looked at internal historical claims data, competitors' data, and overall population health data in formulating projections. FE-12 further stated that some of the data reviewed by CMS is self-reported by the providers. FE-12 explained that among the data sets that he would regularly review was Humana regional market data and the

corporation's overall performance metrics, explaining that since many regional markets covered multiple states, regional managers had to be able to monitor the corporate numbers. FE-12 said that these databases were all available on the corporate "Stars Dashboard." FE-12 stated that by the fall of any individual year, anyone reviewing the data could tell how far ahead or behind the particular region might be.

### 2.    Defendants' Knowledge Of Deteriorating Star Rating Metrics

224.    FE-1 stated that his role included work with Humana's Stars program and he was familiar with its operations, and that Stars performance was discussed at the monthly Special Projects meetings that he attended.

225.    FE-1 said that it was "well-known" within Humana that the overall Star ratings for Humana were going to decline for many plans and this would result in a significant impact on revenues for the company. FE-1 stated that a loss of a single Star rating can have an impact valued at hundreds of millions of dollars over the course of the year. FE-1 participated in many discussions with members of Humana management regarding the Company's declining Star ratings.

226.    With respect to Humana's 2024 Star ratings, FE-1 confirmed that Humana received the 2024 mock Stars results in late 2021 or early 2022. FE-1 recalled that he reviewed the read outs of these mock results first-hand around the time they were released, in late 2021 or early 2022. FE-1 recalled that these mock results revealed worsening performance from prior years. FE-1 explained that the mock results encompassed claims data and survey results, explaining that "every indicator they had was telling them that they would get paid less."

227.    FE-1 specifically described the survey responses as an "oh crap" moment. He noted that Humana "was seeing a change" in the survey responses relative to prior years. For example, FE-1 explained that one survey measure was whether a member received the necessary preventive care. He explained that during the test period, which he described as "post-COVID," Humana's

members were not managing chronic conditions in a preventive way—e.g., members were failing to go in for annual check-ups and routine bloodwork—and as a result, members were reporting in the survey that they had not received this preventive care. FE-1 stated that it was apparent in the survey results that members were failing to return to preventive care as expected as early as the end of 2020 or beginning of 2021. FE-1 added that this shift in member behavior would have a big impact down the road, as most members are elderly and would benefit from preventive care checkups. FE-1 also recalled that the claims aspect of the mock results was unfavorable.

228.    FE-1 stated that the declining Star ratings was known across the organization and discussed openly among employees following the mock results issued in late 2021 or early 2022. FE-1 recalled attending meetings after the mock results were issued in which executives acknowledged that the Company was "about to take a Stars hit" and discussed ways to make up for the projected losses in revenue from the Stars income as a result of a downgrade to its Star ratings. FE-1 also recalled that these meetings were attended by Broussard, Jim Moore, and "other SVPs." FE-1 said that in these meetings the need for "cost containment" was discussed and that the message was along the lines of "with everything going on with Stars, we need to make sure that our cost containment is good so we can make up the revenue." FE-1 confirmed that these meetings occurred throughout his time at Special Projects (i.e., 1Q 2022 to 2Q 2023).

229.    FE-1 stated that the fact that Humana was going to take a hit to its Star ratings was "well-known across the organization" and that teams were expected to "shuffle really hard" to make up for the financial consequences. FE-1 reiterated that he recalled being in meetings with multiple Senior Vice Presidents and Broussard in which this was discussed.

230.    FE-2 confirmed that Star ratings were an important indicator of the Company's performance. FE-2 reported that the Company shared "Quarterly Stars Updates" that were

generally available to most internal associates, as bonuses were tied to the ratings. FE-2 stated that in 2023, these quarterly reports showed "significant" underperformance from some segments of the Company. FE-2 reported that there were departments that were "so far off the trail" that he "didn't know how they were going to close the gap."

231.    FE-12 stated that he was "not at all surprised" that Humana received lower Star ratings in 2025 (revealed in October 2024), as everyone knew that 2023 and 2024 were going to be "tough years." FE-12 explained that with the lag between the "measure year," "rating year," and "plan year," that the 2025 ratings would reflect the effects of eliminating the role of the Regional Stars teams in 2022.

232.    FE-12 explained numerous problems at Humana during 2022 and 2023 that directly impacted the Stars program. He said that starting in approximately 2022, Humana management started to cut back the role of the Regional Stars Improvement units. FE-12 further said there were significant changes implemented by Humana which involved the role of these regional units, including "big cuts" fiscally and a reduction in the manpower levels of these units. FE-12 stated that Humana "de-prioritized" the role of the Regional Stars teams and had the "Corporate Stars teams" absorb much of the role of the regional units. FE-12 explained that Humana management viewed the regional stars teams as unimportant since they "only contributed about a 4%" difference in the overall CAHPS ratings. But in fact, FE-12 stated that the regional market teams provided much better analysis and outreach to implement initiatives that were based on the unique needs of the local market, and that the regional teams' activities and work often made marginal incremental increases in providers' CAHPS ratings for Stars. FE-12 stated that the Regional Stars Improvement Teams have a better understanding of their market and can focus initiatives on areas where extra effort is needed to make marginal gains.

233.    FE-12 said that "when they began to eliminate the role of the Regional Stars Improvement units, we all knew that the CAHPS ratings were going to go down" and it would affect the overall Star ratings. FE-12 stated that because of Humana's movement away from the Regional Stars teams, as 2022 went on, many Stars improvement activities were either "stalled or halted altogether." For example, FE-12 said it got to the point that the Regional Stars Teams could not even send out postcards to remind patients to get their annual wellness exam, but noted that reminders such as this often led the patients to request additional services, get vaccinations and tests and do other wellness activities, and that when these local level initiatives are implemented, they have a ripple effect that has a positive impact on many areas that are reviewed by CMS in Stars assessments.

234.    FE-6 similarly recalled that layoffs in the Stars Improvement group began in October 2022.

235.    FE-12 stated that as the Regional Stars teams were reduced in size and their autonomy was taken away, "employee engagement was down," as most employees "knew they were going to be losing their jobs." FE-12 said that the shift of responsibilities from the Regional Stars teams to the corporate level meant that all of the activities that consistently helped make incremental gains in the CAHPS ratings were now no longer being conducted.

236.    FE-12 stated that he experienced the effects of the shift to Corporate Stars as early as the spring of 2022, and that corporate management "already started tying our hands that spring" and there were many "corporate roadblocks" to the Regional Stars teams doing their job. FE-12 stated that without the regional market Stars improvement teams, all of the "marginal gains" that these teams had created over the years were being lost. FE-12 said that the regional teams were

especially good at getting year-over-year improvement in areas such as Transition Care, diabetes measures, wellness visits, and overall patient experience.

237.    FE-12 stated that the corporate Stars Team really showed no market innovation and focused on easy things, which eventually would come back in the form of lower CAHPS ratings. FE-12 stated that the benefit of the Regional Stars Teams was that they could be innovative and creative in how they addressed their particular region, and that they were better equipped to focus on areas where they could make marginal improvements that the Corporate Stars Teams could not.

238.    FE-12 stated that he, along with many colleagues in Stars improvement, voiced their thoughts to management on the elimination of the Regional Stars Improvement Teams. FE-12 explained that he personally discussed these matters with John Myers, Market President, as well as the corporate team leader. FE-12 stated that he specifically told these individuals, in discussions in mid-2022, that the regional markets make a big difference in improving the overall customer experience and that he believed that Humana should let the regional teams continue to do their work if it wanted to continue to obtain favorable Star ratings. In addition, FE-12 said that the shift of responsibilities to the corporate Stars Teams was also raised at numerous Stars meetings and market collaboration calls in which he participated, and that there were monthly, biweekly or weekly meetings in 2022 where this topic was discussed.

239.    FE-12 said that many of the regional market employees spoke out about the negative ramifications of eliminating the Regional Stars Teams, and recalled statements about this topic by Teresa Fugate, the Tennessee Market Stars Improvement Director, whom he said was "very vocal" about her displeasure with the dismantling of the Regional Star teams. FE-12 stated that the objections raised by the various Regional Stars Team members generally fell on deaf ears.

240.    As a member of the Star Improvement team in 2022, FE-22 was tasked with analyzing reports and determining where weaknesses existed. FE-22 stated that he also called pharmacies in order to maintain medication adherence, and performed outreach to Humana members. FE-22 further stated that reports were generated that showed problems with the Star ratings, and managers in his department would review these reports with other employees. FE-22 explained that monthly meetings would be held to review specific Stars measures, and that these issues would be assigned to team members to work on.

241.    FE-10 reported that Humana performed staff cuts in 2023, and that many talented and experienced people in his staff were let go.

242.    FE-19 explained that, as a Provider Engagement Executive from October 2022 until his departure from Humana, he was responsible for looking at Star ratings and utilization in terms of "what was going on with member cost to Humana" in the Northeast region. FE-19 recalled a spring 2023 virtual meeting at which the Regional President said that because of negative pressures on Star ratings, Humana needed to drive down utilization as an explanation for why the Regional President needed to close panels. FE-19 explained that panels are lists of members and that the panels the Regional President wanted to cut were disadvantaged members in poor health in underperforming markets, like certain areas of New York City and New Jersey. FE-19 recalled that these comments were made not only in virtual meetings, but in person to other members of the Northeast team.

243.    FE-19 recalled that in the late summer of 2023, Humana held a Northeast leadership meeting. In attendance at the meeting were FE-19's Regional President, Julie Mascari, Renee Rees (Director of Provider Engagement), Joel Engleka (Regional Vice President, Network Performance), John Roefaro (Regional Vice President, Provider Experience), Jeremy Greenberg

(Director of Provider Contracting), Nancy Adams Kenny (Regional Director of Health Services), sales executives, and other members of the provider engagement team. FE-19 stated that at the conference, Mascari, the Regional President, said that if Humana could not improve Star ratings, then the Company needed to drive utilization down, and get rid of providers with high utilization patients.

244.    As time went on during his final years at the Company, FE-13 had trouble coordinating care for Medicare Advantage members who needed home healthcare and skilled nursing services, as the number of providers serving Humana members had declined, which was also reflected in Humana's "Patient Portal," where certain prior providers were no longer listed. FE-13 stated that this issue was most prevalent with Humana HMO plans, which were provided at a lower cost for the insured, but gave very little flexibility as to where to seek care. FE-13 further stated that he was a member of the Agent Council at Humana, which consisted of sales agent representatives from every Humana region in the United States, and that many agents on the Council also raised the issue of the list of available skilled nursing and home healthcare providers continuing to shorten.

245.    FE-11—a Senior Stars Improvement Clinical Professional who worked with network providers to ensure they fulfilled CMS requirements and metrics of service—stated that he was not surprised that Humana's Star rating has gone down. FE-11 described how in 2023 there was a backlog of cases and patients were having issues getting appointments due to the number of requests and because Humana was poorly staffed, particularly when it came to specialists. FE-11 attributed the decline in Humana's current Star rating to the Company's inability to handle the COVID "pent-up" surge in demand. FE-11 also cited the structural changes Humana made to try

and become more efficient, including layoffs of staff, as contributing to the decline in Humana's Star rating.

246.    FE-21, a Stars Program Director into 1Q 2023, explained that Humana struggled to meet CMS 5 Star rating metrics coming out of COVID in 2022. FE-21 explained that CMS contracts require Humana to ensure screening, population health, data collection, and data submission to Corporate for ultimate submission to CMS. FE-21 further explained that CMS establishes thresholds every year for different metrics that insurers need to reach in order to achieve a certain Star rating. FE-21 gave the example that, in a Breast Cancer metric, you might need 78% of your patients to get a Breast Cancer screening to achieve a 5 Star Rating. The rating thresholds are recalibrated every year based on industry performance.

247.    FE-21 explained a number of Humana's struggles with respect to its Star rating. According to FE-21, the worst thing that happened was that CMS sends out random surveys to members to collect information on how Humana did from the members' perspective on a variety of metrics. FE-21 stated that the metrics are weighted single weight, double, triple, even quadruple weight depending on which direction CMS wants to move the industry. FE-21 added that certain member satisfaction metrics like getting care, making appointments, and customer service were given quadruple weight.

248.    FE-21 recalled that Humana did not do well in the member satisfaction area covering healthcare such as screenings, tests, chronic care and vaccines. As the reasons for the poor member satisfaction, FE-21 pointed to low staffing at providers, lack of appointment availability for members, member behavior (driven by COVID fears) and the removal of COVID-related CMS exceptions. In addition, FE-21 said that Humana struggled internally from poor customer service and an insufficient ability to support providers. FE-21 did not interact with

members but did notice a drop in all CMS metrics pertaining to member satisfaction in 2022. FE-21 said the drop was evident on the CMS survey and Humana's own member survey.

249.    FE-14 added that the decision to consolidate the Stars system at the corporate level was made in the summer of 2022, likely in June or July. FE-14 recalled that the reorganization occurred in January 2023. FE-14 explained that cuts in the Stars team would likely result in lower Star ratings because all the work for measuring year 2023 would have been done after the reductions in force. FE-14 further recalled that the changes impaired provider engagement because there were fewer staff members to engage with each provider. FE-14 stated that in value-based provider contracts, provider performance is heavily incentivized, which requires significant engagement from Humana.

250.    On the member engagement side, FE-14 recalled that many highly-trained and experienced associates were let go. FE-14 stated that those associates were responsible for engaging members on multiple levels and working to fill gaps in metrics. FE-14 stated that Humana grew much less than it had expected, which created the need to save $1 billion to invest back into benefits and accelerate growth. FE-14 stated that the reorganization was communicated through Company-wide meetings held virtually, including Defendants Broussard and Diamond, Wheatley (Retail Segment President), and Renaudin (President, Insurance).

251.    For Stars data issues, FE-14 stated that the Corporate Stars organization had a team dedicated to member experience that would report any issues to Humana's Vice President of Stars. The Regional Stars Teams also elevated region-specific problems up to a corporate liaison. FE-14 reported to both his region president and the corporate liaison.

252.    In his role as Stars Improvement Lead for one of Humana's regions from 1Q 2020 until early 1Q 2023, FE-6 led a team working with providers to improve their Star ratings. FE-6's

region covered at least 65 providers, including large provider groups. FE-6 explained that Humana tracked member data using the Compass Population Health Insights system, also known as Compass, a Company-wide platform developed by Humana to monitor provider Star rating trends and the metrics used to calculate Star ratings. FE-6 further explained that permission was required to access the platform because it contained sensitive data such as financial information. FE-6 stated that Compass also contained provider performance information and the hierarchical condition categories, the risk-adjustment model used to estimate future health care costs for members.

253.    FE-6 stated that Humana used extensive predictive modeling to predict Star scores, based partly on the information contained in Compass. In FE-6's experience, Humana disregarded small providers in favor of boosting the ratings in large groups. FE-6 explained that CMS audits only select records to calculate Star scores, and Humana makes the "gamble" that CMS will pull from the larger groups. FE-6 specifically cited plan H5216, one of Humana's largest, as a large and high-performing plan that Humana would focus on in the hopes that CMS would pull member records from it. Plan H5216, which contained approximately 45% of Humana's Medicare Advantage membership, was one of the Humana Medicare Advantage plans that suffered a material decrease in its Star Rating, as Humana admitted on October 2, 2024.

254.    FE-6 stated that he had a sense Humana would lose its high Star ratings. Because FE-6's was very high-performing, his team would be asked to target certain metrics for improvement to compensate for lower-performing plans in other regions. This way, FE-6 understood the metrics that concerned Humana. FE-6 recalled that some of the metrics at risk were CAHPS scores.

255.    With regard to Star ratings, FE-6 explained that Humana would attempt to game the metrics by moving members from low-performing plans to high-performing plans. FE-6 stated

that members could be shifted from one plan to another during the Annual Enrollment Period or by eliminating the lower-performing plan and instead selling the high-performing plan. As an example, FE-6 cited plan H5216, which has members that span 34 states. FE-6 explained that the level of available healthcare can vary from state to state. As more members are added to the plan, it becomes more challenging to maintain the performance level. FE-6 stated that if lower-performing regions were added to a higher performing region in an effort to average out their lower performance, it creates the risk of lowering the overall plan's rating. FE-6 compared this maneuvering to a "shell game." FE-6 said there was an awareness of what regions were at risk, including with respect to specific metrics for the struggling areas such as preventive care and mammograms. FE-6 further stated that these decisions would be made by Chuck Dow, Justin Howard, and possibly Tracy Wilbourn, at the beginning of the annual Medicare Advantage bid process in February or March.

256.    FE-17 similarly stated that in 2022 to 2023, poor performance in the northeast Texas region negatively affected Star ratings for those plans. FE-17 recalled discussions about ways to reduce costs for plans that were too expensive, including cuts to benefits, increased co-pays, and reduced dental benefits. FE-17 stated that "hot" areas saw a denigration of benefits due to high utilization. FE-17 explained that Humana would take a high-performing plan from one area in the country and offer it in a low-performing area, like Houston, to stem the loss of money from the low-performing area.

**J.      From July 2022 To June 2023, Defendants Misled The Market About The Risk Of Pent-up Demand, The Causes Of Decreased Utilization, And Humana's Star Ratings**

257.    The foregoing facts establish that, prior to and throughout the Class Period, Defendants knew of and expected increased utilization as the Company emerged from the pandemic, and actively suppressed that demand through widespread denials of claims and prior

authorizations. Defendants also knew Humana continued to implement widespread cost cuts to offset that increased utilization, which were negatively impacting critical functions within the Company and, in turn, Humana's Star rating metrics.

258.    From the start of the Class Period forward, however, none of these facts were disclosed. Instead, in the latter of half of 2022 and first half of 2023, Defendants consistently assured investors that Humana was experiencing favorable healthcare utilization trends in its Medicare Advantage business. They repeatedly claimed that any pent-up demand from the COVID pandemic had already worked through the system, while emphasizing lower-than-expected inpatient utilization rates and downplaying concerns about future utilization spikes. At the same time, Defendants touted Humana's strong Medicare Advantage Star ratings as a competitive advantage.

259.    On the back of these material misrepresentations and omissions, Humana's stock price soared, hitting record highs. Indeed, Defendants' material misrepresentations were accepted by Wall Street analysts, who incorporated them into their ratings and forecasts. Defendants maintained this false narrative even when questioned about increasing utilization among other healthcare companies, including based on reports of strong inpatient volumes by hospital groups. When pressed about this apparent contradiction, Defendants insisted that Humana's Medicare Advantage utilization remained favorable.

260.    To start the Class Period, on July 27, 2022, during the Company's 2Q 2022 earnings call, Diamond touted the "***outperformance particularly in our individual MA business***," stating that "***what we are seeing internally from an individual Medicare Advantage perspective, we are seeing better-than-expected results and better-than-expected MERs based on the -- primarily the lower inpatient utilization***."

261.    Crediting Defendants' statements, on July 27, 2022, UBS noted: "***Utilization trends still appear to be broadly positive with HUM***[.]" Also that day, Oppenheimer & Co. Inc. ("Oppenheimer") wrote: "HUM raised 2022 adj. EPS guidance to 'approximately $24.75' from 'approximately $24.50,' ***driven by favorable utilization trends YTD and the absence of anticipated COVID-19 headwinds***." *Healthcare Dive* similarly reported on July 27, 2022 that "Humana's Q2 profit jumps to$696M on lower medical costs," noting Diamond's comments about the Company's "lower utilization trends."

262.    During Humana's September 15, 2022 Investor Day, Defendants continued to distort the underlying dynamics of utilization and downplay the risks associated with pent-up demand. For example, when an analyst asked for an "update on utilization trends that you've seen since your update on the 2Q call," Diamond responded that "[*w*]*e've been seeing lower-than-expected in-patient utilization, which* . . . . *have continued in the recent weeks*" and that "***[i]n particular, ER rates, observation stays and SNF [skilled nursing facility] utilization continue to trend lower than what we would consider baseline trend levels***."

263.    Following these false and misleading statements, Humana's stock price increased by more than $38, over 8%, on September 15, 2022. Reuters reported that "insurer Humana [saw a] 8.4% surge following its strong earnings forecast," which "made it the top gainer in the S&P 500." Commenting on Defendants' Investor Day, Wells Fargo Securities LLC ("Wells Fargo") specifically quoted Diamond's representation in compiling "recent commentary" on managed care "volumes and utilization." Based on these comments, Wells Fargo concluded that "MCOs [Managed Care Organizations] have generally discussed favorable utilization trends remaining consistent through 3Q22." Morningstar, Inc. similarly reported that "Humana boosts 2022 outlook on medical utilization trends and provides strong 2025 outlook," commenting that "the company's

medical members have been more profitable than initially anticipated based on lower medical utilization trends."

264.    Next, on January 9, 2023, Defendants expressly denied the prospect of any pent-up demand in the individual Medicare Advantage segment. During a JPMorgan Healthcare Conference, an analyst asked "as we think about inpatient/outpatient utilization levels compared to your initial expectations, maybe just talk about how things came out for 2022? And then, are you looking for any pent-up demand as we start to think about 2023?" Diamond responded that after a spike in COVID rates, "*we would see some, what we call, above baseline utilization[,] [b]ut then it would typically in a . . . reasonable period of time come back down*." Diamond further stated that because "[w]e haven't had any of those major surges of COVID in a while . . . . *our view would be that there really isn't pent-up demand that we have to be concerned about*."

265.    Analysts again relied on Diamond's false reassurances. Truist Securities, Inc. ("Truist") commented that "management does not expect any significant impact from pent-up demand." BofA Securities echoed this sentiment: "Humana was pleased to see positive current year restatements and moderating trends during the third quarter . . . HUM expects trend and utilization to remain stable/improve going into 2023."

266.    The next month, on February 1, 2023, during Humana's 4Q 2022 earnings call, an analyst from Barclays Bank PLC ("Barclays") asked about the "midpoint of the MLR guidance" and whether Humana was "assuming any sort of pent-up demand related to elective procedures or any other pent-up non-COVID care coming out of '22 that may have to be absorbed in 2023 at the guidance midpoint[?]" Diamond responded that "*based on all the analysis we've done, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system*." Doubling down, Diamond reasoned that "*[h]istorically, we have seen some evidence of*

*that, but it's typically after a very large COVID spike where there's significant depressed non-COVID utilization, which fortunately we haven't seen for some time, and we are not forecasting that type of event to occur again in 2023.*" Diamond concluded that "***our guide does not have an explicit assumption around pent-up demand, but rather just taking the resulting sort of baseline trend we experienced in 2022.***"

267.    Once more, analysts credited these representations and incorporated Defendants' statements into their outlook on Humana's stock performance. For example, on February 1, 2023, Oppenheimer listed "utilization environment stable" in its base case assumption supporting its "Outperform rating." On February 2, 2023, UBS reiterated its "Buy" rating and stated that "HUM's 2023 outlook appears conservative from an MLR perspective, with mgt. baking in numerous headwinds," including "a return to normal utilization levels." Also, on February 2, 2023, Stephens reiterated an "Overweight" rating, noting "[t]he year-over-year decrease in the quarterly GAAP consolidated benefit ratio reflects the favorable higher per member individual Medicare Advantage premiums and lower inpatient utilization associated with the Medicare Advantage business[.]"

268.    A short time later, in March 2023, Defendants again touted Humana's Star rating as a distinct competitive advantage, including that such ratings "***continue to reflect the Company's unwavering focus on high quality of care, patient-centered clinical outcomes and reliable customer service for members***" and have "***created this ability not only to compete by the product itself, but also the ability to have dependability over multiple years.***" Of course, behind the scenes, Defendants had for months discussed negative trends in Humana's Star ratings metrics, anticipated a drop that would harm future bonus payments from CMS, and had actively begun cost-cutting measures that would harm key Star rating metrics.

269.    Notably, before Humana's April 26, 2023 earnings call, multiple publicly traded healthcare providers reported positive earnings based on strong utilization volumes. While these trends would seem troubling for the profits of large healthcare payors such as Humana, Defendants steadfastly denied this implication or any suggestion that they were seeing increased utilization or pent-up demand among its members.

270.    For example, on April 21, 2023, HCA Healthcare, a company with $60 billion in annual revenues that operates 182 hospitals, 126 surgery centers, and 21 freestanding endoscopy centers, reported in connection with its first quarter 2023 earnings that "[s]ame facility admissions increased 4.4 percent and same facility equivalent admissions increased 7.5 percent in the first quarter of 2023, compared to the prior year period," including that "same facility inpatient surgeries increased 3.6 percent while same facility outpatient surgeries increased 5.1 percent in the first quarter of 2023 compared to the same period of 2022."

271.    On April 25, 2023, Tenet Healthcare, a company with nearly $20 billion in annual revenue that operates 61 acute care, 445 ambulatory surgical centers ("ASC"), and 24 surgical hospitals, reported in connection with its first quarter 2023 earnings that "[s]trong volumes support good results . . . [and] a post-pandemic environment is taking shape, COVID admissions are down, a wider range of acuity is returning to the hospitals, deferred GI procedures are returning and our workforce is starting to stabilize." In response to a specific analyst question about revenue per procedure during Tenet's April 25, 2023 earnings call, Tenet's CEO Saum Sutaria described that "healthcare services that were deferred or more actively deferred" in Tenet's "ASC business in particular" and said that the ASC business had "happened to come back a bit this quarter." Later in the call, Tenet's CFO Daniel Cancelmi attributed increased admits to "the intensity of the

outpatient volume." Universal Health Services (around $15 billion in revenue operating hospitals and outpatient surgical centers) also reported increased patient utilization volumes.

272.    But on April 26, 2023, when Humana announced its 1Q 2023 earnings release, Defendants reported a "strong 1Q23 performance underpinned by robust membership growth and *favorable inpatient utilization trends in the individual Medicare Advantage business*[,]" and reiterated that "[w]e've had a strong start to the year, with our outperformance underpinned by strong membership growth and *favorable inpatient utilization trends in our individual Medicare Advantage business*."

273.    During Humana's earnings call that day, Diamond again downplayed the risk of pent-up demand, noting that "[w]hile non-inpatient claims are less complete, early indicators suggest trends are in line with expectations." Diamond also "*reiterate[d] that we are comfortable with the utilization patterns seen in our insurance segment. And more specifically, our Medicare Advantage business to date as reflected in our updated full year adjusted EPS guidance*."

274.    When an analyst from Credit Suisse specifically questioned Diamond's comments on the utilization patterns the Company was purporting to see relative to those reported by other publicly traded hospital systems, Diamond responded: "*And with our expectation that we would see trends return to normal levels, we would expect a higher first quarter trend relative to the average we would have planned for, for the year. So again, I do think that's very consistent with what we've seen. And even with that expectation and what the hospitals are reporting, we are still seeing some net favorability in the quarter*."

275.    During that same call, George Hill of Deutsche Bank AG ("Deutsche Bank") asked whether Humana would have the ability to expand total Medicare Advantage enrollees in 2024 when considering the "2024 rate environment and the [Stars] environment." Here, Broussard stated

the Company "remain[ed] committed to growing our membership growth in the high single digits" and that the Company would able to gain share because "*[a]s we enter 2024, obviously, our Star[s] position is a positive for the company*."

276.    Encouraged by Defendants' statements, on April 26, 2023, Oppenheimer commented that "HUM remains optimistic around its MA growth positioning going forward, and remains committed to its high single-digit target, especially given its Star Rating positioning." On April 27, 2023, RBC commented that "Humana's above-industry MA Star Rating profile puts the company on better competitive footing amid regulatory/reimbursement headwinds, positioning the company well for continued share gains." On April 27, 2023, Wells Fargo increased its "2023E EPS estimate by $0.25 or ~1% to $28.35 from $28.10 previously," stating that "[o]ur increase is consistent with HUM's guidance raise and underpinned by constructive commentary on utilization." Goldman Sachs similarly remarked that "[f]avorable utilization patterns a notable callout vs. peers," relying on "Humana's commentary on lower inpatient utilization trends than expected in 1Q23." Similarly, on April 26, 2023, *Dow Jones Institutional News* specifically called out Defendants' statements regarding Humana's "*favorable*" utilization.

277.    Speaking at a Bank of America healthcare conference a few weeks later, on May 9, 2023, Diamond continued to downplay pent-up demand and the resulting pressures on Humana's profitability. Responding to a question from a BofA Securities analyst regarding strong volume numbers reported by medical providers, Diamond explained that the Company "*did contemplate that we would see normalized trend development in 2023, off of our 2022 baseline*" and that the Company "*did plan for a normalized trend, and you can think of that as just sort of typical trend that you would apply for utilization and unit cost on top of your starting point*." Diamond further assured investors that "we'll certainly continue to watch the trends develop over the rest of the

year," but that "*so far, what we're seeing is* . . . *slightly favorable [utilization] expectations on the inpatient side*" that are "*consistent, if not slightly positive for the first quarter*."

278.    Responding favorably to these reassurances, Baptista Research noted on May 9, 2023 that "[t]he adjusted earnings per share for the quarter of $9.38 were higher than the company's early forecasts, with the outperformance being driven by robust membership growth and favorable inpatient utilization trends in its individual Medicare Advantage business."

### K.    Following Defendants' Continuous Misrepresentations, Defendant Diamond Reaped Millions In Insider Sales

279.    After nearly a year of misleading the market, Defendant Diamond cashed in on Humana's artificially inflated stock price. Specifically, on May 4, 2023, just weeks after denying and downplaying concerns about Humana's pent-up demand and patient utilization during the Company's 1Q 2023 earnings call, Diamond sold over 4,000 shares of Humana common stock, reaping over $2 million in proceeds in a single day.

280.    Shockingly, as discussed more fully below, Diamond would later concede in August 2023 that "beginning in early May," i.e., the period coinciding with her insider sales, "we noted the emergence of higher-than-anticipated non-inpatient utilization trends in our Medicare Advantage business" and that "[a]t the same time, we began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns." Yet, Diamond never disclosed these material, nonpublic facts and, instead, profited off of that information.

### L.    Beginning In June 2023, Defendants Were Forced To Belatedly Acknowledge Increased Utilization, But Continued To Mislead And Falsely Assure Investors

281.    As alleged above, Defendants sought to conceal increased utilization by Humana's Medicare Advantage members during the Class Period, misleading investors into believing that the Company could maintain its robust profitability despite this utilization wave as COVID subsided.

282.     In reality though, as the effects of the pandemic dissipated, Humana experienced a massive, internally-anticipated increase in utilization, which it actively tracked through its internal models. While Humana sought to divert and deny patient care to maintain a false narrative that Humana's record profitability seen during COVID was sustainable, beginning in June 2023, Defendants were forced to admit that a "higher than anticipated" utilization trend was occurring. However, in disclosures over the subsequent months, Defendants continued to downplay the impact of post-COVID utilization on Humana's profitability, falsely assuring investors that cost-cutting measures would offset the rising utilization costs.

283.     Moreover, while Defendants consistently pointed to Humana's Star ratings as a revenue anchor and competitive advantage during rising utilization, they failed to disclose that the cost-cutting measures they claimed would offset the growing utilization costs were undermining services that were critical to those Star ratings.

284.     The full consequences of Defendants' efforts to conceal Humana's declining profitability were only fully apparent to the market in October 2024, when the Company disclosed a decline in many of its plans' Star ratings, which as alleged above, was a direct result of Defendants' actions during the Class Period to suppress utilization and cut costs to offset rising utilization.

      1.     **June 13, 2023: UnitedHealth Acknowledges Increased Utilization, Leading Humana Investors To Question Defendants' Claims About The Company's Utilization Trends**

285.     On June 13, 2023, while speaking at a Goldman Sachs Healthcare Conference, John F. Rex, the CFO of UnitedHealth, Humana's largest Medicare Advantage competitor, acknowledged that UnitedHealth was seeing increased outpatient utilization. In particular, Rex cited elective outpatient surgeries common in the senior Medicare Advantage population such as

hip replacements, knee replacements, and cardiovascular care. He indicated that the increased

utilization "***look[ed] a little bit like pent-up demand or delayed demand being satisfied***."

286.    Speaking to the "levels of care activity that seniors are getting," Rex identified

"certainly a meaningfully higher number of cases that are being performed," later adding "[t]here's

evidence that they had to delay this care."

287.    UnitedHealth CEO, Timothy Noel, added:

> [W]e're seeing as behaviors kind of normalize across the country in a lot of
> different ways and mask mandates are dropped, especially in physician offices,
> we're seeing that more seniors are just more comfortable accessing services for
> things they might have pushed off a bit like knees and hips . . . . We're just seeing
> more services.

288.    Asked whether one should view the current Medicare trends as "sort of a catch-up,"

Rex responded: "Yes, I think that's a fair way to say, a catch-up to what you'd expect to see" now

that "people are going to be able to access the system a little more freely." With respect to increased

utilization, Rex also indicated that the "[b]ulk of it is outpatient."

289.    In response to this news that pent-up demand for healthcare services among the

Medicare Advantage population was driving increased utilization at the sector leader and

Humana's largest competitor, the price of Humana common stock dropped $57.63 per share, or

11.24%, from its closing price of $512.63 per share on June 13, 2023 to close at $455.00 per share

on June 14, 2023.

290.    Analysts and market commentators were quick to attribute the decline in Humana's

stock price to the increased utilization trend disclosed by UnitedHealth, concluding that

UnitedHealth's revelation reflected a market-wide trend, and thus directly impacted Humana, the

second largest market player in Medicare Advantage behind UnitedHealth. For example, on June

14, 2023, Credit Suisse noted the "outsized movement in HUM shares and the company's large

exposure to MA." The same day, Reuters wrote that health insurers had been benefitting during the COVID pandemic from the delay in elective surgeries but "the gains may be waning."

291.    Also on this date, Deutsche Bank issued a report with the topline statement "UNH Warning Highlights Risk for Other MCOs," identifying Humana as one of the companies likely to see "the greatest absolute impact" from a wider trend of increasing outpatient utilization. Given the proximity of UnitedHealth's increased utilization disclosure, "less than 10 days after Medicare Advantage bids were due to CMS," Deutsche Bank concluded "this will now force investors to question for the next three to four quarters [whether] Humana" was able to price the trend into its Medicare Advantage bids. Deutsche Bank further noted that it anticipated for Humana a "~20% impact to EPS" from the utilization trend that UnitedHealth noted, given Humana's "***greater*** relative exposure to MA."

292.    On June 15, 2023, RBC reported that "[s]hares of HUM closed 11.2% lower Wednesday [June 14, 2023] following comments from peer UNH on Tuesday afternoon that medical costs are trending higher than expected in the second quarter." (original emphasis omitted). RBC further observed that the downward movement in Humana's share price based upon UnitedHealth's disclosure could be attributed to Humana's "higher mix of MA business," highlighting how "HUM's 11.2% decline on Wednesday compares to a 6.4% share price decline for UNH." RBC added that UnitedHealth's comments had come as a surprise, in part because in public comments made on May 9, 2023, Humana had reaffirmed the Company's expected MLR of 86.3%, and the Company had reaffirmed its full-year 2023 adjusted EPS guidance on June 1, 2023.

293.    While investors in UnitedHealth's stock were reassured by UnitedHealth's ability to factor the increased utilization trend into its 2024 bid calculation, Humana's investors lacked

any such reassurances given Defendants' persistent denials of increased utilization prior to UnitedHealth's disclosure.

### 2.    June 16, 2023: Humana Admits To Increased Utilization, But Defendants Continue To Conceal The Full Truth From Investors

294.    With its hand forced by UnitedHealth's disclosure of increased utilization earlier in the week, on June 16, 2023, Humana filed a Form 8-K in which it reaffirmed its full year MLR guidance for the Insurance segment of 86.3% to 87.3%, but predicted for the first time that it would likely "be at the top end of this full year range." Humana attributed this upward adjustment, in part, to "***higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries, and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns***."[2] Humana further stated that the Company assumed the "***moderately higher-than-expected trends***" would continue "for the remainder of the year."

295.    In response to Humana's June 16, 2023 disclosure concerning increased Medicare Advantage utilization, the price of Humana common stock dropped $18.20 per share, or 3.92%, from its closing price of $463.85 per share on June 15, 2023 to close at $445.65 per share on June 16, 2023.

296.    Analysts commented that Humana's disclosure indicated a broader and more severe trend of increased utilization than UnitedHealth had disclosed on June 13, 2023. For example, RBC reported on June 16, 2023 that "Humana's elevated utilization commentary encompasses a

---

[2] "Seasonality" generally refers to seasonal trends in healthcare utilization patterns. For example, in the winter months, providers may experience patterns of higher utilization based on cold and flu cases, or providers associated with benefits that expire at year-end—such as dental cleanings or new glasses—may typically see increased utilization before year-end from members seeking to use benefits before they expire.

broader swath of care categories versus UnitedHealth's commentary on Tuesday." In its June 16, 2023 report, SVB Securities LLC ("SVB Securities") noted that Humana's inpatient "comments seem more negative as compared to UNH commentary." Barclays similarly noted on June 16, 2023 that Humana's 8-K "called out higher than anticipated volume in ER, outpatient surgeries, and dental services, while also pointing to stronger than anticipated inpatient trends in recent weeks." Barclays remarked, with respect to the question of costly inpatient services, that Humana's "inpatient trend comment diverges slightly from UNH earlier this week as UNH had noted that inpatient continued to be 'pretty controlled.'"

297.    Despite the unexpected and negative news that Humana disclosed, the price of the Company's common stock remained artificially inflated because Defendants continued to mislead investors. Specifically, in the same June 16, 2023 release, the Company sought to allay investor concern, assuring them that these higher trends would be "***offset by a variety of factors***, including higher-than-expected favorable prior year development, ***additional administrative expense reductions***, higher than previously anticipated investment income and other business outperformance." Humana further assured that "consistent with historical practice, it considered the initial emergence of these trends in connection with the 2024 Medicare Advantage bids submitted on June 5, 2023."

298.    Defendants' statements had their intended impact, as analysts were reassured by the fact that Humana reiterated its MLR guidance and that Humana had seen the elevated cost trend soon enough to factor it into its 2024 Medicare Advantage bids, and the Company's other materially false and misleading statement that it could offset the increased utilization trend through additional cost-saving measures. Pointing to the comments Humana made with respect to its MLR in the Form 8-K, Barclays stated, "[d]espite the MLR comments . . . HUM reiterated its full-year

guide of 'at least $28.25' pointing to a few offsets." While trimming its price target on Humana, Barclays maintained its full-year EPS estimate of $28.25, and stated that "our fundamental view of HUM is largely unchanged (positive leverage to faster growing MA industry)."

299.    In a June 16, 2023 report entitled "Humana, Inc. Second Shoe Drops; Sees Uptick in Trend But Reaffirms Guidance," Oppenheimer remarked that while Humana "did discuss several factors pushing its FY23 insurance segment [benefit expense ratio] to the top-end of the 86.3-87.3% range, . . . HUM expects offsets." Oppenheimer further stated that "[o]n the bright side" Humana was able to catch the increased utilization trend before submitting its Medicare Advantage bids.

300.    Remarking on Humana's June 16, 2023 announcement, RBC stated that it was "maintaining our full year 2023 and 2024 adjusted EPS estimates, consistent with management's reaffirmed earnings outlook for this year and their expectation that prevailing utilization trends [were captured] in its recently submitted MA bids for next year." SVB Securities was similarly encouraged by the "offsets" Humana called out as mitigating the impact of increased Medicare Advantage utilization, stating: "HUM is clearly seeing an ability to absorb around a 50bs step-up in MLR with business outperformance, favorable PPD, and cost initiatives."

301.    Despite Defendants' assurances, several analysts questioned whether Humana had been able to fully account for the higher utilization trend it acknowledged on June 16, 2023. For example, on June 16, 2023, Wells Fargo stated, "HUM says it considered the emergence of these [increased utilization] trends in [MA] bids. We expect some skepticism impacts were fully captured." Wells Fargo added and that "[t]his will be a key area of focus for the investment community, *as on 5/9 at a conference HUM blessed consensus 2Q23 consolidated MLR that appears to be 30-40bps lower than revised expectations*." In its June 20, 2023 report, Deutsche

Bank likewise questioned why Humana needed to incorporate the increased utilization trends into its Medicare Advantage bids submitted on June 5, 2023 if this trend would be only temporary, stating: "This strikes us as peculiar, as UNH indicated the elevated trend surge is likely to last less than one quarter, with HUM indicating something similar. This begs the question that, if demand were to normalize by December, why would there be a need to adjust bids for 2024?"

### M. After Acknowledging Increased Utilization, Defendants Falsely Claimed Utilization Had Stabilized And That They Could Offset Utilization Through Other Cost Levers, While Also Touting Humana's Favorable Star Ratings

302.    Following the June 2023 disclosures of increased utilization as a result of pent-up demand, Defendants continued to falsely downplay the risks of increased utilization and to misrepresent Humana's ability to offset increased costs and the risks inherent in this strategy.

303.    Defendants' reassurances throughout this period were materially false or misleading. As alleged below, Defendants falsely reassured investors that they could moderate or mitigate rising costs associated with increased utilization, including through additional cost-cutting measures that would be additive to the business. In truth, Defendants were facing sustained and rising utilization, in addition to emergent pressure from regulators to pay more claims, deny fewer prior authorizations, and charge for fewer risk adjustments. At the same time, Defendants had no operational levers left to pull to streamline the Company's cost structure without sacrificing the quality of Humana's plans, and thereby its much-touted Star ratings.

304.    For example, in connection with Humana's 2Q 2023 earnings release on August 2, 2023, Defendants attempted to allay market fears about rising Medicare Advantage utilization, claiming that the Company's results reflected "***stabilizing Medicare Advantage utilization environment*** based on most recent claims activity[.]"

305.    During the Company's 2Q 2023 earnings call on this date, Diamond gave similar assurances about the Company's Medicare Advantage utilization trends, stating:

We were pleased to see that our June paid claims data received in July reflected positive restatements for the first quarter, ***as well as stabilizing outpatient utilization levels in April and May***. While July claims data is not yet complete, early views support our year-to-date booking levels. . . . All in, we view the utilization data received in recent weeks as incrementally positive as compared to the assumptions utilized in our June update.

306.    Diamond also downplayed the risk of increased utilization by again emphasizing that Humana's 2024 "Medicare Advantage pricing contemplated the rate environment, emerging utilization trends and related offsets, as well as the competitive landscape and resulting growth opportunity."

307.    On August 2, 2023, *Dow Jones Institutional News* reported that "Humana's Stock Up 1.6% Premarket After Health Insurer Says Claims Activity Is Stabilizing After June Spike." The same day, *Healthcare Dive* reported that "Humana reports lower-than feared medical costs," stating that "[r]ising medical utilization earlier in the quarter appears to have stabilized based on recent claims activity, management said." The article specifically noted Broussard's statements in that day's earnings call that Humana's "results indicate higher-than-anticipated MA utilization 'has stabilized,'" as well as Diamond's statements that "[a]ll in, we view utilization data received in recent weeks as incrementally positive compared to the assumptions utilized in our June update."

308.    Analysts responded favorably as well. For example, Oppenheimer wrote "[o]verall, the concerns from June seem to have been overblown, as Q2 comments from Humana/peers point toward stable to potentially declining trend."

309.    Defendants also continued to tout the ability to offset increasing costs with operational savings. During the 2Q 2023 earnings call, an analyst from Barclays asked—in light of the "elevated Medicare cost trend for the second quarter"—were there "any major levers you

can and have proactively pulled midyear to just better contain the elevated Medicare cost for the

back half of the year, either on prior authorization policies or just other coverage factors?"

310.    Diamond responded:

*The main lever that I would say that we're relying on internally to offset some of the elevated trend in the back half of the year is more administrative expense savings*. We have asked the organization to find additional opportunities, and that's largely informed by some of the ongoing productivity work that we've been viewing that highlights that there are some additional opportunities. And I would say relative to what we considered in our original plan for the year, *those extra admin savings will be disproportionately benefiting the back half of the year.* Whereas the first half of the year, the elevated trend had the benefit of things like prior year development that we would say is going to disproportionately benefit the first half versus the back half.

311.    In response to this statement, Oppenheimer commented on August 2, 2023, that "[w]hile management maintained the assumption that the current utilization trends continue into year-end, it expects to find additional opportunities for G&A savings and productivity gains to help moderate the impact to a certain extent."

312.    Defendants also touted the release of CMS's Star ratings for the 2024 plan year in a press release published October 13, 2023. The release, titled "Humana Continues to Deliver Exceptional Star Ratings for its Medicare Advantage Members in 2024," highlighted the Company's apparently strong Star metric performance based on data from 2022, including:

- 94% of Humana Medicare Advantage members are enrolled in plans rated 4 stars and above
- 61% of members are in plans rated 4.5 stars and above for 2024
- Humana received a 5 out of 5-star rating for four contracts, covering approximately 790,000 members
- Humana has Medicare Advantage plans rated 4 stars and above in all 50 states and Puerto Rico.

313.    In addition to pointing to the current strength of the Company's Star ratings, Defendants discussed their continued success with and focus on the Star ratings. The release quoted Insurance Segment President George Renaudin as stating, "*[o]ur excellent CMS Star*

*Ratings reflect our continued focus on the quality of care, clinical outcomes and industry leading customer service for our members*," and "*[o]ur continued delivery of quality care for our members has enabled our consistent high performance in Stars*, even as changes to the rating methodology were introduced this year."[3]

**N.    On The Heels Of Defendants' False Assurances, Humana Disclosed Persistent And Worsening Elevated Utilization While Issuing Additional False Statements About Purported "Offsets" And Its Star Ratings**

**1.    November 1-2, 2023: Humana Discloses Continued Elevated Utilization, But Defendants Point To "Incremental Mitigation" As An "Offset" While Continuing To Tout Humana's Star Ratings**

314.    Before the market opened on November 1, 2023, Humana filed a press release on Form 8-K reporting its results for the 3Q 2023. Humana reported that its Insurance Segment MLR was 87.4%—nearly two percentage points higher than for the same period in 2022. The press release stated that the Company's third quarter performance reflected "modestly higher than anticipated utilization in the Medicare Advantage business."

315.    Prior to the Company's earnings call, several analysts issued reports commenting on the November 1, 2023 press release. Wolfe Research LLC ("Wolfe Research") stated that it "expect[ed] questions around widening spread between Insurance and consolidation MLR at 90bps in quarter vs. typical 50bps." Oppenheimer similarly noted that "we expect some pressure on the stock as the market looks for commentary around how the elevated MA utilization affects the outlook for 2024."

---

[3] Final Rule CMS-4201-F was proposed on December 27, 2022 and went into effect June 5, 2023. The change first affected rating year 2024. The final rule eliminated outliers on the low end of Star metric performance. This resulted in an upward shift in cut points for each star level when CMS applied its clustering algorithm to the raw data. The upward shift of cut points made it more difficult to retain or improve ratings.

316.    On November 1, 2023, Humana held a call with securities analysts to discuss the Company's 3Q 2023 financial results. In her opening remarks, Diamond addressed the Company's higher MLR "due to higher medical costs in our Medicare Advantage business." She stated:

> *[W]e are planning for the higher level of utilization seen in the third quarter to continue for the remainder of the year. As a result, we are increasing our full year insurance segment benefit ratio guidance to approximately 87.5%, which implies a fourth quarter ratio of 89.5%.*

317.    Diamond further indicated that increased Medicare Advantage utilization would continue during 2024, affecting EPS: "*[r]ecognizing the increased utilization we have now seen in 2023 and prudently assuming this level of utilization continues into 2024, we currently anticipate growth at the low end*" of the 2024 EPS range of growing adjusted EPS 11% to 15%.

318.    In response to the information disclosed in the November 1, 2023 press release and earnings call concerning increased and persistent Medicare Advantage utilization and increased MLR, the price of Humana common stock declined by $42.29 per share, or more than 8.00%, from its closing price of $523.69 per share on October 31, 2023 to close at $481.40 on November 2, 2023.

319.    Subsequently, analysts expressed concern regarding Humana's statements that increased utilization would continue into 2024, connecting that new information to Humana's negative stock price movement that day. For example, on November 1, 2023, Wells Fargo issued a report stating, "we are not surprised to see stock pressure given commentary on non-inpatient Med Adv trend and potential need to take some additional pricing action in 2025 to achieve targets." Wells Fargo further noted that "[r]ecent concern for Medicare Advantage utilization trends has weighed on stock performance, which we don't see as surprising given HUM has by far the most exposure of the large cap MCOs."

320.    Deutsche Bank's November 1, 2023 report similarly stated, "On Humana's Q3 call, the company delivered a notable messaging shift as it relates to 2024, which could impact its ability to hit the 2025 EPS target of $37, *which sent shares down 6.6%*."

321.    In a November 1, 2023 report issued after Humana's earnings call, UBS stated:

> *HUM's shares are underperforming peers today (-5% vs. flat peer avg.) reflecting concerns around HUM's 2024 EPS growth trajectory in light of increasing utilization. In addition, it did not sound like HUM appropriately captured the elevated utilization in their 2024 MA bids, with the company recognizing additional mitigation efforts are needed in 2024 to offset rising cost trends.*

322.    Despite the additional negative news that Humana disclosed on November 1, 2023, the price of the Company's common stock remained artificially inflated because Defendants continued to mislead investors. In the Company's November 1, 2023 press release, Humana announced that "*94 percent*" of the Company's Medicare Advantage members were "*currently enrolled in 4-star and above contracts for 2024*," with "*61 percent of members in 4.5 and 5-star contracts*," which the Company claimed made it "*an industry-leader among its publicly traded peers for the sixth consecutive year*." Further emphasizing Humana's Star ratings, Broussard stated in the press release that the Company's 3Q 2023 results could be partially attributed to, among other things, "*prioritizing quality*," calling out the Company's "*industry-leading Star Ratings*," which he claimed "*are a testament to our commitment to the health, well-being, and satisfaction of our customers and to our being a trusted brand within the broker community*." Alongside these claims, Humana affirmed its full year adjusted EPS of at least $28.25.

323.    During the Company's 3Q 2023 earnings call, in his prepared remarks, Broussard claimed, "our ability to deliver on our targeted earnings growth rate in 2023, while also achieving [] impressive membership growth is supported by the strength and scale of our organization . . . *including industry-leading stars results and higher customer satisfaction*." Continuing, Broussard stated:

99

> *Humana continues to deliver exceptional quality to our members measured by our CMS star ratings. For 6 consecutive years, Humana has maintained the highest percentage of members in 4 star or higher-rated contracts among national health lines. In 2024, 94% of our members will be enrolled in plans rated 4 stars or higher and 61% from plans rated 4.5 stars or higher . . . . these results are a testament to putting the health and wellness of our customers first*.

324.    Diamond similarly assured investors that "[w]e anticipate that **the higher 2023 insurance segment benefit ratio will be offset by additional administrative expense reductions**, driven in part by the sustainable productivity initiatives we discussed, improved net investment income and other business outperformance."

325.    During the question-and-answer portion of Humana's 3Q 2023 earnings call, Albert "AJ" Rice of UBS inquired as to whether, with respect to its MLR, Humana "need[ed] to have some level of offsetting efficiencies to mitigate a sequential uptick in utilization that you're assuming will continue next year." Diamond responded that "[i]t'll be incremental mitigation that we need to do to offset that in '24," and further stated:

> I would say, as we saw the trend develop, we certainly recognize[d] that we would need to identify some additional mitigation. I would say our ongoing efforts around productivity have continued since the work we kicked off in '22. *And as we've said before, we have continued to identify more opportunities than we might have initially anticipated, which is built in those pipeline of opportunities that will certainly mitigate it in this year and we'll continue to do so next year*.

326.    In response to a question from Sanford C. Bernstein & Co., LLC ("Sanford Bernstein") analyst, Lance Wilkes, concerning Humana's 2025 EPS target of $37.00, Diamond pointed to Humana's Medicare Advantage Stars ranking as benefitting the Company going forward, stating: "**[w]e are very pleased though, again, to have the really strong stars results that were published recently. And that, again, is a nice durable advantage for us** where we do know some others will have some challenges to deal with there while others may have some improvement."

327.    Analysts credited Defendants' assurances about their ability to offset the persistent elevated utilization through additional mitigation. In its November 1, 2023 report, UBS noted that the higher MLR that Humana guided for the remainder of 2023 "is expected to be offset by additional administrative expense reductions, driven in part by HUM's efficiency initiatives, improved net investment income, and other business outperformance." With respect to Humana's increasing MLR, RBC's November 2, 2023 report similarly remarked that "[m]anagement continues to expect to offset the higher benefit costs with productivity gains, higher investment income, and outperformance in other business segments."

328.    Moreover, analysts were reassured by Defendants' statements touting the Company's apparently strong Star ratings. In its November 1, 2023 report, Oppenheimer called out Humana's "Strong STAR ratings" as a "tailwind" to the Company's "2024-2025 Earnings Trajectory." On the same day, Morningstar issued a report noting that it was maintaining its $550 fair value estimate for Humana stock based upon the Company's "outperformance in MA membership growth, which "outpac[ed] most peers." In this regard, Morningstar further commented:

> ***Part of this outperformance relates to strong MA star ratings***, which remain better than those of the other managed-care organizations we cover, including the scores announced in October 2023 that will affect marketing in 2024 and bonus payments in 2025. ***With these strong scores and other reputational factors attracting seniors to its MA plans, Humana looks likely to continue to delivering [sic] robust MA results relative to peers***.

329.    Truist's November 2, 2023 report similarly embraced Defendants' representations that Humana's Star ratings provided a competitive advantage going forward, stating:

> ***Stars remain a key area of strength as HUM has delivered the highest percentage of members in 4+ star plans for the 6th consecutive year, with 94% of members in 4+ Star plans, 61% in 4.5+ Star plans and the membership in 5-Star plans more than doubling from 2023***.

330.     Thus, the price of the Company's common stock remained artificially inflated because Defendants continued to mislead investors.

### 2.   January 18, 2024: Humana Announces Higher Fourth Quarter 2023 And FY 2023 MLR And Lowers FY 2023 Adjusted EPS, But Defendants Downplay Investor Concerns

331.     On January 18, 2024, Humana released its preliminary earnings for fiscal year 2023 in a Form 8-K. Revising key metrics yet again, Humana raised the MLR for 4Q 2023 to approximately 91.4% and to 88% for the full year 2023. In the press release, Humana stated that its fourth quarter results "reflect an additional increase in Medicare Advantage medical cost trends, driven by higher than anticipated inpatient utilization . . . as well as a further increase in non-inpatient trends, predominantly in the categories of physician, outpatient surgeries and supplemental benefits." Humana also stated that its cost-cutting measures implemented during 2023 did not "offset the entirety of the higher than anticipated medical costs that continued to increase through the end of the fourth quarter." As a result, Humana announced that it now expected its 2023 adjusted EPS to be $26.09 per share, more than $2 per share lower than what the Company had announced in November 2023.

332.     In response to the news that Humana's MLR would exceed the targets it had reaffirmed just two-and-a-half months earlier, and that it had been unable to offset persistently high utilization through cost-saving measures, the price of Humana common stock dropped $35.78 per share, or 7.99%, from its closing price of $447.76 per share on January 17, 2024 to close at $411.98 per share on January 18, 2024.

333.     News outlets and analysts connected the new information in Humana's January 18, 2024 Form 8-K to Humana's negative stock price movement that day. *Bloomberg* published an article "Humana Plunges as Higher Patient Care Costs Weigh on Earnings," noting that "Humana Inc. shares plummeted after preliminary earnings missed estimate" and that "Humana's report of

higher costs mirrors trends UnitedHealth Group Inc. reported last week" (which, of course, Defendants had denied). *Street Insider* published a similar story the same day titled "Humana (HUM) sinks 10% after cutting profit guidance on tempered Medicare Advantage growth outlook." *Healthcare Dive* reported on the updated guidance on January 18, 2024, noting that Humana's stock had fallen to its lowest point since February 2022 after the announcement.

334.    In a January 18, 2024 report, RBC stated, "we are lowering our estimates following HUM's announcement today, which included lower than expected 2024 MA growth and higher 4Q utilization . . . ***HUM finished down ~8%, off -12.4% intra-day lows***." Wells Fargo's January 18, 2024 report similarly noted, "HUM's update represents a major setback. Impact to 2024 EPS hard to assess but likely much higher than 2023 revision . . . ***[w]hile UNH's 4Q23 results sparked concern HUM could miss Q4, the magnitude of pressure here is clearly worse than expected***." Similarly, Morningstar's January 18, 2024 analyst note stated: "***Humana gave a preliminary look at 2023-24 operating metrics that was weaker than we anticipated on increasing medical utilization*** and a tougher landscape for adding new" Medicare Advantage members. Commenting on Humana's Form 8-K, Leerink Partners LLC's ("Leerink") January 18 report noted that Humana had reported a "***material inflection in utilization***." Wells Fargo issued a report on January 23, 2024, in which it remarked that "***uncertainty around utilization and industry-level membership growth are weighing on the stock***." Wells Fargo also noted that "HUM now expects 4Q23 Insurance MLR of 91.4%, well above prior guidance of 89.5%."

335.    Once again, however, Humana balanced the negative disclosures and kept the price of Humana common stock artificially inflated. This time, in the Company's 8-K, Humana assured investors that it remained "well positioned to compete as an industry leader in the attractive

Medicare Advantage market going forward," which it attributed, in part, to its purportedly "**exceptional quality as demonstrated by its industry leading Stars scores**."

336.    Based on these assurances, despite the disappointing news, analysts continued to believe that Humana was on solid ground going into 2024. The immediate question posed by many analysts following the January 18, 2024 8-K filing was whether the 4Q 2023 MLR pressure was seasonal or would continue into 2024. For example, on January 18, Wells Fargo noted that Humana did not specifically state that the higher utilization in the fourth quarter was seasonal, and Leerink noted on the same day that Humana had not called out any respiratory viruses as drivers of the increase. In its commentary on the fourth quarter "surprise" utilization increase, RBC wrote that it continued to believe Humana would enter 2024 on "slightly better footing than peers," assuming the increase "was indeed isolated to November-December seasonality."

337.    RBC's optimism was echoed by Leerink, which reported on January 19, 2024 that Humana had already "faced numerous setbacks only to adjust, implement course correcting initiatives, and return back to targeted growth," and that the issue likely was not "structural." Wells Fargo commented on January 23 that "[d]espite several negative earnings surprises," the news as of yet did not justify downgrading Humana's stock. The confidence was partly due to Humana's hedging around whether the fourth quarter utilization was seasonal, as its peer UnitedHealth had claimed, and continued belief that the Company had captured the majority of the pressure from increased trends in its 2024 bids.

 **3.    January 25, 2024: Humana Reports Further Increases In Inpatient And Outpatient Utilization, But Defendants Again Falsely Reassure Investors**

338.    Just two days after Wells Fargo had concluded that there was not enough negative news to justify downgrading Humana's stock, the Company exceeded even the worst predictions from analysts when it published its earnings release for 4Q 2023 and fiscal year 2023 on January

25, 2024. The Company shocked the market when it announced a loss of $4.42 per share (adjusted loss per share of $0.11) for 4Q 2023 that was "driven by higher than anticipated inpatient utilization . . . and a further increase in non-inpatient trends," and stated that it expected the higher level of medical costs would "persist throughout 2024." As a result, Humana revealed that it expected a 2024 adjusted EPS of only $16 per share – a $10 per share decrease from 2023 and well below analysts' predictions of $29 per share.

339.    On January 25, 2024, Humana published prepared remarks for its fourth quarter earnings call, attributed to Broussard and Diamond. In these remarks, Defendants stated that "we were unable to fully offset the higher cost trends experienced in the fourth quarter, despite our best efforts to identify mitigation opportunities throughout the year." Defendants further stated that "it is prudent to assume the higher costs persist throughout 2024." In other words, Defendants finally acknowledged that Humana was facing persistently elevated utilization among its Medicare Advantage members and that, contrary to Defendants' reassurances, higher utilization costs could not be offset by cost-saving measures elsewhere in the Company.

340.    Analysts reacted negatively to the new information in Humana's January 25, 2024 press release and the prepared remarks. For example, TD Cowen issued an earnings update stating, "[l]ast week, HUM pre-announced a 4Q23 miss & warned of 'material' impact for 2024. 2024 consensus EPS then stood at $31, the bear case seemed centered on $20, today HUM guided $16." Leerink similarly stated that "[i]nitial views on 2024-25 EPS fall *considerably below expectations*, with underlying assumptions for 2024 underpinned by a continuation in elevated medical cost trends." UBS published a report titled in part, "2024 Outlook Materially Lower than Downside Expectations," while Wells Fargo described Humana's 2024 guidance as "Much Worse Than Expected" and remarked that its 2024 and 2025 EPS guidance "is clearly quite disappointing."

341.    JPMorgan stated in its pre-earnings call report, "*We expect HUM shares will trade down this morning, as 2024 adj. EPS guidance of ~$16 is much lower than the Street low ($21.50 per Bloomberg) and significantly lower than where we believe investor expectations recalibrated to over the last week*." Deutsche Bank similarly reported that "Humana reported Q4 results this morning and issued 2024 guidance that **missed the most pessimistic investor expectations**." It further termed 2024 "*a lost year*" for Humana.

342.    During Humana's January 25, 2024 earnings call, analysts pressed Diamond on the increased inpatient utilization trend. AJ Rice of UBS asked if the higher utilization was no longer coming just from Medicare age-ins, as the Company had previously claimed, but had "broadened." Diamond responded, "related to inpatient, **you are correct**," and that while Humana did see increased inpatient pressure due to new membership, "the medical costs were slightly higher than we would have expected."[4] She went on to state that the fourth quarter pressure was "completely unrelated and different . . . and **very much more widespread**."

343.    In response to Humana's disappointing 4Q 2023 results, lowered guidance, and admission that the higher utilization would persist, the price of Humana common stock dropped $47.04 per share, or 11.69%, from its closing price of $402.40 per share on January 24, 2024 to close at $355.36 per share on January 25, 2024.

344.    Analysts and news reports again connected the decline in Humana's stock price to the new information disclosed by Humana on January 25, 2024. The morning of January 25, *Barron's* reported that Humana stock had "plummeted" after revealing earnings that "fell startlingly short of already-dampened investor expectations." *CNBC*'s report, published the same

---

[4] The term "age-ins" refers to people who become eligible for Medicare coverage by turning 65, as opposed to qualifying beneficiaries under 65 who have certain disabilities or conditions.

morning, echoed that the stock "plummeted" after the issuance of the "dismal full-year earnings guidance." Also on January 25, *Bloomberg* issued an article entitled "Humana warns that rising care costs will persist through 2024, surprises Wall Street with forecast."

345.    Analysts were sharply critical of Humana's performance. In reports on January 25, 2024, Stephens commented that "HUM now expects to produce Adjusted EPS of only ~$16 in 2024 (vs. Street at $29.14). Moreover, HUM formally abandoned its key 2025 Adjusted EPS target of $37 . . . . The stock will reset in the [near-term] to reflect this significantly lower EPS outlook." In another report, Stephens described Humana's revised 2024 Adjusted EPS outlook as "a worst-case scenario relating to building pressures facing the MA category." On January 25, 2024, Morningstar stated that it was "lowering our fair value estimate to $500 per share from $550 previously to reflect this weak profit trajectory in Humana's core end market – Medicare Advantage." Morningstar further commented that:

> With Humana's mispriced plans currently in effect and an assumption that medical utilization trends will remain high through 2024, ***management followed up a weak 2023 result (3% growth in adjusted of $26.09) with guidance of a nearly 40% decline to about $16 of adjusted EPS in 2024. This pales in comparison with the firm's goal just three months earlier of producing adjusted EPS growth toward the low end of its 11% to 15% adjusted EPS goal in 2024***.

346.    In its January 26, 2024 report, RBS similarly observed that "**the earnings call did little to quell debate over the source of higher utilization and whether the headwinds are seasonal and transitory, or if they represent a structural shift in utilization patterns**." (emphasis in original).

347.    Cantor Fitzgerald & Co.'s ("Cantor Fitzgerald") January 26, 2024 report summed up Humana's tumultuous week and the impact on its securities prices:

> ***Humana traded down 20% (vs. SPX 0%)*** since pre-announcing higher-than-expected medical costs and lower-than-expected enrollment growth on 1/17/24 [sic], followed by disappointing guidance for 2024 and a lowering of prior 2025 guidance on 1/25.

348.    On January 29, 2024 TD Cowen similarly reported that Humana's "disappointing" fourth quarter numbers and updated guidance had "weighed heavily on the stock."

349.    Nevertheless, Defendants continued to issue false reassurances to investors. For example, on January 25, 2024, Defendants assured investors that Humana "*remain[s] well positioned to compete as an industry leader in the attractive MA market going forward with our differentiated capabilities, including . . . exceptional quality as demonstrated by our industry leading Stars scores*."

350.    During the 4Q 2023 earnings call, Defendants attempted to reassure investors that Humana's repeated negative announcements reflected only temporary setbacks. Broussard stated, "I do want to first just continue to reemphasize that although the near-term impacts of the higher utilization are disappointing, our confidence in the long-term attractiveness of this sector and our position within it has not changed one bit."

351.    During the question-and-answer portion of the 4Q 2023 earnings call, Stephen C. Baxter of Wells Fargo inquired as to Humana's earnings outlook, while stating, "it's a little hard to feel like the incremental actions you're taking related to pricing honestly are really all that material. So I would love to get just a little bit more color on that." In response, Diamond stated:

> [A]s you saw and as we've been describing all year, as we saw the initially higher outpatient trend starting in the second quarter*, we were able to successfully mitigate that pressure that we stepped up to through the third quarter through multiple levers, including administrative cost, further administrative cost reductions*. . . . *[w]e do think there is additional opportunity, particularly leveraging technology, AI and some other tools*, but we recognize they probably have longer timelines to get the full value realization.

352.    During the earnings call, Defendants also attempted to portray Humana's fourth quarter results as reflecting an industry-wide issue. Broussard described the fourth quarter utilization increase as an "unprecedented increase[]" on top of the "already elevated level

impacting the industry." Later in the call, Broussard stated that he expected "the whole industry will probably reprice" in 2025 to compensate for the increase in utilization.

### O.   Undeterred, Throughout 2024, Defendants Continued To Falsely Reassure Investors About The Strength Of The Company's Star Ratings

353.   Throughout the remainder of the Class Period, the prices of Humana common stock remained inflated because Defendants continued to mislead the market about the Company's Star ratings and underlying metrics.

354.   For example, on March 8, 2024, in Humana's 2024 Proxy Statement, Defendants continued to extoll both the Company's Star ratings and efforts to maintain them. After stating that "[t]he strength of our core insurance operations remains clear" and that "[i]n 2023, we grew our individual MA membership by over 840,000," Defendants proclaimed they "*continued our leadership in putting members first - evidenced again in our strong Star Ratings for 2024, with 94 percent of our members in plans rated 4 stars or higher, 61 percent in plans rated 4.5 or 5 stars, and 37 percent of all 5-star MA membership in a Humana plan.*"

355.   Further discussing the reasons for Humana's Star ratings success, the 2024 Proxy Statement explained "Our commitment to quality of care, patient-centered clinical outcomes and customer service is reflected in the consistent strength of our MA plan's Star Ratings."

356.   As another example, on September 4, 2024, during a presentation at the Wells Fargo Healthcare Conference, Stephen Baxter of Wells Fargo asked how Humana was "thinking about STARS opportunity?" In response, in spite of the impending release of CMS's review of Star metrics for the 2023 review year (which Diamond knew was based on less favorable data submitted by Humana), Diamond stated:

> Yeah. We didn't have some of the same impacts as last year. I want to get to key in some of those types of things. But I would say just in general, the program is challenging in terms of just the basic structure, right? Greater on the curve, it's not weighted. And so it can be more difficult to predict. So I would just say we continue

to be focused on it. ***It is early right has not released the information as yet, so we don't have visibility to the thresholds just yet. So as you said, it will be early October when we get the information the same time as others. And so we'll certainly comment in. But I would say it continues to be a focus. As you said, we continue to be proud of the work that we [] are very high performing. So a lot of days, it feels like there's only one way to go, right, just because when you're 94%, I don't know that we ever get to 100%. So continue to focus on across the enterprise and work to improve all of those activities, but too early unfortunately to share any details***.

357.    Thus, Defendants continued to feign ignorance regarding poor Star metrics and cost cuts to the very areas that could hurt Humana's Star ratings, choosing instead to mislead investors.

**P.    In October 2024, The Consequences Of Humana's Class Period Efforts To Offset Increased Utilization Were Finally Revealed Through A Dramatic Decline In The Company's Star Ratings**

358.    On October 1, 2024, CMS inadvertently released the 2025 Star ratings by making them available through the agency's Plan Finder tool, which allows users to sort plans by Star Rating. Although the numbers were not officially published, investors using the Plan Finder discovered that several of Humana's plans had plunged in rating. The new ratings indicated that Humana's share of members in plans rated four stars or above had fallen from ***94% in 2024*** to a projected ***25% in 2025***. A significant driver of these results was Humana's contract H5216, which decreased from 4.5 stars in 2024 to 3.5 in 2025. H5216 contains approximately 45% of Humana's Medicare Advantage membership, including greater than 90% of its employer group waiver plan (i.e., Group MA) membership. The other significant downgrades were to plans H5619, H6622, and H0028, which collectively accounted for approximately 21% of Humana's Medicare Advantage membership. Although the decline in Stars performance will not affect Humana's revenue until 2026, it put in jeopardy billions of dollars in quality bonus payments from CMS in 2024 and raised doubts about the much-touted quality of Humana's Medicare Advantage plans, and related enrollment effects.

359.     Since the Star rating data reflected Humana's performance in Measuring Year 2023, the publication of the data revealed Humana's unsuccessful attempts to mask its struggles with increased utilization and rising medical costs during 2023 by cutting costs in care delivery and Stars improvement efforts, which eventually led to the drastic decline in plan ratings.

360.     Humana acknowledged the loss of its higher ratings in a Form 8-K filed on October 2, 2024. In the 8-K, Humana attributed the reduction in ratings to "narrowly missing higher industry cut points on a small number of measures," and claimed there were errors in CMS's calculation of the results that it would challenge in an appeal. The Company expressed disappointment with its Star rating results and announced initiatives it would launch to improve ratings, including a focus on member and provider engagement, improving customer experience, and improving technology integration.

361.     In response to the October 1, 2024 CMS preliminary Star ratings release and Humana's Oct 2, 2024 Form 8-K, the price of Humana common stock plunged by $70.25 per share, or 22.18%, from its closing price of $316.74 per share on September 30 to close at $246.49 on October 2.

362.     The decline in Humana's performance during Measuring Year 2023 was a significant surprise to analysts. On October 2, Cantor Fitzgerald reported that Humana ending up with only 25% of its members in 4-star rated plans was "***shocking***," as its "bear scenario" had been 50% of members in a 4-star rated plan. In an October 2 report, Oppenheimer estimated that the reduction in Humana's Star ratings "***translates to a >$3B impact to bonus payments***, which will significantly impact enrollment/margins in 2026." An October 2 UBS report on Humana entitled "***Humana Inc: Worst Case Scenario for Stars Comes to Fruition***," stated that "the [unmitigated] EPS impact is expected to be roughly $16.08 against our 2026 EPS estimate of $25.75 (same as

111

cons[ensus]).” On October 2, 2024 Stephens stated: “**This represents a worst-case scenario result, in our opinion**.” (emphasis in original).

363.    Analysts also noted that the decline in Humana’s Medicare Advantage plan ratings was appreciably worse than its peers. On October 2, JPMorgan reported that other managed care organizations, in particular UnitedHealth and CVS Health, had maintained the Star ratings of their largest plans and did not have results as negative as Humana. On October 3, Piper Sandler remarked that its assumption Humana had maintained its “long legacy of quality” during Measuring Year 2023 was a “large miscalculation.”

364.    News and analyst reports published on and following October 1 connected the drop in the Company’s common stock with the news about Humana’s lower Star ratings. On October 2, *Reuters* wrote that Humana’s shares were down due to the substantial decrease of members in top-rated plans. That same day, *The Washington Post* reported that Humana’s stock had sunk to “its lowest level in 15 years” following the revelation of the decline in Humana’s Star ratings.

365.    On October 2, Deutsche Bank issued a report noting “**Stock Shed Another 12% Today, HUM Filed 8K**.” (emphasis in original). Deutsche Bank reported that following Humana’s same-day Form 8-K addressing the drop in its Star ratings, “*HUM shares declined from -12% yesterday to another -12% today*.”

366.    During the October 2, 2024 trading day, Humana hosted a call with securities analysts to discuss the dramatically reduced Star ratings and how the Company intended to address the issues going forward. Marking a shift from the cost-cutting that Humana was pursuing to offset the costs of increased Medicare Advantage utilization, Humana indicated that additional investments would be made to attempt to regain more favorable Star ratings. For example, Leerink reported on October 2, 2024 that management indicated that “**HUM to invest considerably to**

**ensure improvement in Stars going forward**. HUM repeatedly emphasized its focus on improving Star ratings and making the necessary investments." (emphasis in original). TD Cowen's same-day report reflected that, during its call with analysts, Humana management flagged the same areas for investment as the Company had identified in its 8-K issued earlier that day, "member and provider engagement, member experience, vendor relationships, and tech enhancements."

367.    On October 3, *Morning Sentinel* published an article entitled "Quality ratings hit to key Medicare plan rattles value of Humana stock," reporting that "[s]hares of Humana have tumbled after the health insurer said a Medicare Advantage quality rating drop will hurt future bonus payments the company receives." The article stated that "BTIG analyst David Larsen said in a separate note that Humana's ratings were disappointing given that Medicare Advantage plans already are dealing with challenges like higher claims cost and more inpatient hospital visits."

368.    Investor fears that the preliminary ratings release reflected a decline in the quality of Humana's healthcare services were confirmed on October 10, 2024, when CMS released the official data. With respect to plan H5216 – the plan that dropped from 4.5 to 3.5 stars and drastically decreased the total number of Humana's members in a 4+-star plan – the data revealed that performance declined in several important metrics related to customer experience. Specifically, the plan declined on the metrics of: (i) Health Plan Customer Service (5 stars to 3); (ii) Rating of Health Care Quality (4 stars to 3); (iii) Complaints About Health Plan (5 stars to 4); (iv) Call Center – Foreign Language Interpreter Availability (5 stars to 4), and (v) Complaints About Drug Plan (5 stars to 4). In a report published October 10, Cantor Fitzgerald stated that while investors had been focused on the foreign language availability on customer calls, the biggest

113

drops had come on the metrics most heavily weighted in CMS's calculation, including the overall plan rating, care coordination, and health plan quality improvement.

**Q.    Scathing Governmental Reports Have Shined More Light On Defendants' Misconduct**

369.    Since September 2024, the PSI and OIG have issued reports detailing their respective findings of Humana's misconduct with respect to its Medicare Advantage program. These reports, based on the PSI's and OIG's comprehensive investigations and analysis of internal Humana files, are detailed below.

**1.    The PSI Report Confirmed That Humana Artificially Depressed Utilization And MLR Through Denial Of Prior Authorizations**

370.    On October 17, 2024, the U.S. Senate Permanent Subcommittee on Investigations published a report (the "PSI Report") detailing its findings from an inquiry launched on May 17, 2023 concerning Humana's denial of prior authorization requests. In its findings, the PSI revealed that Humana had used prior authorization to target and deny a variety of post-acute care to Medicare Advantage beneficiaries, and against the wishes of its employees, had steered patients away from expensive post-acute care in favor of hospice care.

371.    As discussed above, if a prior authorization for services is denied, Humana's Medicare Advantage beneficiaries have an opportunity to appeal the denial to Humana. If Humana denies the appeal, or fails to meet the statutory deadline to respond, the request is automatically referred to an Independent Review Entity ("IRE"). If denied by the IRE, beneficiaries may appeal further to the Office of Medicare Hearings and Appeals, the Medicare Appeals Council, and eventually a federal judge.

372.    The PSI inquiry was focused on Medicare Advantage organizations' efforts to lower their medical costs by denying post-acute care to patients. Post-acute care refers to care after recovery from an illness or injury that would be treated in a hospital. Such treatment in a hospital

would be the "acute" phase, and subsequent treatment post-acute care. In making its findings, the PSI sought data on prior authorization requests and denials between 2019 and 2022 from the three largest Medicare Advantage organizations: CVS Health, UnitedHealth and Humana. This date range aligned with what the PSI called "increases in concern from patients and providers that prior authorization was threatening seniors' wellbeing and the viability of medical practices."

373.    The PSI reviewed a variety of information that was not publicly available in making its determinations. These included, but were not limited to: (i) prior authorization request and denial data from post-acute care facilities; (ii) documents used in training workers evaluating prior authorization requests, and explanations of the procedures used to evaluate or measure these workers and determine their prospects for advancement; (iii) meeting agendas, meeting minutes, presentations, policy statements and training exercises for numerous groups or committees within the companies, including internal bodies that discussed methods of extracting further savings from healthcare; and (iv) communications with healthcare providers and medical groups, as well as third parties assisting in the prior authorization process.

374.    The PSI Report noted that seniors who make up the majority of Medicare Advantage beneficiaries are more likely to have medical conditions that coexist alongside a primary diagnosis, complicating their post-acute recovery, and requiring stays in facilities such as Skilled Nursing Facilities ("SNF"), Inpatient Rehabilitation Facilities ("IRF") and Long-Term Acute Care Hospitals ("LTACH"), facilities which "treat chronically critically ill patients needing care for an extended timeframe."

375.    The PSI found that since 2019, Humana used prior authorization to target and deny "costly yet critical stays" at post-acute care facilities at a rate far exceeding other denials. Specifically, the PSI found that, for 2022, Humana's overall prior authorization adverse

determination rate was only 1.5%, but that for post-acute care, the rate ballooned to 24.6*%, 16 times higher* than the overall rate. For LTACH, which both PSI and Humana recognized as the "most expensive" type of post-acute care, Humana's denial rate increased by *54%* between 2020 and 2022.

| Adverse Determination Rates, Overall, Post-Acute Care and Post-Acute Care Facility Type by Year | | | | | |
|---|---|---|---|---|---|
| **Year** | **SNF** | **IRF** | **LTACH** | **PAC** | **Overall** |
| 2019 | 7.1% | 55.4% | 57.3% | 20.7% | 1.3% |
| 2020[5] | 4.5% | 42.3% | 39.9% | 20.2% | 1.1% |
| 2021 | 4.9% | 49.5% | 49.5% | 22.1% | 1.4% |
| 2022 | 6.3% | 51.3% | 61.4% | 24.6% | 1.5% |

376.    These changes followed a campaign by Humana to push both providers and the Company's employees reviewing prior authorization to find alternatives to post-acute care facilities. For example, between May 2020 and December 2021, Humana held at least 4 "Case Concordance Conferences" devoted to LTACH admissions. According to documents reviewed by the PSI, Humana held Case Concordance Conferences bi-weekly for members of Humana's prior authorization clinical review team. These conferences typically offered a fact pattern including anonymized information about a patient and their condition, then asked participants to choose how to respond to a service request submitted by the patient's healthcare provider.

377.    The PSI noted that Case Concordance Conferences held in November and December 2021 in particular focused on prior authorization denials. Participants were given

---

[5] The PSI Report notes that "[p]eriodically throughout 2020 and 2021, in line with federal COVID-19 guidelines and reports of diminishing hospital bed availability, Humana announced temporary suspensions of prior authorization requirements for skilled nursing facilities in certain parts of the country. Sometimes these announcements also included the suspension of prior authorization for inpatient rehabilitation facilities or long-term acute care hospitals."

materials to help explain denials to providers and were shown presentations on reasons not to approve LTACH. For example, the PSI Report detailed parts of those conferences as follows:

> For example, a PowerPoint presentation for the November conference—at which the correct answer was to deny admission because the patient could be treated at a lower level of care—included a "vignette" in which a lower-level placement, like a skilled-nursing facility, might decline to accept a patient with complex or costly needs, noting that in such cases patients are usually approved for long-term acute care hospitals.

> The presentation indicated that this was not a reason to approve a long-term acute care hospital placement, reminding case reviewers that the patient could simply remain in an acute hospital and that "usually these issues can be sorted out and [a lower-level-of-care placement] 'becomes' available." A PowerPoint for the December 2021 conference—at which the correct answer was to deny admission because there was "no expectation of improvement"—noted that long-term acute care hospitals "are a *high cost intervention* that requires the same weight of deliberation in consideration of medical necessity as, for example, high risk/high cost procedures" [emphasis in original]. It urged reviewers, when talking with a patient's provider, to ask if there had been a "'goals of care' conversation," noting that "the 'surprise question' can be a 'gut' check."

378.    Internal Humana documents reviewed by the PSI further revealed the Company's focus on LTACH prior authorization denials. In the fall of 2019, Humana worked on templates it gave to case reviewers to "communicate decisions to providers on prior authorization requests and appeals of prior authorization denials." An October 2021 email between a Humana employee and the medical director who led the 2021 conferences stated that "there has been a lot of discussion about the LTAC templates." The employee stated that they had reviewed the latest round of revisions to those templates, and also "a few more IRE decisions that were unfavorable." The PSI noted that the medical director to whom this was sent had suggested in late 2019 that the modifications to the templates were "important for denial purposes[.]"

379.    The PSI Report found that Humana also had plans to instruct employees to recommend hospice care as an alternative to LTACH despite objections raised by the Company's employees. Hospice care, which focuses on improving quality of life and reducing pain and suffering for those determined to have a life expectancy of six months or less, was discussed at

117

multiple points during the November and December 2021 Case Concordance Conferences. Meeting minutes reviewed by the PSI showed that employees were concerned that using this language on templates used for evaluating requests for LTACH admission sounded "like we are denying [long-term acute care hospital stays] b/c the [member] has hospice/palliative needs." (alterations in original). Ultimately, reviewers decided to remove hospice language from denial letters sent to Medicare Advantage beneficiaries and make the hospice option on templates "'variable' and use it 'when it applies to the member situation.'"

380.    The PSI noted, however, that Humana's training materials continued to "emphasize [LTACH's] high cost, limited usefulness, and position hospice as an alternative" well into 2023. In March 2023, training scripts sent to the medical director who had overseen the 2021 Case Concordance Conferences stated that "a vast majority of these cases will not meet necessity criteria for [LTACH admission]," and underscored that LTACH "is the most expensive post-acute setting for care. If unsure of decision for specific case, please reach out to an appropriate colleague for assistance."

381.    The PSI also found that Humana was allowing its third-party reviewers to use Artificial Intelligence to "exclude humans from the decision-making process" surrounding prior authorization denials. Humana's policy on "Ethical Usage of Augmented Intelligence," provided to PSI, stated "[c]ertain third parties may utilize Artificial Intelligence systems in support of services being provided to Humana and are covered within the scope of these guidelines, where applicable." The PSI further noted that Humana had a contractual relationship with a company called naviHealth since August 1, 2017. The agreement with naviHealth specified that naviHealth would have the right to use protected health information "solely in connection with (i) naviHealth's

'LiveSafe' clinical decision support tool (or its successor) and related database(s); and (ii) reporting to Humana at an aggregate level."

382.    The LiveSafe support tool would later be renamed "nH Predict," which is an algorithm that has been linked by media reports to "AI-powered denials of care." The PSI Report cited the results of an investigation by STAT—an online health, medicine and scientific discovery publication produced by Boston Globe Media—into Medicare Advantage organizations' use of AI to cut off care for seniors. On March 13, 2023, STAT published the results of its investigation, finding that nH Predict's creator had specifically intended for it to save insurance companies money in the post-acute care setting.[6] Further, STAT's interviews with providers found that providers believed that as NaviHealth changed hands in a series of lucrative M&A transactions,[7] "they started noticing an increase in denials under its contracts — that the pendulum had now swung too far in the other direction in an effort to prevent overbilling and make sure patients weren't getting unnecessary services." STAT's investigation quoted a Texas case management director working for a community hospital who explained that "NaviHealth will not approve [skilled nursing] if you ambulate at least 50 feet. Nevermind [sic] that you may live alon(e) or have poor balance." (second alteration in original).

383.    For example, as noted in the PSI Report, Humana has been sued for its use of the nH Predict model to influence outcomes for patients prior to any evaluation by their own post-acute care providers. A class action lawsuit filed on December 12, 2023 in the Western District of Kentucky included allegations of numerous patients whose care was terminated prematurely as a

---

[6] Casey Ross & Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/

[7] In 2015, NaviHealth was sold to Cardinal Health for $410 million. In 2018, it was sold to Clayton, Dubilier & Rice for $1.3 billion. In 2020, it was sold to UnitedHealth for $2.5 billion.

result of nH Predict. For example, the complaint details the case of an elderly old woman (86 at the time of the inquiry) who fractured her leg, and subsequently saw her coverage terminated by Humana after only two weeks at a post-acute care facility as a result of nH Predict's algorithm.

384.    Finally, the PSI pointed out that Humana was aware of the adverse effect these prior authorization denials could have on their Star ratings. A presentation reviewed by the PSI—which appeared to be used for training about the appeals process at Humana—stated that "[o]ur star rating is affected by the rate we are overturned by Maximus [the IRE]." The report explained that because "only about 12 percent of all Medicare Advantage denials are ever appealed to Maximus, even a relatively small increase in the number of overturned denials in a given year could diminish the marketability of a Medicare Advantage plan." PSI noted that "Insurers' fear of being overturned could also potentially explain why, although only a small share of denials are appealed, more than 80 percent of those appeals are overturned internally by the companies themselves before reaching Maximus, the 'Independent Review Entity.'"

385.    Ultimately, while Humana kept Maximus overturned appeals down, its 2025 Star ratings (released in October 2024) suffered for reasons that align with post-acute care denials that were decided by AI and lacked human input from both providers and Humana. For example, CMS data revealed that "Member Experience with Health Plan" metrics for Humana's largest, most important plan, H5216, fell in a number of measures, including Rating of Health Care Quality (from 4 to 3), Rating of Health Plan (from 4 to 3), Complaints about Health Plan (from 4 to 3) and largest of all, Customer Service, which fell from 5 to 3. This was in addition to failures in preventive screening measures such as controlling blood pressure, which fell in rating in Humana's plans H5216, H0028, H5619 and H6622.

386.     As documented by the PSI Report, Humana's multipronged efforts to suppress post-acute care usage among Medicare Advantage beneficiaries created the illusion of fewer beneficiaries seeking the most expensive type of care. These revelations further evidence how the actions taken by the Company during the Class Period to control its MLR ultimately led to a severe drop in the quality of its plans and the level of care being provided to Humana's Medicare Advantage beneficiaries, contributing to the reduction in the Company's Star ratings.

        **2.**      **The OIG Report Confirmed That During The Class Period, Humana Could Not Rely On One Of The Tools It Had Historically Used To Inflate Its Medicare Revenue**

387.     In a September 2024 report by the U.S. Department of Health & Human Services Office of Inspector General (the "OIG Report"), OIG found that, prior to the Class Period, Humana engaged in a practice of miscoding Medicare Advantage beneficiaries' diagnoses in order to obtain higher payouts from CMS, thereby increasing the Company's Medicare revenue. An audit of Humana's risk assessment practices beginning in October 2021 and ending January 2024 put pressure on the Company to change this practice. Thus, during the Class Period, Humana's inability to rely on inflated risk adjustments meant that increases in utilization would more severely impact the Company's MLR, since Humana could not seek additional revenue to offset its higher benefit expenses.

388.     The OIG Report found that the vast majority of diagnosis codes that were submitted under one of Humana's Medicare Advantage plans "did not comply with Federal requirements" and led to overpayments being made to Humana. In its findings, OIG recommended that Humana repay $6.8 million for 2017 and 2018 overpayments under the plan, identify similar instances of noncompliance occurring before and after the audit period, and refund any resulting overpayments to CMS. This was nearly half of the estimated total overpayments made to Humana under the plan, which OIG estimated at $13.1 million, signaling the potential for much larger future refunds if

Humana's practices were taking place in the Company's other Medicare Advantage plans. This was nearly half of the estimated total overpayments made to Humana under the plan, which OIG estimated at $13.1 million, signaling the potential for much larger future refunds if Humana's practices did not change and were also taking place in Humana's other Medicare Advantage plans. In the audited years of 2017 and 2018, CMS paid Humana $4.9 billion to provide coverage to enrollees.

389.     OIG's audit of Humana's practices reviewed the Company's H2649 plan, focusing on diagnoses that were identified as having a higher risk of being miscoded.[8] Improper coding of these diagnoses led to enrollees appearing higher risk than they truly were, and therefore higher payments made to Humana than was appropriate given the enrollees' true risk profile. OIG then reviewed a random sample of 240 "enrollees on whose behalf providers documented diagnosis codes that mapped to one of the eight high-risk groups during the 2016 and 2017 service years, for which Humana received increased risk-adjusted payments for payment years 2017 and 2018," which the OIG Report referred to as "enrollee-years." For these enrollee-years, Humana had received payments totaling $3.7 million in 2017 and 2018. In conducting the audit, OIG reviewed medical records associated with the sampled enrollee-years to determine whether the values assigned to certain diagnoses were properly validated.

390.     Ultimately, OIG found that only 38 of the 240 sampled enrollee-years were validated by medical records. The remaining 202 enrollee-years reviewed "did not comply with

---

[8] These high-risk diagnosis groups included: acute stroke (30 diagnoses), acute myocardial infarction (30 diagnoses), embolism (30 diagnoses), sepsis (30 diagnoses), lung cancer (30 diagnoses), breast cancer (30 diagnoses), colon cancer (30 diagnoses) and prostate cancer (30 diagnoses).

Federal requirements" for a wide variety of reasons. For example, OIG found the following failures in Humana's coding practices:

- Humana incorrectly submitted diagnosis codes for acute stroke for all 30 sampled enrollee-years. For example, for 19 enrollee-years, medical records indicated a previous stroke, but did not support an acute stroke diagnosis at the time of the physician's service.

- Humana incorrectly submitted diagnosis codes for acute myocardial infarction for all 30 sampled enrollee-years. For example, for 6 enrollee-years, medical records only supported a less severe manifestation of the related-disease group.

- Humana incorrectly submitted diagnosis codes for embolism for 25 of 30 sampled enrollee-years. For 9 enrollee-years, the medical records in each case did not support a diagnosis that mapped to an embolism category at all.

- Humana incorrectly submitted diagnosis codes for prostate cancer for 26 of 30 sampled enrollee-years. For 3 enrollee-years, medical records did not support a prostate cancer diagnosis.

As a result of the errors identified by the audit, OIG estimated that Humana received at least $13,150,480 in overpayments under H2649 during the audit period alone. Significantly, plan H2649 accounted for 247,872 enrollees during the audit period, only 8% of Humana's 3,064,000 individual Medicare Advantage enrollees in 2018.

391.    OIG further pointed out the need for improvement in Humana's policies and procedures to prevent, detect and correct its issues with noncompliance with CMS requirements. The OIG Report identified only one example of Humana taking steps to better its policies and procedures to prevent improper coding as a result of the audit. This change, however, only accounted for situations similar to 6 of the 202 miscoded sample enrollee-years identified.

392.    As the OIG Report demonstrates, Humana was facing pressure to modify its risk adjustment practices during the Class Period, further constraining the Company's ability to mask the effect of rising utilization. Thus, throughout the Class Period, increases in utilization more severely impacted the Company's MLR.

## VI.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT[9]

### A.    July 27, 2022 – 2Q 2022 Earnings Call

393.    On July 27, 2022, Humana held an earnings call to announce and discuss the

Company's 2Q 2022 financial results. Defendants Broussard and Diamond participated in the call.

394.    During the earnings call, Justin Lake from Wolfe Research asked:

First on MLR in the quarter. It sounded like the MLR had some moving parts, but was in line-ish, give or take, with your own expectations. Obviously, consensus is a little bit lower than this. So I was hoping, you gave us some EPS seasonality. Given your retail business still has 100 basis points of a range, maybe you could tell us where you think you're going to be in that range for the back half of the year and to think about 3Q versus 4Q?

395.    In response, Diamond stated:

***So yes, in terms of MLR, as you said internally, it is meeting our expectation***. As you mentioned, analyst expectations did vary. I think there was on the consolidated MER, about a 200 basis point spread in analyst expectations at about 150% basis point spread in retail. There is a wide variation. What came out in terms of consensus was based on just a few who happened to respond to this survey. ***So we do want to reiterate that what we are seeing internally from an individual Medicare Advantage perspective, we are seeing better-than-expected results and better-than-expected MERs based on the -- primarily the lower inpatient utilization we mentioned***.

Within the segment, though, as we said, there is some mix impact in terms of the higher Medicaid membership that comes with a higher MER typically as well as the group Medicare pressure that we mentioned in my commentary.

But when you consider all of that, as we said, we are very pleased with our performance, in particular, the strength of the individual MA improvement, which is reflective of the more conservative pricing approach we took in our bids that we've been talking about all year. For the full year, we also remain confident in what we are seeing, ***we'll certainly continue to watch the emerging trends to see if that results in any additional favorability in the back half of the year relative to our estimates***.

396.    Rivka Goldwasser from Morgan Stanley Research Division then asked:

So I'm just kind of like thinking how you're kind of thinking about that as you think about the MLR. I mean, clearly, you saw kind of like the MLR in the quarter that

---

[9] In this Section, Plaintiff has emphasized in ***bold and italics*** the portion of each statement that it alleges was materially false or misleading. Additional text is provided for context, which also contributes to the false or misleading nature of Defendants' statements.

was a little bit higher than Street expectations. But are you starting to see that impacting the MLR when you parse out the membership mix?

397.    In response, Diamond stated:

Sure. I'll take that. So I would say, as you mentioned, while MLR was different and didn't meet consensus, that's again reflective of how I mentioned earlier. There's a wide range in the consensus estimate. Those are not necessarily reflective of internal estimates. ***And so relative to our internal estimates, we did see outperformance particularly in our individual MA business. And so it's important to keep that in mind. I would say that we are seeing so far, certainly in ER use and observations. They are continuing to run lower than we saw pre-COVID. Some of that, I do think it's probably reflective of people seeking out other sites of care that are more appropriate, whether that's physician and urgent care that they became accustomed to during the pandemic and has continued.***

398.    During the earnings call, Nathan Rich from Goldman Sachs asked:

You talked about utilization in the individual MA business running favorable to expectations. Is the lower admits per 1,000 that you called out. Is that related to COVID? Or are you also seeing favorability on non-COVID utilization as well? And can you talk about what you expect over the balance of the year?" And then Susan, could you also address the increase in days claims payable in the quarter? What drove that and what you were expecting in the guidance? And given that it is sort of above the longer-term rate that you target, how you expect that to trend over the balance of the year.

399.    Diamond responded:

***And then we are seeing some improved impact from some of our utilization management programs. They're also positively impacting inpatient activity. So other than the flu that we'll moderate some, we don't have any reason to think that inpatient to outpatient or the positive utilization management impacts won't continue for the rest of the year, and so that is contemplated in our full year guide.***

400.    Defendants' statements set forth in ¶¶395 and 397, including those concerning the purported "***lower inpatient utilization***" and "***favorability***" of utilization trends, were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See* Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly

125

discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. At the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. *See* Section V.G.1. These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

401.    In addition, Defendants' statements set forth in ¶¶395, 397, and 399, including the purported "***positive utilization management*** impacts" resulting from the Company's "***utilization management programs***," were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance.

402.    Defendants' statements set forth in ¶¶395, 397, and 399 were also materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

**B.    September 15, 2022 – Humana Investor Day**

403.    On September 15, 2022, Humana held a virtual investor day conference call with research analysts from Credit Suisse, SVB Securities, Jefferies LLC, TD Cowen, Deutsche Bank,

Nephron Research LLC, Wolfe Research, BofA Securities, JPMorgan, Goldman Sachs, Stephens, Wells Fargo, and Barclays. Defendants Broussard and Diamond participated in the call.

404.     During the call, Joshua Raskin from Nephron Research LLC asked: "First, could you just provide an update on utilization trends that you've seen since your update on the 2Q call, and I'm specifically interested on thoughts around that 3Q MLR consensus, I think it's [86.8%]."

405.     In response to this question, Diamond responded:

In terms of overall utilization, as we shared on our second quarter call, **we have seen medical costs in our individual MA business running favorable to our expectations**. We've been seeing lower-than-expected in-patient utilization, which was partially offset by some higher-than-expected in-patient unit costs, and then also slightly favorable non-in-patient costs.

I'm pleased to say that those trends have continued in the recent weeks, although with some moderation. **The current year estimates have continued to restate positively, with in-patient unit costs and non-in-patient trends coming in lower than we initially estimated. In particular, ER rates, observation stays and SNF utilization continue to trend lower than what we would consider baseline trend levels.**

406.     Defendants' statement set forth in ¶405 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See* Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of

Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. *Id.* These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

407.    In addition, Defendants' statement set forth in ¶405 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by numerous former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance.

408.    Defendants' statement set forth in ¶405 was materially also materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and

satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

### C.    January 9, 2023 – JPMorgan Healthcare Conference

409.    On January 9, 2023, Defendant Diamond participated in the JPMorgan Healthcare Conference on behalf of Humana.

410.    During the conference, Goldman Sachs' Managing Director Lisa Gill asked "are you looking for any pent-up demand as we start to think about 2023?"

411.    In response to this question, Diamond stated, in relevant part: "***So our view would be that there really isn't pent-up demand that we have to be concerned about***."

412.    Gill then asked: "What about acuity levels? Like we've heard other managed care companies talk about that perhaps if you put off a surgery last year now that you need some --

you're not going to get a second surgery, right, but maybe it's going to be a higher level of acuity surgery. Are you anticipating that going into 2023?"

413.    To this question, Diamond responded:

> **We haven't seen anything that we would call an outlier or have a significant concern**. I mean it really is interesting, the impact of mortality. The morbidity of the population is much lower than it used to, and it will take a number of years for that to, frankly, even get back on par with where it was pre-COVID. **And so again, the pent-up demand, we feel like has worked its way through** -- throughout the pandemic and our primarily our value providers, where it's really hard to make sure members were getting the care that they need.
>
> They were staying medication adherent. We were making sure they had access to food and other things and getting their vaccines and screenings and everything else once the system opened back up. So far, we haven't seen anything.

414.    Defendants' statements set forth in ¶¶411 and 413, including that "*there really isn't pent-up demand that we have to be concerned about*" and that "*the pent-up demand . . . has worked its way through*" were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See* Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID

131

pandemic. *Id.* These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

415.    In addition, Defendants' statements set forth in ¶¶411 and 413 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance.

416.    Defendants' statements set forth in ¶¶411 and 413 were also materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated

experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

417.    During the same conference, Goldman Sachs' Managing Director, Lisa Gill, asked:

Great. Another net positive is 2024 STARS. Clearly, Humana standing out from the rest of the pack when we think about 96% will be four-plus stars for 2024. Can you talk about what's really been differentiated for Humana? I think you and I have talked in the past around your relationship with value-based care providers and the difference that, that's made, but maybe just talk in general around stars and what really is differentiated for Humana.

418.    Diamond responded:

*As you said, the other big factor and we think that's more durable and differentiating is our focus on value-based primary care providers in particular. They consistently outperform on stars and they consistently deliver high-quality results. And so as we continue to work to have more of our patients and members supported by high-quality Primary Care, we see beneficial impact in terms of the STARS results. And that's certainly harder to replicate quickly by some of our peers that are seeing some pressure. And again, we'll continue to focus on that, which we do think creates a differentiated advantage.*

419.    Defendants' statement set forth in ¶418 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### D.        February 1, 2023 – 4Q 2022 Earnings Call

420.    On February 1, 2023, Humana held an earnings call to discuss the Company's 4Q 2022 and FY 2022 financial results. Defendants Broussard and Diamond participated in the call.

421.    During the call, Steven Valiquette from Barclays asked whether Defendants were "assuming any sort of pent-up demand related to elective procedures or any other pent-up non-COVID care coming out of [20]22 that may have to be absorbed in [20]23 at the guidance midpoint."

422.    In response to this question, Diamond stated:

So we would expect as labor capacity increases, that will be 1 area where I imagine we will start to see some return to pre-COVID levels as there is sufficient capacity to support those additional patients in the facilities. ***So I would say it's not explicitly pent-up demand***.

***And based on all the analysis we've done, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system. Historically, we have seen some evidence of that, but it's typically after a very large COVID spike where there's significant depressed non-COVID utilization, which fortunately we haven't seen for some time, and we are not forecasting that type of event to occur again in 2023***.

***So our guide does not have an explicit assumption around pent-up demand, but rather just taking the resulting sort of baseline trend we experienced in 2022. Increasing that for normal course trend as well as the expectation of some higher utilization as labor capacity returns***. And as I mentioned in the commentary and expectation that flu will also see higher costs than we saw in 2022 as well.

423.    Defendants' statement set forth in ¶422, including denying the presence of "***a large amount of pent-up demand sort of that needs to work its way through the system***," was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See* Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members

135

sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. *Id*. These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

424.    In addition, Defendants' statement set forth in ¶422 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance.

425.     Defendants' statement set forth in ¶422 was also materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

### E.    March 7, 2023 – Cowen Health Care Conference

426.     On March 7, 2023, Defendant Broussard participated in the Cowen Health Care Conference on behalf of Humana.

427.     During the conference, Cowen analyst Gary Taylor asked:

A lot of stuff going on in Medicare, at least from a regulatory perspective, right now. But maybe just, first, walk us through the journey that Humana has been on a little bit over the last year or so where you made this concerted effort to find savings across the enterprise, to invest that in benefit. It appears you've done that very successfully, given the amount of enrollment growth that you're going to see this year. But is there anything about that that surprised you? And what's sort of your reaction to the amount of enrollment growth that you guys have been able to generate for 2023?

428.    Broussard responded:

*I think the combination of our product positioning, our service, and our Net Promoter Score, along with our Stars and our relationship and the investment that we've made in the brokerage community this year has created this ability not only to compete by the product itself, but also the ability to have dependability over multiple years*.[10]

429.    Later during the conference, Broussard commented on Humana's positioning for 2024, stating "just a few things I think investors should think about . . . *One is, as you mentioned, our Stars performance will carry us farther than others in the 2024 [sic]*."

430.    Defendants' statements set forth in ¶¶428 and 429 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, contrary to these statements touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement

---

[10]  A "Net Promoter Score" measures how likely a Medicare Advantage beneficiary is to recommend their current Medicare plan based on their satisfaction with the plan's services and customer experience.

units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### F.    March 8, 2023 – Proxy Statement

431.    On March 8, 2023, Humana filed its 2023 Proxy Statement. In the executive summary of Humana's Compensation Discussion & Analysis, Defendants stated:

> As one of the nation's leading health care companies, we are pleased to once again be recognized by the Centers for Medicare and Medicaid Services (CMS) with strong Star Ratings for our Medicare Advantage plans that became effective on January 1, 2023. In all, we're able to offer plans under 47 Medicare Advantage contracts in 2023, 30 of which are rated 4-stars or higher and covered 4.9 million members in 2022, representing 96% of our existing Medicare Advantage membership in rated contracts as of September 2022. Further, more than 99% of retirees in Humana Group Medicare Advantage rated plans remain in 4-star or above contracts for 2023. ***These Star Ratings continue to reflect the Company's unwavering focus on high quality of care, patient-centered clinical outcomes and reliable customer service for members***.

432.    Defendants' statement set forth in ¶431 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and

"*unwavering focus on high quality of care*" and "*reliable customer service for members*," Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### G.    April 20, 2023 – Annual General Meeting

433.    On April 20, 2023 Humana held its annual shareholders meeting. Defendant Broussard participated on behalf of the Company.

434.    During the meeting, Broussard stated: "*As you look at the other parts of the business, we continue to be oriented to our quality scores, which today represent 96% of our members are in 4-star plans or greater*."

435.    Defendants' statement set forth in ¶434 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that

Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### H.    April 26, 2023 – Earnings Release And 1Q 2023 Earnings Call

436.    Before the market opened on April 26, 2023, Humana issued a press release attached to a Form 8-K announcing 1Q 2023 financial results. On the same day, Humana held an earnings call to discuss the Company's 1Q 2023 financial results. Defendants Broussard and Diamond participated in the call.

437.    Within the April 26, 2023 earnings release, Defendants stated "1Q23 earnings per share (EPS) of $9.87 on a GAAP basis, Adjusted EPS of $9.38, with strong 1Q23 performance *underpinned by robust membership growth and favorable inpatient utilization trends in the individual Medicare Advantage business[.]*"

438.    In the April 26, 2023 earnings release, Broussard stated:

*We've had a strong start to the year, with our outperformance underpinned by strong membership growth and favorable inpatient utilization trends in our individual Medicare Advantage business*. The strength of our results enabled us to raise our full year 2023 Adjusted EPS by $0.25 to 'at least $28.25'[.]

439.    In her opening remarks on the earnings call, Diamond stated:

*Finally, I would reiterate that we are comfortable with the utilization patterns seen in our insurance segment. And more specifically, our Medicare Advantage business to date as reflected in our updated full year adjusted EPS guidance*.

440.    During the April 26, 2023 call, research analyst AJ Rice of Credit Suisse asked:

And then the other thing, I guess, and I appreciate Susan's comments here on -- there's been -- we've been asked a lot about -- we've had 3 public hospital companies talk about how strong their inpatient utilization has been at least relative to recent quarters. I'm wondering is the rationalizing that versus what you guys are saying is that just that you plan for a step-up in utilization, and it hasn't happened to the amount that you thought or is there any other way? Because a lot of those public companies focused particularly in Florida and Texas and are seeing seemingly strong volumes, but you're saying your inpatient side has been one of the areas of outperformance.

441.    In response to this question, Diamond stated:

In terms of your question about the strong inpatient trends that some of the hospital systems have reported, just as you said, we expected that, particularly in the first quarter. Because if you look at the medical costs last year over the quarters, it was depressed in the first quarter. ***And with our expectation that we would see trends return to normal levels, we would expect a higher first quarter trend relative to the average we would have planned for, for the year. So again, I do think that's very consistent with what we've seen. And even with that expectation and what the hospitals are reporting, we are still seeing some net favorability in the quarter.***

442.    Defendants' statements set forth in ¶¶437, 438, 439 and 441, including those concerning "***favorable inpatient utilization trends in the individual Medicare Advantage business***," that utilization trends were "***very consistent with what we've seen***," and that Humana was seeing "***some net favorability***," were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See* Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. Indeed, FE-2 stated that beginning in April 2023, there was an "inexorable progressive" monthly increase of inpatient admission rates, recorded as higher admissions per thousand patients, and that this trend was visible in the internal trackers that were discussed in Trend Committee meetings, pre-read materials and reports. ¶¶162-63. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. These factors resulted in increased benefit

expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

443.    In addition, Defendants' statements set forth in ¶¶437, 438, 439 and 441 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1.

444.    Defendants' statements set forth in ¶¶437, 438, 439 and 441 were also materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing

144

backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

445.    During the same call, research analyst George Hill of Deutsche Bank asked:

Bruce, kind of a big picture question. As you now know, kind of the 2024 rate environment and the Star's [sic] environment, do you think the company will have the ability to continue to take share like it has in calendar '23 or should we think of -- my short question is should we think of '24 as more of a share gain opportunity for Humana or more a chance for the company to kind of flex its margin capability in the individual MA market?

446.    Broussard responded: "Yes. It's obviously early in the bid cycle for us to give you the details that you want here. I would say, in general, we continue to remain committed to growing our membership growth in the high single digits there. And I would just use that as a sort of a measurement for us as we think about whether it's share gain or not. *As we enter 2024, obviously, our Star's [sic] position is a positive for the company*."

447.    Defendants' statement set forth in ¶446 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a

145

reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

**I.    May 9, 2023 – Bank of America Healthcare Conference**

448.    On May 9, 2023, Defendants Broussard and Diamond participated in the Bank of America Health Care Conference on behalf of Humana.

449.    During the conference, Kevin Fischeck of BofA Securities asked:

146

So I guess one of the things that I'm trying to get a strong answer to throughout this week and asking everybody is just about Q1 utilization because we've seen really strong volume numbers from the providers [] from the med tech companies, broadly speaking, and the managed care companies routinely say, no, everything is fine. So we'd love to kind of hear your view about how we can square those 2 seemingly in congruent [sic] concepts?

450.    In response to this question, Diamond stated:

Sure. Happy to. So as you mentioned on our first quarter call, part of this is obviously how is it performing relative to what you expected? And we've been saying throughout the back half of last year, that as we price for 2023, we did contemplate that we would see normalized trend development in 2023, off of our 2022 baseline. And so we did plan for a normalized trend, and you can think of that as just sort of typical trend that you would apply for utilization and unit cost on top of your starting point.

. . .

So based on what we know, we feel good, but it is still very early in the year, and we'll certainly continue to watch the trends develop over the rest of the year. But ***so far, what we're seeing is, again, slightly favorable expectations on the inpatient side. And overall, we would say consistent, if not slightly positive for the first quarter***.

451.    Defendants' statement set forth in ¶450, including that utilization trends were

"***consistent, if not slightly positive for the first quarter***," was materially false or misleading when

made, omitted material facts necessary to render such statement not misleading, and lacked a

reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing

significant undisclosed increases in members' utilization due to pent-up post-COVID demand. *See*

Section V.G.1. As described by numerous former Humana employees, these increases were

actively monitored by the Company throughout the Class Period and openly discussed in internal

meetings, and resulted from a "snowball effect" of claims volume as members sought previously

deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the

undisclosed increases in Medicare Advantage plan members' utilization that the Company

monitored continued and intensified during the Class Period. *See* Section V.G.1. Indeed, FE-2

stated that beginning in April 2023, there was an "inexorable progressive" monthly increase of

147

inpatient admission rates, recorded as higher admissions per thousand patients, and that this trend was visible in the internal trackers that were discussed in Trend Committee meetings, pre-read materials and reports. ¶¶162-63. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H. Moreover, as Defendant Diamond admitted on August 2, 2023, by no later than "***early May,*** [Defendants] noted the emergence of higher-than-anticipated non-inpatient utilization trends in [Humana's] Medicare Advantage business" and that "[a]t the same time, [] began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns."

452.    In addition, Defendants' statement set forth in ¶450 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials

148

without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance, as they gave investors the false impression that the increased utilization Humana was reporting was transient and contained.

453.    Defendants' statement set forth in ¶450 was also materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that

increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

454.    During the conference, Broussard stated the following about the Company's Star scores:

> *For us as an organization, we continue to believe that we are in . . . the preferred spot as a result of our Star scores and that will benefit us quite a bit in 2024. And at the same time, we're coming off a great year from a brand point of view and our relationships with the brokers.*

455.    Defendants' statement set forth in ¶454 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout

2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### J.   June 16, 2023 – Form 8-K

456.   On June 16, 2023, Humana issued a press release on Form 8-K. In the press release, Defendants stated that:

> At this time, the Company assumes it will continue to experience moderately higher-than-expected trends for the remainder of the year, *which will be offset by a variety of factors,* including higher-than-expected favorable prior year development, ***additional administrative expense reductions***, higher than previously anticipated investment income and other business outperformance.

457.   Defendants' statement set forth in ¶456, including that "***additional administrative expense reductions***" would "***offset***" increased utilization, was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. This is because Defendants could not offset the increased utilization through additional cost-saving measures. Given the extent of cost-cutting measures Defendants had implemented as of the date of this statement, additional cost-cutting would only further undermine the quality of the Company's Medicare Advantage plans. Indeed, Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination,

appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

### K.    August 2, 2023 – Earnings Release And 2Q 2023 Earnings Call

458.    Before the market opened on August 2, 2023, Humana issued a press release attached to a Form 8-K announcing 2Q 2023 financial results. On the same day, Humana held an earnings call to discuss the Company's 2Q 2023 financial results. Defendants Broussard and Diamond participated in the call.

459.    In the 2Q 2023 earnings release, the Company represented that its quarterly results "Highlight[ed] *stabilizing Medicare Advantage utilization environment based on most recent claims activity*[.]"

460.    In his opening remarks on the earnings call, Broussard stated:

Results for the quarter include the impact of the higher-than-anticipated Medicare Advantage utilization recently disclosed, *which has stabilized and is tracking in line with our updated expectations*, and were supported by in line to slightly positive results from all other lines of business.

461.    In her opening remarks on the earnings call, Diamond stated:

We were pleased to see that our June paid claims data received in July reflected positive restatements for the first quarter, as well as ***stabilizing outpatient utilization levels in April and May***. While July claims data is not yet complete, early views support our year-to-date booking levels.

With respect to inpatient activity, the higher than initially anticipated utilization has continued, consistent with our June update. ***All in, we view the utilization data received in recent weeks as incrementally positive as compared to the assumptions utilized in our June update***. That said, we continue to point you to the top end of our full year Insurance segment benefit ratio guidance range of 86.3% to 87.3%, and will continue to monitor emerging trends. This guidance also contemplates the individual Medicare Advantage membership growth post the Annual Election Period, which has included a higher-than-expected proportion of age-ins.

462.    Defendants' statements set forth in ¶¶459, 460 and 461, including those concerning a purportedly "***stabilizing Medicare Advantage utilization environment based on most recent claims activity***," and that "higher-than-anticipated Medicare Advantage utilization . . . ***has stabilized***," were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Humana's Medicare Advantage plans were experiencing significant undisclosed increases in members' utilization due to pent-up post-COVID demand. Section V.G.1. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. Indeed, FE-2 stated that beginning in April 2023, there was an "inexorable progressive" monthly increase of inpatient admission rates, recorded as higher admissions per thousand patients, and that this trend was visible in the internal trackers that were discussed in Trend Committee meetings, pre-read materials and reports. ¶¶162-63. In addition, at the same time,

153

because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H. Moreover, as Defendant Diamond admitted on August 2, 2023, by no later than "***early May,*** [Defendants] noted the emergence of higher-than-anticipated non-inpatient utilization trends in [Humana's] Medicare Advantage business" and that "[a]t the same time, [] began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns."

463.    In addition, Defendants' statements set forth in ¶¶459, 460 and 461 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact

154

on the Company's financial performance, as they gave investors the false impression that the increased utilization Humana was reporting was transient and contained.

464.    Later during the earnings call, Steven Valiquette from Barclays asked:

So I guess just regarding the elevated Medicare cost trend for the second quarter and then thinking about some of the potential moderation in the back half of '23, can you just remind us whether or not there's any major levers you can and have proactively pulled midyear to just better contain the elevated Medicare cost for the back half of the year, either on prior authorization policies or just other coverage factors? Or are the '23 trend[s] is really more just serendipitous at this stage? You just have to wait essentially until '24 to make any material changes to either better control costs or adjust pricing benefit design, et cetera?

465.    Diamond responded:

***The main lever that I would say that we're relying on internally to offset some of the elevated trend in the back half of the year is more administrative expense savings***. We have asked the organization to find additional opportunities, and that's largely informed by some of the ongoing productivity work that we've been viewing that highlights that there are some additional opportunities. And I would say relative to what we considered in our original plan for the year, ***those extra admin savings will be disproportionately benefiting the back half of the year.*** Whereas the first half of the year, the elevated trend had the benefit of things like prior year development that we would say is going to disproportionately benefit the first half versus the back half.

466.    Defendants' statement set forth in ¶465, including that "***administrative expense savings***" were the "***main lever***" the Company was "***relying on internally to offset some of the elevated trend***" in utilization, was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. This is because Defendants could not offset the increased utilization through additional cost-saving measures. Given the extent of cost-cutting measures Defendants had implemented as of the date of this statement, additional cost-cutting would only further undermine the quality of the Company's Medicare Advantage plans. Indeed, Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants'

cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

467.    Also during the call, research analyst Justin Lake of Wolfe Research asked:

[A]ny early commentary on 2025 Stars? I know you've gotten a bunch of data there. I know the – it's still not perfect, but any thoughts on how your 2025 Star performance is shaping up going into October? It would be helpful, too.

468.    Broussard responded:

Relative to Stars, it is an early -- it's -- we haven't got all our results, ***but we feel pretty good about where we stand as a result of what we see preliminarily***. Obviously, we haven't seen the comparative measurements and how you stack up with the industry, ***but I would say that we feel pretty good about our existing analysis***.

469.    Defendants' statement set forth in ¶468 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings,

Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### L.    September 6, 2023 – Wells Fargo Healthcare Conference

470.    On September 6, 2023, Defendants Broussard participated in the Wells Fargo Healthcare Conference on behalf of Humana.

471.    During the conference, Wells Fargo analyst Stephen Baxter asked, in pertinent part, "any early thoughts on how we should be thinking about 2025 stars would be helpful[?]"

472.    Broussard responded:

As you mentioned, we've gotten our first look at it, and we said this in the second quarter call, *we feel comfortable that we're going to continue to lead the industry [in Stars]*. And in the next few days, we'll be able to see the cut points and understand that further. *But what we've seen . . . in our results, both on our satisfaction scores in the [HEDIS] area, especially, we've just - continues to reaffirm our confidence*.

473.    Defendants' statement set forth in ¶472 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars

hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### M.    October 13, 2023 – Press Release

474.    After the market closed on October 13, 2023, Humana published a press release reporting CMS Star ratings for its 2024 Medicare Advantage plans.

475.    In the Press Release, speaking on behalf of the Company, Humana's Insurance segment President George Renaudin stated:

> *Our excellent CMS Star Ratings reflect our continued focus on the quality of care, clinical outcomes and industry leading customer service for our members*, […] O*ur continued delivery of quality care for our members has enabled our consistent high performance in Stars, even as changes to the rating methodology were introduced this year. This is a testament to the dedication of the Humana team to putting our members at the center of everything we do*.

476.    Defendants' statement set forth in ¶475 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan

member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### N.      November 1, 2023 – Earnings Release And 3Q 2023 Earnings Call

477.    Before the market opened on November 1, 2023, Humana issued a press release attached to a Form 8-K announcing 3Q 2023 financial results. On the same day, Humana held an earnings call to discuss the Company's 3Q 2023 financial results. Defendants Broussard and Diamond participated in the call.

478.    In the press release, Humana announced that ***94 percent of its Medicare Advantage members were*** "***currently enrolled in 4-star and above contracts for 2024***," ***with*** "***61 percent of members in 4.5 and 5-star contracts***," which the Company stated made it "an industry-leader among its publicly traded peers for the sixth consecutive year."

479.    In the same press release, Defendant Broussard stated that the Company's 3Q 2023 results could be partially attributed to "***prioritizing quality***" and highlighted Humana's "***industry-leading Star Ratings***," stating they "***are a testament to our commitment to the health, well-being, and satisfaction of our customers and to our being a trusted brand within the broker community***."

480.    In his opening remarks during the 3Q 2023 earnings call, Defendant Broussard stated that:

[O]ur ability to deliver on our targeted earnings growth rate in 2023, while also achieving [] impressive membership growth is supported by the strength and scale of our organization, underpinned by a continued focus on disciplined investments, driving sustainable productivity improvements and *delivering consistent fundamentals, including industry-leading stars results and higher customer satisfaction as reflected in our Net Promoter scores*.

481.    Defendant Broussard further stated that "*Our product enhancements are coupled with Humana's leading position in quality and experience. Humana continues to deliver exceptional quality to our members as measured by our CMS star ratings*."

482.    Broussard further stated:

*Humana continues to deliver exceptional quality to our members measured by our CMS star ratings. For 6 consecutive years, Humana has maintained the highest percentage of members in 4 star or higher-rated contracts among national health lines. In 2024, 94% of our members will be enrolled in plans rated 4 stars or higher and 61% from plans rated 4.5 stars or higher . . . . these results are a testament to our commitment to putting the health and wellness of our customers first*.

483.    During the same call, in response to a question from Sanford Bernstein analyst Lance Wilkes concerning Humana's 2025 EPS target of $37.00, Diamond pointed to Humana's Medicare Advantage Star ratings as benefitting the Company going forward, stating:

We are very pleased though, again, to have the really strong stars results that were published recently. *And that, again, is a nice durable advantage for us where we do know some others will have some challenges to deal with there while others may have some improvement*."

484.    Defendants' statements set forth in ¶¶478, 479, 480, 481, 482 and 483 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, contrary to these statements touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset

the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H.

485.     As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

486.     In her opening remarks during the 3Q 2023 earnings call, Diamond discussed the Company's higher MLR and stated that "***We anticipate that the higher 2023 insurance segment benefit ratio will be offset by additional administrative expense reductions, driven in part by the sustainable productivity initiatives we discussed, improved net investment income and other business outperformance***."

487.     Later during the call, AJ Rice from UBS asked:

Maybe just following up on some of the MLR related questions. I think last quarter, you said with what you were seeing on the utilization front, you were comfortable that you had sort of incorporated that in your expectations around '24 pricing.

162

Given the incremental commentary today, are you still comfortable? Or do you need to have some level of offsetting efficiencies to mitigate a sequential uptick in utilization that you're assuming will continue next year.

And I guess just part of that as well is obviously part of what's impacting your medical loss ratio this year, is all the enrollment growth you've got. So you've got utilization being a little higher, but you've also got the drag of all these new members. Can you -- is there any way to parse out how much of the variance that you're seeing is utilization versus the drag of the new members and give us some flavor on that, assuming that the one might start to ease next year?

488.    In response to Rice's question, Diamond stated:

Yes, that's a great question in there and I'll try to get all of them. I would say, in terms of this incremental trend that we are announcing in the third quarter and then stepping up to for the full year. Obviously, this would not have been done at the time of pricing. ***It'll be incremental mitigation that we need to do to offset that in '24. If you recall, on the second quarter call, we did reaffirm that we intended to be within our long-term historical range of 11% to 15% and we reaffirm that today, although acknowledge it is a result of this higher trend that we would expect to be in the low end of that, is our initial thinking.***

***I would say, as we saw the trend develop, we certainly recognize that we would need to identify some additional mitigation. I would say our ongoing efforts around productivity have continued since the work we kicked off in '22. And as we've said before, have continued to identify more opportunities than we might have initially anticipated, which is built in those pipeline of opportunities that will certainly mitigate it in this year and we'll continue to do so next year."***

489.    Defendants' statements set forth in ¶¶486 and 488, including those concerning purported "***mitigation***" efforts and opportunities related to offsetting increased utilization, were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Defendants could not offset the increased utilization through additional cost-saving measures. Given the extent of cost-cutting measures Defendants had implemented as of the date of this statement, additional cost-cutting would only further undermine the quality of the Company's Medicare Advantage plans. Indeed, Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i)

163

widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and (vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

**O.    January 18, 2024 – Form 8-K**

490.    On January 18, 2024, Humana issued a Form 8-K, which included a "Medical Cost Trend Update and Revised Full Year 2023 EPS Expectations."

491.    In its Form 8-K, Humana stated that "***it remains well positioned to compete as an industry leader in the attractive Medicare Advantage market going forward with its differentiated capabilities***, including . . . ***exceptional quality as demonstrated by its industry leading Stars scores***[.]"

492.    Humana further stated that:

The Company continues to believe it took a prudent approach to 2024 pricing considering the current regulatory changes and evolving utilization environment. In addition, ***the Company believes it remains well positioned to compete as an***

164

***industry leader in the attractive Medicare Advantage market going forward with its differentiated capabilities, including highly diversified and patient centered value-based care arrangements, exceptional quality as demonstrated by its industry leading Stars scores***, best in class consumer experience rankings, and continued growth and integration of its CenterWell capabilities.

493.    Defendants' statements set forth in ¶¶491 and 492 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, contrary to these statements touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to

165

take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

**P.      January 25, 2024 – Earnings Release, Prepared Remarks, And 4Q 2023 Earnings Call**

494.    On January 25, 2024, Humana issued a press release attached to a Form 8-K announcing fiscal year 2023 financial results. That same day, Humana filed with the SEC and made available to investors prepared remarks attributed to Defendants Broussard and Diamond for the Company's earnings call scheduled to commence the same morning. The earnings call was held to announce and discuss the Company's 4Q 2023 and FY 2023 financial results. Defendants Broussard and Diamond participated in the call.

495.    Within the Management Commentary section of the press release, Defendants stated that Humana "***remain[s] well positioned to compete as an industry leader in the attractive MA market going forward with our differentiated capabilities, including*** . . . ***exceptional quality as demonstrated by our industry leading Stars scores***."

496.    Defendants' statement set forth in ¶495 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had

166

historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

497.    During the earnings call, Stephen Baxter from Wells Fargo Securities asked:

And then just also your approach to operating expenses in 2024 and 2025, like it does look like you had SG&A up $700 million in 2024. I guess I thought there might have maybe more actions you could take to try to protect earnings in the short term as you work to reprice. I would love to just understand that a little better.

498.    Defendant Diamond responded:

[O]n the operating front, yes, as you saw and as we've been describing all year, as *we saw the initially higher outpatient trend starting in the second quarter, we were able to successfully mitigate that pressure that we stepped up to through the third quarter through multiple levers, including administrative cost -- further administrative cost reductions*. And you saw that in the operating cost ratio we reported for 2023, which was certainly favorable relative to the commitment we've made for 20 basis points of annual improvement.

499.    Defendants' statement set forth in ¶498 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because the increased utilization trend did not "*start[] in the second quarter*." Rather, Humana's Medicare Advantage plans were experiencing significant increases in

members' utilization due to pent-up demand throughout the Class Period. As described by numerous former Humana employees, these increases were actively monitored by the Company throughout the Class Period and openly discussed in internal meetings, and resulted from a "snowball effect" of claims volume as members sought previously deferred care. *See* Sections V.E and V.G.1. These former employees also confirm that the undisclosed increases in Medicare Advantage plan members' utilization that the Company monitored continued and intensified during the Class Period. *See* Section V.G.1. In addition, at the same time, because Humana had seen a surge in Medicare Advantage membership during the COVID pandemic, the Company faced excessive costs resulting from its expanded base of Medicare Advantage members seeking treatment for medical conditions that went undiagnosed or inadequately treated during the COVID pandemic. These factors resulted in increased benefit expenses in both inpatient and outpatient settings, which Humana sought to offset through tactics designed to suppress utilization and through widespread, damaging cost-cutting. *See* Sections V.G.2 and V.H.

500.    In addition, Defendants' statement set forth in ¶498 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact, because Humana was artificially suppressing utilization through the systematic denial and obstruction of claims and prior authorizations. As described by former Humana employees and documented in the PSI Report, Humana: (i) denied as much as 50% of claims, with costly claims, such as those for post-acute care, denied more frequently; (ii) pressured its employees to deny claims and discouraged approvals; (iii) implemented front-end review systems specifically to deny claims before payment; (iv) reclassified providers with high utilization as "out of network" to discourage its Medicare Advantage members from receiving treatment from those providers; and (v) used artificial intelligence systems to automate care denials

without proper medical review. *See* Sections V.G.2 and V.Q.1. These practices concealed or distorted Humana's increased utilization and its impact on the Company's financial performance, as they gave investors the false impression that the increased utilization Humana was reporting was transient and contained.

501.    Defendants' statement set forth in ¶498, including that Defendants were "***able to successfully mitigate that pressure* . . . *through multiple levers, including* . . . *further administrative cost reductions***," was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. This is because Defendants could not offset the increased utilization through additional cost-saving measures. Given the extent of cost-cutting measures Defendants had implemented as of the date of this statement, additional cost-cutting would only further undermine the quality of the Company's Medicare Advantage plans. Indeed, Humana was implementing cost-cutting measures in an effort to offset and conceal the dramatic increase in Medicare Advantage demand and utilization, which were negatively impacting its Medicare Advantage plan members' care and satisfaction. Thus, these efforts were neither sufficient nor successful. As described in Section V.H by numerous former Humana employees, Defendants' cost-cutting measures included: (i) widespread layoffs and restructuring that eliminated experienced staff and combined different regions, leading to inadequate staffing levels, growing backlogs in utilization management and care coordination, appointment delays and declining customer service levels; (ii) reducing the benefits available under its Medicare Advantage plans; (iii) reduced support for provider quality improvement initiatives; (iv) prioritizing large provider groups while disregarding smaller ones, leading to customer dissatisfaction and problems with the care provided; (v) a decline in preventive care and wellness initiatives; (vi) a diminished ability to monitor and address quality metrics; and

(vii) the inability to handle claims processing efficiently and maintain internal controls over claims processing, which created tensions with healthcare providers and damaged provider relationships. As a result of Humana's widespread, damaging cost-cutting measures, the Company was unable to manage the post-COVID surge in utilization while maintaining the quality of its Medicare Advantage plans. Moreover, these practices concealed or distorted the impact that increased Medicare Advantage plan members' utilization had on the Company's financial performance, including its MLR.

**Q.     March 8, 2024 – Proxy Statement**

502.    On March 8, 2024 Humana filed its 2024 Proxy Statement. Within the 2024 Proxy Statement, Defendants stated:

> The strength of our core insurance operations remains clear. In 2023, we grew our individual MA membership by over 840,000, and ***continued our leadership in putting members first - evidenced again in our strong Star Ratings for 2024, with 94 percent of our members in plans rated 4 stars or higher, 61 percent in plans rated 4.5 or 5 stars, and 37 percent of all 5-star MA membership in a Humana plan.***

503.    Defendants also described the Company's Star ratings within the 2024 Proxy Statement, stating "***Our commitment to quality of care, patient-centered clinical outcomes and customer service is reflected in the consistent strength of our MA plan's Star Ratings.***"

504.    Defendants' statements set forth in ¶¶502 and 503 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, contrary to these statements touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See*

Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives, including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

### R. September 4, 2024 – Wells Fargo Healthcare Conference

505.    On September 4, 2024, Defendant Diamond participated in the Wells Fargo Healthcare Conference on behalf of Humana.

506.    During the conference, Wells Fargo analyst Stephen Baxter asked, in pertinent part, "[h]ow you guys thinking about STARS opportunity? I know your top-performing plan, so your ability to improve is obviously limited. But what are you watching on STARS? What are you focused on?"

507.    Defendant Diamond responded:

Yeah. We didn't have some of the same impacts as last year. I want to get to key in some of those types of things. But I would say just in general, the program is challenging in terms of just the basic structure, right? Greater on the curve, it's not

171

weighted. And so it can be more difficult to predict. So I would just say we continue to be focused on it. ***It is early right has not released the information as yet, so we don't have visibility to the thresholds just yet. So as you said, it will be early October when we get the information the same time as others. And so we'll certainly comment in. But I would say it continues to be a focus. As you said, we continue to be proud of the work that we [] are very high performing. So a lot of days, it feels like there's only one way to go, right, just because when you're 94%, I don't know that we ever get to 100%. So continue to focus on across the enterprise and work to improve all of those activities, but too early unfortunately to share any details***.

508.    Defendants' statement set forth in ¶507 was materially false or misleading when made, omitted material facts necessary to render such statement not misleading, and lacked a reasonable basis in fact. In truth, contrary to this statement touting the Company's Star ratings and portraying them as a competitive advantage, Defendants had undermined the quality of Humana's Medicare Advantage plans by pursuing measures to conceal the expenses of escalating utilization, including: (i) suppressing utilization by, among other things, denying claims; and (ii) reducing costs elsewhere at the Company to offset the increasing utilization costs, leading directly to a decline in key Star rating metrics for Humana's Medicare Advantage plans. *See* Sections V.G.2 and V.H. As described in Section V.I by numerous former Humana employees, Defendants' injurious cost-cutting actions included: (i) dismantling Regional Stars Improvement units that had historically driven incremental improvements in Star metrics; (ii) reducing staff in care coordination roles, which affected patient outcomes; (iii) reducing preventive care and wellness initiatives and other initiatives that helped maintain care quality metrics; (iv) eliminating local outreach programs that helped ensure patient compliance; (v) reducing Medicare Advantage plan member benefits; and (vi) eliminating positions across the Company and combining regions, which created growing backlogs and service delays and affected Medicare Advantage plan member satisfaction scores. As reflected in internal survey results and Quarterly Stars Updates throughout 2023, these actions adversely impacted Humana's Star ratings, jeopardizing the billions of dollars in quality bonus payments Humana received from CMS. In fact, senior Humana executives,

172

including Broussard, acknowledged in internal meetings that Humana was going to take a "Stars hit" and needed to pursue "cost containment" strategies to make up for the anticipated loss of revenue.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

509.    The facts detailed above and herein, when viewed holistically and together with the other allegations in this Complaint, establish a strong inference that each of the Defendants knew or recklessly disregarded that each of the misrepresentations and omissions alleged herein would be, and was, false or misleading to investors at the time it was made.

510.    In addition to the facts set forth above, the following facts support a strong inference of scienter as to each Defendant.

### A.    Defendants Had Actual Knowledge Of And Access To Information About Humana's Undisclosed Increases In Medicare Advantage Demand And Utilization

511.    During the Class Period, Defendants had direct knowledge of and access to information related to Medicare Advantage plan member demand for healthcare services and the undisclosed pent-up demand for healthcare services among Humana's Medicare Advantage members. As set forth above in Section V, Defendants' knowledge is established in numerous ways, including the following:

512.    *First*, Defendants repeatedly admitted that they actively tracked and analyzed underlying Medicare Advantage demand trends and, thus, had knowledge of the same:

- July 28, 2021 earnings call (Diamond): "We are *continuing to watch*" for "indicators that there is a higher acuity . . . *or there has been impact from the deferred care in 2020*."

- September 15, 2021 Morgan Stanley investor conference (Diamond): "*We do continue to watch the trends very closely in terms of the type of care our patients are receiving*. Are they visiting their primary care and specialists? Are they having hospitalization events and understanding where those diagnosis submissions are coming from? We also continue to watch the level of in-home assessments and other annual wellness assessments, which are a large contributor to ensuring that we have complete and

accurate sort of clinical profiles for all of our patients and members," before concluding, "*[a]nd we'll continue to monitor that closely and evaluate it*."

- November 3, 2021 earnings call (Diamond): "[W]e do, as we've said before, have really good real-time information on inpatient activity" and that the Company would "continue to watch the non-inpatient."

- April 27, 2022 earnings call (Diamond): "[t]here are a number of items we will need to *continue to monitor* to fully assess '22 performance, including *non-COVID utilization trends*, the rate of COVID positivity and inpatient unit cost trends[.]"

- July 27, 2022 earnings call (Diamond): "We have great visibility in real-time to inpatient utilization," and that "we'll certainly continue to watch the emerging [utilization] trends[.]"

- November 2, 2022 earnings call (Diamond): stating that the inpatient utilization trend was "certainly something that we'll take into account as we estimate MLR for next year," while also stating that Defendants were "*continu[ing] to watch*" and "be[ing] mindful" of factors that related to patient demand and utilization.

- February 1, 2023 earnings call (Diamond): touting "*all the analysis we've done*" on "*pent-up demand*." Diamond further stated: "*And based on all the analysis we've done*, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system."

- March 7, 2023 Cowen Health Care Conference (Broussard): "And what we're seeing in our trends and our admissions per thousands today is very consistent with our expectations. So we feel really good about the year."

- August 8, 2023 earnings call (Diamond): "As highlighted in our 8-K filing last month, beginning in early May, we noted the emergence of higher-than-anticipated non-inpatient utilization trends in our Medicare Advantage business. At the same time, we began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns. These trends continued in early June."

- January 25, 2024 prepared remarks for the 4Q 2023 earnings call (Broussard and Diamond): they confirmed that "[w]e have robust processes throughout the organization focused on identifying and analyzing emerging trends and have leveraged this infrastructure throughout the year to gain insights into the higher cost trends."

- January 25, 2024 earnings call (Humana Chief Operating Officer Jim Rechtin): "The entire management team has been working tirelessly to understand the underlying issues that we've discussed today, and I'm confident in the approach that the team has taken with respect to assumptions around the utilization pressures we are facing."

- January 25, 2024 earnings call (Diamond): "We do leverage authorization data on the inpatient side. We are actually using that to actually book reserves each month. We get authorization data for over -- like 99% of the inpatient events that occur. So it's very accurate in predicting, and we do receive it in more real time."

513.    *Second*, numerous former Humana employees confirm that Defendants and other members of senior management had knowledge of, were directly provided with, or had full access

174

to the several internal programs used to analyze utilization trends. These former employee accounts confirm that Humana maintained sophisticated systems for monitoring member utilization in real-time, including the following, which provided Defendants comprehensive visibility into developing trends:

- FE-19 recalled that Humana tracked utilization "every day, every Region has people to track it," and that Humana updated the system and ran reports frequently.

- FE-3 stated that Humana maintained a comprehensive internal utilization data tracking dashboard, using Tableau software, that generated weekly corporate updates and monthly reports and was accessible to director-level employees, certain supervisors, and Insurance Segment President Renaudin, allowing them to sort data by market, membership type, or state. While corporate provided these regular updates, each region maintained its own analyst team producing more detailed daily reports, including outpatient utilization rates, to quickly address emerging trends.

- FE-9 stated that Humana used a program called Service Fund to monitor utilization, which tracked both inpatient utilization and outpatient utilization, and that everyone at the Company had access to this program.

- FE-20 stated that Humana used Clinical Guidance Exchange, a system that generated detailed utilization reports that were accessible throughout the Company's management chain. The system also regularly generated reports that were elevated to senior leadership.

- FE-18 stated that Humana used a system that tracked each member's activity, which was accessible to everyone at Humana and was used to report utilization data to upper management.

- FE-5 stated that Humana senior management, including Retail Segment President Wheatley, received weekly utilization reports containing metrics and information such as the number of conditions per member per week and bid targets, which were then used to inform Defendants Diamond and Broussard.

- FE-7 participated in quarterly Joint Operation Committee meetings, attended by Defendant Broussard, where employees would present utilization data.

514.    ***Third***, Defendants received or had access to information about Humana's prior authorization process and determinations. Here, for instance, FE-1 confirmed that Humana maintained a database that tracked prior authorization decisions, stating that this data is very easily retrievable and is available to any interested party to pull on a real-time basis. By pulling this data, FE-1 explained one could see the backlog of procedures that had been approved but not yet performed. Corroborating this account, FE-19 recalled that Humana used a program called

175

Compass that, if a patient had received a prior authorization, maintained data related to the prior authorization by diagnosis code. FE-19 confirmed that one could use the prior authorization data in Compass to aggregate the total number of prior authorizations for a particular diagnosis code for Humana members.

515.  ***Fourth***, Defendants were specifically warned of and referred to the existence of pent-up healthcare demand. FE-1 stated that the Company saw increased elective procedure utilization coming "from a mile away" since Humana had visibility into the backlog of members waiting for procedures that had been approved but not yet performed. FE-1 further confirmed that the backlog of approved but not yet performed elective procedures—which Broussard and Diamond received through their admitted monitoring and review of utilization and demand data— was directly raised by utilization management employees to Broussard during ***at least two meetings in the summer and fall of 2022***. FE-1 explained that the utilization management team who presented this information raised these concerns in the context of the backlogs impacting Humana's financial performance.

516.  Other former employees corroborate that Defendants knew that pent-up demand had not worked through Humana's Medicare Advantage system by the start of the Class Period and that Defendants knew of or recklessly disregarded Humana's increased Medicare Advantage utilization before they disclosed it to investors:

- FE-5 stated that, based on the data and information he worked with in HQRI, Humana was expecting and planning for pent-up demand. In 2021, FE-5 stated that the COVID Weekly Reports his team prepared for Wheatley examined how far behind the utilization level was, what was expected regarding pent-up demand, and approximately when Humana would catch up with the demand.

- FE-4 stated that Humana's actuaries knew that utilization, particularly for elective inpatient procedures, would bounce back in 2022 to the baseline level and above. FE-4 stated that other teams prepared analyses indicating the expectation of higher claims.

- FE-7 confirmed that by 2023, Broussard was openly acknowledging the Company's increased utilization, sending company-wide emails that blamed Humana's financial

176

issues and need for ongoing layoffs on pent-up demand.

- FE-2 stated that in April 2023, there was an "inexorable progressive" monthly increase of inpatient admission rates. FE-2 stated that this trend was visible in the internal trackers that were discussed in Trend Committee meetings, pre-read materials and reports. FE-2 stated that "it was clear on the internal trackers that the admissions were going up."

517. **Sixth**, Broussard and Diamond's knowledge of utilization data and demand trends and patterns is further evidenced by their involvement in the Company's bid pricing and reserve setting functions.

518. With respect to bid pricing, Defendants acknowledged their understanding of utilization assumptions before bid submissions each June. For example, during the May 9, 2023 Bank of America Global Healthcare Conference, Diamond indicated her first-hand involvement in bid pricing, stating, "as we price for 2023, we did contemplate that we would see normalized trend development in 2023 . . . so we did plan for a normalized trend, and you can think of that as just sort of typical trend that you would apply for utilization and unit cost on top of your starting point." Similarly, on the November 1, 2023 earnings call, Broussard noted, "[b]eginning with Medicare Advantage, we took a thoughtful approach to 2024 bids, recognizing the need to balance the rate environment with our commitment to achieve industry average or better membership growth." Confirming Defendants' knowledge of utilization trends vis-à-vis their involvement in bid pricing, FE-15 explained that Humana executives considered projected utilization trends in connection with Humana's annual bid process and pricing model, which was a significant focus for the Company leading up to bid submissions each June.

519. With respect to reserve setting, Defendants stated in Humana's 2022 and 2023 Form 10-Ks that they "continually review estimates of future payments relating to benefit claims costs for services incurred in the current and prior periods and make necessary adjustments to [the Company's] reserves, including premium deficiency reserves where appropriate." On the January

25, 2024 earnings call, Diamond confirmed Defendants' involvement in this process, stating, "[w]e do leverage authorization data on the inpatient side. We are actually using that to actually book reserves each month. We get authorization data for over -- like 99% of the inpatient events that occur. So it's very accurate in predicting, and we do receive it in more real time."

520.    **Seventh**, Defendants' knowledge of the Company's utilization and demand trends and dynamics can be inferred from Humana's increased focus on suppressing patient demand and utilization through denying or obstructing claims. It is implausible that such focus and, in certain cases, policies, were implemented without the approval or knowledge of the Company's CEO and CFO, Broussard and Diamond. Defendants' efforts in this regard are corroborated by several former employee accounts, detailed fully above in Section V.G.2, including:

- FE-1 participated in monthly Special Projects meetings between 1Q 2022 and 2Q 2023 in which Humana's executive team, including Broussard, discussed using claim denials and prior authorization denials as a means of cost-containment, and specifically discussed how far they could push these strategies without risking consequences such as fines or the loss of CMS contracts. FE-1 stated that this strategy raised ethical concerns among staff, leading several long-term employees to quit or accept voluntary layoffs, while those who voiced objections were either silenced, removed from their teams, or terminated.

- According to FE-8, Humana implemented policies designed to artificially increase claim denials, including a rule to deny claims if review took more than five minutes, regardless of the volume of documentation. The push for denials intensified in 2023, with the company tightening approval criteria, removing items from the automatic approval list, setting daily denial quotas, and other measures to prevent members from accessing their benefits.

- FE-13 stated that Humana employed third-party companies to review prior authorization requests, which frequently denied authorizations, particularly by reducing the approved duration of skilled nursing and home healthcare services below expected levels. Despite employees raising concerns about these practices, the situation deteriorated after the pandemic and continued to worsen through the summer of 2023 when FE-13 left the company.

- FE-18 stated that Humana enforced strict approval/denial guidelines that discouraged any flexibility. He was instructed to be stringent with approvals for cost-saving purposes and stated that employees faced consequences for certain claim approvals. He reported denying approximately 50% of claims, with expensive claims receiving an even higher denial rate.

- FE-20 similarly recalled that the goal of Humana's utilization management program was "to reduce cost to Humana."

521.     Defendants' efforts to suppress and obstruct utilization and demand is also corroborated through the PSI report, discussed above at Section V.Q.1. As alleged above, PSI found that in 2022, Humana declined coverage 24.6% of the time on post-acute care—such as SNF and observation stays, *16 times higher* than its overall prior authorization denial rate. Moreover, for LTACH, the "most expensive" type of post-acute care, Humana's denial rate increased by *54%* between 2020 and 2022.

522.     *Eighth*, in Defendants' public statements, they demonstrated their knowledge of Humana's utilization management programs and processes—which, unbeknownst to investors, Defendants were exploiting in an effort to offset adverse utilization and demand trends. Examples of such statements include:

- November 3, 2021 earnings call (Diamond): "[W]e [are] continu[ing] to work on our trend initiatives and various utilization management and other strategies not -- no different than any other year to continue to work to reduce total cost of care . . . ." She continued that "we continue to work to see how we can use these capabilities to focus on patients who are disproportionately likely to see potentially avoidable hospitalization events and use those capabilities to redirect to an alternative site of service like the home or an outpatient setting."

- January 9, 2023, JPMorgan Healthcare Conference (Diamond): "[W]e continue to see [an] even better medical cost[s] [trend] than we had anticipated . . . . The source of the favorability was largely improved performance from our utilization management programs and better-than-expected results."

- November 1, 2023 earnings call (Diamond): "I think you're referring to some of the utilization management practices, and those are typically done on the front end. We do that wherever possible where we will have the opportunity to review for medical necessity and appropriate setting. So whether that's a full inpatient admission or an observation stay."

- January 25, 2024 prepared remarks for the 4Q 2023 earnings call (Broussard and Diamond): "we enhanced these [utilization management] processes, establishing dedicated teams focused on further analyzing the [increased utilization] trends and identifying additional opportunities to mitigate the impacts near and longer term through a range of levers that include enhanced analytics and prior authorization programs, site of service redirection, and targeted contracting initiatives, among others. The work and findings of these teams will continue to enhance our understanding of the emerging trends and contribute to the refinement of our 2024 outlook throughout the year."

179

523.     As the foregoing facts demonstrate, at the time of Defendants' false or misleading statements and omissions, Defendants had direct knowledge of and access to information related to Humana's Medicare Advantage member demand for and utilization of healthcare services, the undisclosed pent-up demand that drove higher utilization during the Class Period, and the Company's efforts to suppress demand and utilization through denials of care and other utilization management strategies.

**B.     Defendants Had Actual Knowledge Of And Access To Information About The Company's Faltering Star Ratings**

524.     At all relevant times, Defendants had first-hand knowledge of internal data showing that Humana would suffer downgrades in its Star ratings. This information stood in stark contrast to Defendants' public statements touting the quality of Humana's Medicare Advantage plans and the Company's Star ratings as a strength and competitive advantage relative to peer Medicare Advantage companies. Moreover, Defendants aggressively cut costs throughout 2022 and 2023, which further undermined the metrics comprising the Company's Star ratings in 2023.

525.     *First*, Defendants understood by the summer of 2022 that Humana's Star ratings faced significant risk of being downgraded.

526.     FE-1 explained that Humana prepared internal "pulse checks" related to Star ratings that allowed the Company to understand how the Stars program would perform in future years. FE-1 further explained that the "pulse check" provided insight into Star ratings two to two-and-a-half years in advance of the rating year. FE-1 stated that Humana's internal surveys are typically "pretty spot on" in terms of predicting actual Star ratings, and generally accurate with regard to how CMS would rate a particular plan. For ratings that would be issued in 2024 (i.e., 2025 Star ratings), FE-1 stated that the "pulse check" results were made available in late 2021 or early 2022.

180

FE-1 recalled that the results of this pulse check revealed several weaknesses in Star metrics—explaining that "every indicator they had" suggested that Humana's Star ratings would decline.

527.    Following these mock results, FE-1 participated in meetings in which Defendant Broussard and multiple Senior Vice Presidents specifically discussed the expected financial hit from reduced Star ratings. FE-1 explained that the expected financial hit from Star ratings was "well known within the organization" and that the Company would need to "shuffle really hard" to offset the expected revenue hit.

528.    **Second**, Defendants Broussard and Diamond frequently issued statements evidencing their first-hand involvement in and understanding of the Star-rating process and the Company's Star ratings. For example, on the November 2, 2022 earnings call, Broussard admitted that Defendants "did have an insight into our ratings" Similarly, during the August 2, 2023 earnings call, Broussard indicated his knowledge of the forthcoming 2025 Star ratings, stating: "Relative to STARS, it is an early -- it's -- we haven't got all our results, but we feel pretty good about where we stand as a result of what we see preliminarily."

529.    **Third**, Defendants knew or had access to data in 2023 that revealed that Humana's underlying Stars performance was declining. FE-2 recalled that in 2023, Humana's "Quarterly Stars Updates"—which were generally available to employees at the associate level and above—showed "significant" underperformance from some segments of the Company, and that some departments that were "so far off the trail" that he "didn't know how they were going to close the gap."

530.    **Fourth**, Defendants knew or would have known that their cost-cutting measures implemented throughout 2022 and 2023 further impaired the Company's ability to generate favorable Star ratings for 2025 (reflecting measuring year 2023, the results of which were

announced in October 2024). For example, FE-12 explained that he was "not at all surprised" that Humana received lower Star ratings and that there was a general understanding that 2023 and 2024 were going to be "tough years" for Humana's Star ratings. FE-12 explained that the 2025 ratings reflected the effects of eliminating the role of the Regional Stars teams in 2022, specifically pointing to Humana cutting regional analysis and outreach that had historically implemented initiatives tailored to the unique needs of a local market, including efforts to encourage preventive care.

531.    Multiple other former employees confirmed that the cuts Humana made to the Stars team contributed to Humana's poor Star ratings performance for the 2025 rating year. FE-14 recalled that both Humana's provider and member engagement suffered because there were fewer staff members to promote engagement. FE-11 similarly cited the structural changes Humana made to increase efficiency, including layoffs of staff, as contributing to the decline in Humana's Star ratings. FE-21 stated that, in 2022, Humana began to encounter issues in member satisfaction with healthcare such as screenings, tests, chronic care and vaccines. This was due, at least in part, to low staffing and providers' lack of appointment availability for members.

532.    As the foregoing facts demonstrate, at the time of Defendants' false or misleading statements and omissions, Defendants had direct knowledge of and access to information that Humana's Medicare Advantage plans faced significant risks of being downgraded by CMS.

### C.    Defendants Knew That They Would Be Unable To Implement Cost Cuts To Offset Higher Utilization Without Undermining The Quality Of The Company's Medicare Advantage Plans

533.    As alleged above, during the period of June 16, 2023 to January 25, 2024, Defendants misled investors about their ability to offset increasing utilization costs through additional administrative savings. In reality, as Defendants knew, they had already implemented

extensive cost-cutting measures, and any additional cost-cutting would only further undermine the quality of the Company's Medicare Advantage plans.

534.    ***First***, Defendants repeatedly spoke about cutting administrative expenses to offset the ballooning cost of increased utilization, many times specifically referencing their involvement in identifying these mitigation measures. For example, in Humana's June 16, 2023 Form 8-K, Defendants stated that higher utilization "***will be offset by a variety of factors,*** including . . . ***additional administrative expense reductions***." During the 2Q 2023 earnings call on August 2, 2023, Defendant Diamond stated in response to an analyst question about "any major levers" the Company had to offset costs, that "***[t]he main lever that I would say that we're relying on internally to offset some of the elevated trend in the back half of the year is more administrative expense savings***." Diamond reiterated this message during the 3Q 2023 earnings call on November 1, 2023, stating: "***the higher 2023 insurance segment benefit ratio will be offset by additional administrative expense reductions***." On this same call, Diamond responded to an analyst question about "some level of offsetting efficiencies to mitigate a sequential uptick in utilization," by stating: "***And as we've said before, we have continued to identify more opportunities than we might have initially anticipated, which is built in those pipeline of opportunities that will certainly mitigate it in this year and we'll continue to do so next year***." On January 25, 2024, during the 4Q 2023 earnings call, Diamond declared that these cost-cutting measures had been successful, stating: "***we were able to successfully mitigate that [utilization] pressure . . . through multiple levers, including administrative cost -- further administrative cost reductions***."

535.    ***Second***, Defendants knew that they would not be able to offset increased utilization with additional cost-savings without undermining the Company's Star ratings because the Company had already made major cost cuts throughout 2022 and the beginning of 2023. Former

Humana employees detailed the nature in which earlier cuts had already resulted in hamstrung operations and lower-quality service for Humana members. For example, FE-12, FE-14, FE-11, and FE-21 detailed how Humana's Star ratings and quality scores suffered as a result of the first wave of layoffs. *See* Sections V.H and V.I.

536.    As the foregoing facts demonstrate, at the time of Defendants' false or misleading statements and omissions, Defendants had direct knowledge of and access to information that Humana would not be able to offset the costs of increased utilization without jeopardizing the Company's Star ratings.

### D.    The Alleged Fraud Directly Concerned Humana's Core Operations

537.    That the alleged fraud concerned the core of Humana's business operations further contributes to a strong inference of scienter.

538.    ***First***, Defendants acknowledged "the concentration of [Humana's] revenues" in "Medicare initiatives" and stated that "[t]he growth of [Humana's] Medicare products is an important part of our business strategy." That Defendants' false or misleading statements concerned the most significant events, initiatives, and issues in Humana's business supports the strong inference of scienter.

539.    ***Second***, the vast majority of Humana's revenue is generated by the Company's Insurance segment, primarily from its Medicare Advantage plans. As alleged above, Individual Medicare Advantage revenue made up the majority of Humana's total revenue in 2022 and 2023, contributing 70% and 74% of the total, respectively. When setting pricing on plans, Humana primarily considered the projected cost of members based upon their utilization of healthcare services. The Company's ability to forecast and track utilization trends thus was of central importance to its profitability, as confirmed by Defendants' repeated public statements that they were continuing to watch these trends in relation to MLR results and bid pricing for 2024 bids.

540.    ***Third***, the Company's ability to maintain its Star ratings was of central importance, as Defendants acknowledged throughout the Class Period. For example, in response to an analyst question during the January 9, 2023, JPMorgan Healthcare Conference, Defendant Diamond stated that "we ***continue to work to have more of our patients and members supported by high-quality Primary Care, we see beneficial impact in terms of the STARS results. And that's certainly harder to replicate quickly by some of our peers that are seeing some pressure. And again, we'll continue to focus on that, which we do think creates a differentiated advantage***." During Humana's April 26, 2023 earnings call, Defendant Broussard stated the Company would be able to gain market share because "***[a]s we enter 2024, obviously, our Stars position is a positive for the company***." Similarly, on January 25, 2024, Defendants stated that Humana "***remain[s] well positioned to compete as an industry leader in the attractive MA market going forward with our differentiated capabilities, including . . . exceptional quality as demonstrated by our industry leading Stars scores***."

541.    Indeed, as alleged above, Star ratings offer significant financial incentives through the quality bonus payment and increased rebate structure. Plans achieving four stars or higher receive a 5% increase on their CMS benchmark payment (the maximum payment for a Medicare Advantage enrollee), while plans falling below four stars receive no bonus payment. The amounts are doubled in low-cost counties with higher Medicare Advantage penetration to encourage competition. Star ratings also affect rebate calculations, with 4.5-star and 5-star plans receiving 70% of the bid-benchmark differential, 3.5 and 4-star plans receiving 65%, and those at 3 stars and below receiving 50%. Higher Star ratings thus allow plans to earn more from each Medicare Advantage enrollee, either in the form of a bonus payment or rebate from CMS. In addition, plans rated 5 stars enjoy special marketing privileges, including the ability to enroll new members

outside of the formal Annual Enrollment Period. In 2023, Humana received an estimated $2.5 billion in Medicare Advantage quality bonus payments from CMS, a figure roughly equivalent to Humana's total net income for 2023.

> **E.    Defendants Repeatedly Spoke About The Issues At The Center Of The Alleged Fraud, Including In Response To Direct Analyst Questions**

542.    Defendants' public statements during the Class Period strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were reckless in failing to investigate the very issues on which they spoke publicly.

543.    As alleged in Section VI above, Defendants' misrepresentations and omissions explicitly pertain to Humana's: (i) Medicare Advantage members' utilization of healthcare services and the attendant risks of pent-up demand; (ii) ability to maintain quality Star ratings in their core Medicare Advantage plans; and (iii) cost-cutting to improve profitability or to maintain profitability to offset increasing costs. Defendants made such statements and fielded questions regarding these subjects during earnings calls, investor conferences, and in public filings, among other forums.

544.    Moreover, these statements concerned the central narrative of the Company's earnings results. As alleged above, from July 2022 until June 2023, Defendants touted lower-than-anticipated utilization as a driving force behind the Company's results, denied the impact of any pent-up demand for healthcare services, and highlighted Humana's ongoing efforts to implement cost savings. Beginning in June 2023, after Defendants were forced to acknowledge increased utilization following UnitedHealth's disclosure of adverse patient utilization trends, they falsely assured investors that the Company could offset (and, in fact, was offsetting) increasing costs

through additional cost savings. All the while, Defendants touted the quality of their plans and their commitment to Star ratings.

545. As alleged above, many of these representations were in direct response to analyst questions. Defendants frequently responded to analyst questions about the Company's utilization trends and utilization results. For example, during the JPMorgan Healthcare Conference held January 9, 2023, Lisa Gill of JPMorgan asked: "As we think about inpatient/outpatient utilization levels compared to your initial expectations, maybe just talk about how things came out for 2022? And then, are you looking for any pent-up demand as we start to think about 2023?" In response to this question, Diamond stated: "***So our view would be that there really isn't pent-up demand that we have to be concerned about***."

546. Defendants also regularly made statements concerning the Company's Star ratings and metrics, including in response to analyst questions about those ratings and whether this aspect of the business differentiated Humana from competitors. For example, on the August 2, 2023 earnings call, Justin Lake of Wolfe Research asked for "early commentary on 2025 Stars" and "any thoughts on how your 2025 Star performance is shaping up going into October," to which Broussard responded "***we feel pretty good about where we stand as a result of what we see preliminarily***. Obviously, we haven't seen the comparative measurements and how you stack up with the industry, ***but I would say that we feel pretty good about our existing analysis***."

547. Defendants also frequently spoke about the levers Humana had (or purportedly had) to cut costs once the Company saw the trend of increased utilization emerge, and the nature of those measures. For example, on the November 1, 2023 earnings call, AJ Rice from UBS asked whether Defendants "need[ed] to have some level of offsetting efficiencies to mitigate a sequential uptick in utilization that you're assuming will continue next year." Diamond responded that "I

would say our ongoing efforts around productivity have continued since the work we kicked off in '22. ***And as we've said before, have continued to identify more opportunities than we might have initially anticipated, which is built in those pipeline of opportunities that will certainly mitigate it in this year and we'll continue to do so next year***." Further, on the November 1, 2023, earnings call, in response to an analyst question about "utilization being a little higher," Diamond confirmed their recognition of this trend in real-time, stating: "[A]s ***we saw the [utilization] trend develop, we certainly recognize that we would need to identify some additional mitigation***."

### F. The Individual Defendants Controlled The Company And Its Public Statements And Had Access To Material, Nonpublic Information Contradicting Those Statements

548.    The Individual Defendants' control over the entire Company and access to material nonpublic information supports a strong inference of scienter. As Humana's top executives during the Class Period, Defendants Broussard and Diamond (CEO and CFO, respectively) controlled the Company's day-to-day operations and were informed of, and intimately involved with, the factors underlying Humana's performance, as indicated above.

549.    Because of their high-level positions and involvement with Humana's core operations, each of the Individual Defendants: (i) controlled the contents of the material misstatements alleged in Section VI; (ii) was provided with, or had access to, copies of the statements alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected; and (iii) knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made to investors were materially false, misleading, and incomplete. Because of their positions and access to material nonpublic information, each of the Individual Defendants knew that the adverse

facts specified herein were not disclosed to, and/or were being concealed from, the public, and that the positive representations made were materially false and/or misleading.

### G. The Temporal Proximity Between Defendants' Material Misrepresentations, Including Affirmative Denials, And Subsequent Disclosures Supports A Strong Inference Of Scienter

550.    The temporal proximity between Defendants' alleged misstatements and subsequent disclosures exposing the truth bolsters the strong inference that Defendants knew, or were deliberately reckless in not knowing, the false and/or misleading nature of their statements.

551.    Throughout the Class Period, and in particular from the start of 2023, in response to specific analyst questions, Defendants consistently downplayed the risk of pent-up demand in the individual Medicare Advantage segment. On January 9, 2023, for example, Defendant Diamond stated: "So our view would be that there really isn't pent-up demand that we have to be concerned about." Diamond repeated that refrain on April 26, 2023, stating regarding utilization that "we are still seeing some net favorability in the quarter," and May 9, 2023, stating, "what we're seeing is, again, slightly favorable expectations on the inpatient side." Despite these affirmative assurances, a short time later, on June 16, 2023, Defendants revealed that the Company was seeing increased utilization and that this trend had been caught early enough to be included in the Company's Medicare Advantage bids—submitted June 5, 2023. Indeed, on the August 2, 2023 earnings call, Diamond admitted that, "beginning in early May, we noted the emergence of higher-than-anticipated non-inpatient utilization trends in our Medicare Advantage business" and that "[a]t the same time, we began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns."

552.    Similarly, Defendants repeatedly misled the market about the Company's Star ratings and underlying metrics, including as late as September 4, 2024. Here, in direct response to an analyst question about how Humana was "thinking about STARS opportunity," Diamond stated

that "*it continues to be a focus*" and "*we continue to be proud of the work that we [] are very high performing*," concealing from investors the truth about the Company's declining Star metrics and cost cuts to the very areas that undermined Humana's Star ratings. Of course, based on Defendants' consistent and active monitoring of the Company's Star metrics and activities, and submission of all relevant information to CMS well in advance of the publication of Humana's ratings, it is implausible that Defendants did not know those ratings would fall by substantial amounts. Just weeks later, on October 1-2, 2024, the market learned that truth when CMS's preliminary Star ratings data was published, revealing steep reductions in Humana's ratings.

### H.    Defendants Were Financially Motivated And Had The Opportunity To Mislead Investors

553.    Defendant Diamond reaped millions of dollars in proceeds from insider sales that were executed at artificially inflated prices under suspicious circumstances. As set forth above, from July 2022 through June 2023, Defendants falsely denied the existence of pent-up demand among its individual Medicare Advantage members. These denials continued even in April 2023 as publicly traded healthcare providers specifically disclosed increased utilization and cited rebounding post-COVID demand as a cause of the uptick in utilization. Indeed, during the April 26, 2023 earnings call, Diamond "*reiterate[d] that we are comfortable with the utilization patterns seen in our insurance segment*," while specifically denying that the healthcare providers' disclosures of higher utilization had any bearing on Humana's utilization. Just days after these denials, while specifically understanding that the walls were closing in around Defendants' false narrative around utilization, Diamond cashed in. Specifically, on May 4, 2023, Diamond unloaded 4,156 shares of Humana common stock for proceeds of over $2 million.

554.    As is detailed above, just weeks after these sales, on June 16, 2023, Humana disclosed that it was seeing "higher than anticipated non-inpatient utilization trends," and noted it

knew about these trends long before their disclosure as "it considered the initial emergence of these trends in connection with the 2024 Medicare Advantage bids submitted on June 5, 2023." And, shockingly, Diamond would concede on the August 2, 2023 earnings call that "beginning in early May," i.e., the period coinciding with her insider sales, "we noted the emergence of higher-than-anticipated non-inpatient utilization trends in our Medicare Advantage business" and that "[a]t the same time, we began seeing higher-than-anticipated inpatient utilization diverging from historical seasonality patterns." Thus, Diamond's insider sales further support an already strong inference of her scienter.

555.    During the Class Period, Defendants were also motivated to conceal adverse information about Humana's Medicare Advantage business in order to pursue a potential merger with The Cigna Group ("Cigna"), a major managed care organization that focuses on commercial insurance provided by employers and pharmacy benefits. Cigna and Humana had previously considered a merger in 2015. In November 2023, reports emerged that Humana was in new merger negotiations with Cigna. As reported by *The Wall Street Journal* on November 29, 2023, the potential deal "would be huge, and give rise to a company worth some $140 billion given Cigna's market value Wednesday morning [November 29, 2023] of about $83 billion and Humana's of roughly $62 billion." In particular, the deal would combine Humana's dominance in the Medicare Advantage market with Cigna's group and individual insurance business, and "would give the pair scale to rival that of UnitedHealth Group and CVS Health." As reported by *The Wall Street Journal* on December 10, 2023, the potential merger was scuttled several weeks later because "[t]he companies couldn't come to agreement on price and other financial terms, according to people familiar with the matter." Then, in October 2024, *Bloomberg* reported that Cigna had resumed merger talks with Humana. Ultimately, however, on November 11, 2024, Cigna announced that it

was not pursuing the deal, stating in a press release that "in light of recent and persistent speculation, The Cigna Group expects to communicate that the company is not pursuing a combination with Humana Inc." While the deal was ultimately unsuccessful, the prospect of a merger with Cigna gave Defendants a clear motive to inflate Humana's stock price in order effectuate the merger on terms favorable to Humana.

## VIII.  LOSS CAUSATION

556.    The fraud alleged herein was the direct and proximate cause of the economic losses suffered by Plaintiff and the Class. There was a causal connection between the alleged fraud and the loss (i.e., securities price declines) alleged herein.

557.    During the Class Period, Plaintiff and the Class purchased or otherwise acquired Humana securities, including common stock and call options at artificially inflated prices, or sold put options at artificially deflated prices, and were damaged thereby when the price of Humana common stock declined in response to the disclosures alleged in this section and above in Sections V.L (¶¶281-301) and V.N (¶¶314-352) and/or when the risks previously concealed by Defendants' material misrepresentations and omissions materialized. The prices of Humana call and put options rose and fell in correspondence with the movements of the Company's common stock price and for the same reasons.

558.    Throughout the Class Period, Defendants' materially false or misleading statements and omissions artificially inflated the prices of Humana common stock and call options and/or maintained the prices of these Humana securities at artificially inflated levels, or artificially deflated or maintained the artificial deflation in the price of Humana put options. As alleged in the remainder of this Section, the price of Humana common stock significantly declined, causing corresponding changes in the prices of Humana options, and causing investors to suffer losses, in response to a series of six (6) partial disclosures concerning and proximately caused by the

revelation of facts that Defendants misrepresented and concealed, and/or as the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information, which disclosures are also alleged above in Sections V.L (¶¶281-301) and V.N (¶¶314-352).

### A.     First Partial Disclosure: June 13, 2023

559.    On June 13, 2023, UnitedHealth, the single largest player in the Medicare Advantage space, revealed during a question-and-answer session at the Goldman Sachs Healthcare Conference that it was seeing "higher levels" of outpatient care activity likely due to "pent-up demand or delayed demand being satisfied." As a result of this higher utilization trend, Rex stated that UnitedHealth's MLR would likely be in "the upper bound or moderately above the upper bound" of the company's full year guidance. UnitedHealth CEO Timothy Noel added that the company had been able to factor the increased utilization into its bid pricing for 2024, which UnitedHealth submitted to CMS earlier that month. In response to an analyst's question on whether the pent-up demand was one quarter's worth of backlog, Rex responded that UnitedHealth had built continued increased demand into its 2024 plan designs because "assuming that it was going to end quickly wouldn't have been prudent."

560.    In response to UnitedHealth's June 13, 2023 disclosure that pent-up demand for healthcare services among the Medicare population was driving increased utilization, through which risks of increased utilization, benefit cost, and MLR for Humana began to materialize, the price of Humana common stock declined by $57.63 per share, or 11.24%, from its closing price of $512.63 per share on June 13, 2023 to close at $455.00 per share on June 14, 2023.

561.    UnitedHealth's announcement regarding elevated Medicare Advantage outpatient utilization raised alarms across the industry concerning, among other things, the potential impact

upon MLR among UnitedHealth's peers and competitors. In this regard, analysts concluded that the news had serious implications for Humana.

562.    For example, in its June 14, 2023 report, Deutsche Bank concluded that "HUM would likely see the greatest absolute impact" from the trend in increased outpatient utilization, predicting a "~20% impact to EPS" from the utilization trend that UnitedHealth noted, given Humana's "greater relative exposure to MA." Credit Suisse similarly noted the "outsized movement in HUM shares and the company's large exposure to MA."

563.    On June 15, 2023, RBC reported that "[s]hares of HUM closed 11.2% lower on Wednesday following comments from peer UNH on Tuesday afternoon that medical costs are trending higher than expected in the second quarter." (emphasis in original). RBC further observed that the comparatively larger negative movement in Humana's share price based upon UnitedHealth's disclosure could be attributed to Humana's "higher mix of MA business."

### B.    Second Partial Disclosure: June 16, 2023

564.    On June 16, 2023, Humana issued a Form 8-K in which the Company admitted it was experiencing "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries, and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns."

565.    In its June 16, 2023 Form 8-K, Humana also stated that it would "continue to experience *moderately higher-than-expected trends for the remainder of the year*."

566.    In response to Humana's revelation that it was experiencing increased "non-inpatient" Medicare Advantage utilization and stronger "inpatient trends," which the Company acknowledged would likely lead to a higher MLR, the price of Humana common stock declined

194

by \$18.20 per share, or 3.92%, from its closing price of \$463.85 per share on June 15, 2023 to close at \$445.65 per share on June 16, 2023.

567.    Analysts commented that Humana's June 16, 2023 Form 8-K indicated a more widespread and severe trend of increased utilization than had been disclosed by UnitedHealth on June 13, 2023. In its June 16, 2023 report, Barclays noted that Humana "called out higher than anticipated volume in ER, outpatient surgeries, and dental services," and that the Company's "inpatient trend comment diverges slightly from UNH earlier this week as UNH had noted that inpatient continued to be 'pretty controlled." In its own report, RBC stated that "Humana's elevated utilization commentary encompasses a broader swath of care categories versus UnitedHealth's commentary on Tuesday." In its June 16, 2023 report, SVB Securities noted that Humana's inpatient "comments seem more negative as compared to UNH commentary."

568.    Analysts also expressed skepticism that Humana had been able to account for the recently-disclosed trend of higher utilization in its recent Medicare Advantage bids, with Wells Fargo stating "[w]e expect some skepticism impacts were fully captured" and Deutsche Bank commenting that "[t]his strikes us as peculiar, as UNH indicated the elevated trend surge is likely to last less than one quarter, with HUM indicating something similar. This begs the question that, if demand were to normalize by December, why would there be a need to adjust bids for 2024?"

### C.    Third Partial Disclosure: November 1-2, 2023

569.    Before the market opened on November 1, 2023, Humana filed a press release on Form 8-K reporting its results for 3Q 2023. Among other things, the Company reported that its Adjusted Insurance Segment benefit expense ratio was 87.4%, which it attributed in part to "modestly higher than anticipated utilization in the Medicare Advantage business."

570.    Several securities analysts issued reports in response to Humana's November 1, 2023 press release highlighting the negative information regarding the Company's persistently

high utilization. For example, Wolfe Research reported that it "expect[ed] questions around widening spread between Insurance and consolidation MLR at 90bps in quarter vs. typical 50bps." Oppenheimer similarly stated that "we expect some pressure on the stock as the market looks for commentary around how the elevated Medicare Advantage utilization affects the outlook for 2024."

571.    During Humana's 3Q 2023 earnings call on November 1, 2023, Diamond addressed the Company's higher MLR "due to higher medical costs in our Medicare Advantage business," stating:

> [W]e are planning for the higher level of utilization seen in the third quarter to continue for the remainder of the year. As a result, we are increasing our full year insurance segment benefit ratio guidance to approximately 87.5%, which implies a fourth quarter ratio of 89.5%. This guidance also reflects the increased individual MA membership growth, which continues to include a higher-than-expected proportion of age-ins.

572.    Diamond also indicated that increased Medicare Advantage utilization would continue during 2024, affecting the Company's EPS: "*Recognizing the increased utilization we have now seen in 2023 and prudently assuming this level of utilization continues into 2024, we currently anticipate growth at the low end*" of the 2024 EPS range of growing adjusted EPS 11% to 15%.

573.    In response to the new information concerning increasing Medicare Advantage utilization and increased MLR that Humana disclosed in its November 1, 2023 press release and during its same-day earnings call, the price of Humana common stock declined by $42.29 per share, or more than 8.00%, from its closing price of $523.69 per share on October 31, 2023 to close at $481.40 on November 2, 2023.

574.    In reports issued after Humana's November 1, 2023 conference call, analysts expressed concern regarding the Company's indication that increased Medicare Advantage

utilization would continue into 2024, with many connecting that new information to Humana's negative stock price movement that day. For example, Leerink's November 1, 2023 report stated, with respect to increased utilization, that "HUM expects this trend to persist through the year into 2024. HUM's 2024 bids did not fully capture this uptick in trend with the company now expecting to grow at the low end of its LT targeted range. We now model a 25bps step-up in MLR into 2024 driven by these higher trends." Leerink also lowered its 2023-24 Humana EPS forecast for the same reason.

575.    Also following Humana's earnings call, Wells Fargo issued a report in which it stated, "*we are not surprised to see stock pressure given commentary on non-inpatient Med Adv trend and potential need to take some additional pricing action in 2025 to achieve targets*." Wells Fargo further noted that "[r]ecent concern for Medicare Advantage utilization trends has weighed on stock performance, which we don't see as surprising given HUM has by far the most exposure of the large cap MCOs."

576.    In a November 1, 2023 report issued after Humana's earnings call, UBS stated:

> *HUM's shares are underperforming peers today (-5% vs. flat peer avg.) reflecting concerns around HUM's 2024 EPS growth trajectory in light of increasing utilization. In addition, it did not sound like HUM appropriately captured the elevated utilization trends in their 2024 MA bids, with the company recognizing additional mitigation efforts are needed in 2024 to offset rising costs trends*.

577.    Deutsche Bank's November 1, 2023 report similarly stated: "On Humana's Q3 call, the company delivered a notable messaging shift as it relates to 2024, which could impact its ability to hit the 2025 EPS target of $37, *which sent shares down 6%*."

### D.    Fourth Partial Disclosure: January 18, 2024

578.    On January 18, 2024, Humana issued a Form 8-K, which included a "**Medical Cost Trend Update and Revised Full Year 2023 EPS Expectations**," in which Humana revealed that its fourth quarter results "reflect an additional increase in Medicare Advantage medical cost trends,

driven by higher than anticipated inpatient utilization . . . as well as a further increase in non-inpatient trends, predominantly in the categories of physician, outpatient surgeries and supplemental benefits." (emphasis in original). As a result, the Company disclosed the following new information:

> The higher than anticipated cost trends ***are expected to result in a fourth quarter 2023 Adjusted Insurance segment benefit ratio of approximately 91.4 percent as compared to the Company's previous expectation of 89.5 percent***, and a full year Adjusted Insurance segment benefit ratio of approximately 88.0 percent as compared to the Company's previous expectation of 87.5 percent.

579.    In its January 18, 2024 Form 8-K, Humana also stated that its cost-cutting measures implemented during 2023 did not "offset the entirety of the higher than anticipated medical costs that continued to increase through the end of the fourth quarter." As a result, Humana announced that it now expected its 2023 adjusted EPS to be approximately $26.09 per share, more than $2 per share lower than what the Company had announced in November 2023.

580.    In response to the news that Humana would miss the targets it had reaffirmed only two months earlier due to increased Medicare Advantage utilization, the price of Humana common stock dropped $35.78 per share, or 7.99%, from its closing price of $447.76 per share on January 17, 2024 to close at $411.98 per share on January 18, 2024.

581.    In reports issued after Humana's January 18, 2024 Form 8-K was released, analysts expressed concern and surprise regarding Humana's disclosure of continued increased Medicare Advantage utilization and weaker than expected Medicare Advantage growth outlook, with many connecting that new information to Humana's negative stock price movement that day. For example, in a January 18, 2024 report, RBC stated, "we are lowering our estimates following HUM's announcement today, which included lower than expected 2024 MA growth and higher 4Q utilization . . . ***HUM finished down ~8%, off -12.4% intra-day lows***." Wells Fargo's January 18, 2024 report similarly noted, "HUM's update represents a major setback. Impact to 2024 EPS

198

hard to assess but likely much higher than 2023 revision . . . *[w]hile UNH's 4Q23 results sparked concern HUM could miss Q4, the magnitude of pressure here is clearly worse than expected*." Similarly, Morningstar's January 18, 2024 analyst note stated, "*Humana gave a preliminary look at 2023-24 operating metrics that was weaker than we anticipated on increasing medical utilization* and a tougher landscape for adding new" Medicare Advantage members. Commenting on Humana's Form 8-K, Leerink's January 18 report noted that Humana had reported a "*material inflection in utilization*."

582.    Wells Fargo issued a report on January 23, 2024, in which it remarked that "*uncertainty around utilization and industry-level membership growth are weighing on the stock*." In this report, Wells Fargo also noted that "HUM now expects 4Q23 Insurance MLR of 91.4%, well above prior guidance of 89.5% . . . For now, we don't assume the entire 200bps of incremental MLR pressure flows through into 2024 but visibility is low."

### E.    Fifth Partial Disclosure: January 25, 2024

583.    Humana published its fiscal year 2023 earnings release on January 25, 2024. In the release, Humana announced a loss of $4.42 per share (adjusted loss per share of $0.11) for 4Q 2023. The Company also disclosed that its 4Q23 results were impacted by an "*additional increase in Medicare Advantage medical cost trends, driven by higher than anticipated inpatient utilization . . . and a further increase in non-inpatient trends*." Humana stated that it expected the higher level of medical costs would "persist throughout 2024," and as a result expected 2024 adjusted EPS of only $16 per share, a $10 per share decrease from 2023.

584.    On January 25, 2024, Humana made available to investors the prepared remarks, attributed to Broussard and Diamond, for the Company's earnings call scheduled to commence later in the morning. Among other things the "Fourth Quarter 2023 results" expressed disappointment that "we were unable to fully offset the higher cost trends experienced in the fourth

quarter, despite our best efforts to identify mitigation opportunities throughout the year." In the "Initial 2024 Guidance & Outlook," the remarks further indicated "it is prudent to assume the higher costs persist throughout 2024." This disclosure revealed that Humana was facing persistently elevated utilization among its Medicare Advantage members and that the Company was unable to offset this higher utilization through cost-saving measures elsewhere in the Company.

585.     Analysts reacted negatively to the new information in Humana's January 25, 2024 press release and the prepared remarks made available prior to the 4Q 2023 earnings call. For example, TD Cowen issued an earnings update stating, "[l]ast week, HUM pre-announced a 4Q23 miss & warned of 'material' impact for 2024. 2024 consensus EPS then stood at $31, the bear case seemed centered on $20, today HUM guided $16. Worse is a slower-anticipated-margin recovery to only $22-26 EPS in 2025." Leerink similarly stated that "[i]nitial views on 2024-25 EPS fall *considerably below expectations*, with underlying assumptions for 2024 underpinned by a continuation in elevated medical cost trends." In its January 25, 2024 report issued before the earnings call later that day, UBS issued a report titled "2024 Outlook Materially Lower than Downside Expectations; LT 2025 EPS Target Substantially Reduced," and Wells Fargo's January 25, 2024 Flash Comment flagged Humana's 2024 guidance as "Much Worse Than Expected" and remarked that its 2024 and 2025 EPS guidance "is clearly quite disappointing."

586.     Based upon the new information in Humana's January 25, 2024 press release and prepared remarks for the earnings call later that morning, JPMorgan stated in its same-day report, "*We expect HUM shares will trade down this morning, as 2024 adj. EPS guidance of ~$16 is much lower than the Street low ($21.50 per Bloomberg) and significantly lower than where we believe investor expectations recalibrated to over the last week*." Deutsche Bank similarly

reported that "Humana reported Q4 results this morning and issued 2024 guidance that *missed the most pessimistic investor expectations*." It further termed 2024 "a lost year" for Humana, and reasoned that investors would be left guessing "whether this is a Humana-specific issue, where the company has mispriced its benefits, underestimated utilization or misunderstood the competitive environment, or likely some combination of all three."

587.    In response to Humana's disappointing 4Q 2023 results and lowered guidance driven by persistent increased Medicare Advantage utilization and costs, which Defendants could not offset through cost-savings, the price of Humana common stock dropped $47.04 per share, or 11.69%, from its closing price of $402.40 per share on January 24, 2024 to close at $355.36 per share on January 25, 2024.

588.    In reports issued after Humana's January 25, 2024 Q423 earnings call concluded, analysts commented on Humana's revision of its 2024-25 outlook based upon continuing and unsuccessfully mitigated Medicare Advantage pressures. For example, in its January 25, 2024 Research Brief, Stephens commented that "HUM now expects to produce Adjusted EPS of only ~$16 in 2024 (vs. Street at $29.14). Moreover, HUM formally abandoned its key 2025 Adjusted EPS target of $37 . . . The stock will reset in the [near-term] to reflect this significantly lower EPS outlook." In another Research Brief that it issued the same day, Stephens termed Humana's sharply revised 2024 Adjusted EPS outlook as "a worst-case scenario relating to building pressures facing the MA category."

589.    In its January 25, 2024 report issued after the earnings call that day, Morningstar remarked, "Humana gave a much weaker 2024 and 2025 outlook than we had anticipated. We are lowering our fair value estimate to $500 per share from $550 previously to reflect this weak profit

trajectory in Humana's core end market – Medicare Advantage, or MA." Morningstar further commented that:

> With Humana's mispriced plans currently in effect and an assumption that medical utilization trends will remain high through 2024, *management followed up a weak 2023 result (3% growth in adjusted of $26.09) with guidance of a nearly 40% decline to about $16 of adjusted EPS in 2024. This pales in comparison with the firm's goal just three months earlier of producing adjusted EPS growth toward the low end of its 11% to 15% adjusted EPS goal in 2024*.

590.    In its January 26, 2024 report, RBC noted that "**the earnings call did little to quell debate over the source of higher utilization and whether the headwinds are seasonal and transitory, or if they represent a structural shift in utilization patterns**." (emphasis in original).

591.    Cantor Fitzgerald's January 26, 2024 report summed up Humana's tumultuous week and the impact on its securities prices:

> *Humana traded down 20% (vs. SPX 0%)* since pre-announcing higher-than-expected medical costs and lower-than-expected enrollment growth on 1/17/24 [sic], followed by disappointing guidance for 2024 and a lowering of prior 2025 guidance on 1/25.

**F.      Sixth Partial Disclosure: October 1-2, 2024**

592.    On October 1, 2024, the 2025 Medicare Advantage Star ratings became available through CMS's Plan Finder tool. Although the actual ratings were not yet listed, investors were able to use the sort function to display plans by rating, which revealed that four of Humana's plans had dropped in rating. The 2025 ratings, which reflect data collected during 2023, indicated that *Humana had only 25% of its members enrolled in plans 4 stars or above for 2025, a reduction from 94% in 2024*. A significant driver of these results was plan H5216, which contains approximately 45% of Humana's Medicare Advantage membership, including greater than 90% of its employer group waiver plan (i.e., Group MA) membership. The fall in ratings put in jeopardy $3 billion of the $4 billon in quality bonus payments from Humana received from CMS in 2024.

593.    Commenting on the Star ratings information that became available that day, Deutsche Bank issued an October 1, 2024 report noting, "***HUM shares tumbled ~12% today, with sharp declines a[s] the day wore on***. We believe this move was driven by investor belief that CMS' 2025 Medicare Advantage Plan Finder indicates that Humana plan 5216, with 45% of the company's members, lost its 4-star plus rating from CMS."

594.    On October 2, 2024, Humana filed a Form 8-K in response to CMS's preliminary Star ratings data. In the 8-K, Humana attributed the reduction in ratings to "narrowly missing higher industry cut points on a small number of measures," and claimed there were errors in CMS's calculation of the results that it would challenge through appeal. The Company expressed disappointment with its Star rating results, and announced initiatives it would launch to improve its Star ratings, including a focus on member and provider engagement, enhancing customer experience, and improving technology integration. This commentary signal led a shift from the cost-cutting that Humana was pursuing to offset the costs of increased Medicare Advantage utilization.

595.    Before the market opened on October 2, 2024, Cantor issued a report stating that the drop from 94% of Humana Medicare Advantage members enrolled in Star bonus eligible plans in 2024 to only 25% in 2025 "***is shocking***." Cantor further stated that given the new, negative news, "[w]e believe the stock could re-rate down beyond where the stock is indicated to open . . . [t]he stock is indicated to open down 20%, which we believe reflects the view that a disappointing STAR result had already built in 10-15% pressure."

596.    After trading commenced on October 2, Deutsche Bank issued a report noting "**Stock Shed Another 12% Today, HUM Filed 8K**." (emphasis in original). Deutsche Bank

reported that following Humana's same-day Form 8-K addressing the drop in its Star ratings, "*HUM shares declined from -12% yesterday to another -12% today*."

597.    In response to the October 1, 2024 CMS preliminary Star ratings release and Humana's October 2, 2024 Form 8-K, through which the undisclosed risks of Humana's aggressive cost-cutting and other measures designed to offset increased Medicare Advantage utilization costs materialized, the price of Humana common stock declined by $70.25 per share, or 23.56%, from its closing price of $316.74 per share on September 30 to close at $246.49 on October 2.

598.    Securities analysts were quick to issue reports on October 2, 2024 remarking on the precipitous reduction in Humana's Star ratings, which would deprive the Company of billions of dollars of CMS bonus payments. For example, Oppenheimer estimated that the reduction in Humana's Star ratings "translates to a >$3B impact to bonus payments, which will significantly impact enrollment/margins in 2026." UBS's October 2, 2024 report on Humana bore the headline: "*Humana Inc: Worst Case Scenario for Stars Comes to Fruition*," and stated that "the [unmitigated] EPS impact is expected to be roughly $16.08 against our 2026 EPS estimate of $25.75 (same as cons[ensus])." Stephens's October 2, 2024 report also decried the news, stating: "**This represents a worst-case scenario result, in our opinion**." (emphasis in original).

599.    As set forth in the table below, the disclosure of the relevant truth and/or materialization of the risks concealed by Defendants' fraud directly and proximately caused declines in the price of Humana common stock on the dates in question by removing the artificial inflation in the price of Humana common stock created and maintained by Defendants' fraud.

| Dates and Stock Price Reactions for Corrective Events | | | | |
|---|---|---|---|---|
| **Date of Corrective Event[11]** | **Closing Stock Price After Disclosure** | **Common Stock Price Change[12]** | **Common Stock % Change[13]** | **Trading Volume** |
| **6/13/23 (6/14/23)** | $455.00 | -$57.63 | 11.24% | 6,917,327 |
| **6/16/23 (6/16/23)** | $445.65 | -$18.20 | 3.92% | 5,301,383 |
| **11/1-2/23 (11/1-2/23)** | $481.40 | -$42.29 | 8.00% | 5,357,375[14] |
| **1/18/24 (1/18/24)** | $411.98 | -$35.78 | 7.99% | 9,405,270 |
| **1/25/24 (1/25/24)** | $355.56 | -$47.04 | 11.69% | 10,864,902 |
| **10/1-2/24 (10/1-2/24)** | $246.49 | -$32.96 | 11.90% | 22,245,161[15] |

600.    Throughout the disclosure period, Defendants mitigated the price declines of Humana common stock by making additional false assurances concerning the alleged fraud, as alleged herein.

601.    It was entirely foreseeable that Defendants' materially false or misleading statements and omissions of material fact alleged herein would artificially inflate and/or maintain the price of Humana common stock and call options, and artificially deflate or maintain the artificial deflation of the price of Humana put options. It was also foreseeable to Defendants that

---

[11] The date(s) in parentheses refer to the date(s) of the stock price decline resulting from the alleged corrective event, for which the Trading Volume is recorded in the column so-labeled.

[12] This column records the decline in the price of Humana common stock as measured from the closing price before the corrective event and the price at the close of trading after the stock price decline resulting from the corrective event.

[13] This column records the percentage of the price decline resulting from the corrective event.

[14] This figure is the combined trading volume for November 1-2, 2023.

[15] This figure is the combined trading volume for October 1-2, 2024.

the disclosures of the previously misrepresented and/or concealed facts and materializations of the previously concealed risks would cause the price of Humana's common stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. The prices of Humana call and put options rose and fell in correspondence with the movements of the Company's common stock price and for the same reasons. Thus, the price declines alleged above were directly and proximately caused by Defendants' materially false or misleading statements and omissions of material fact during the Class Period.

## IX.   CLASS ACTION ALLEGATIONS

602.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired the publicly traded securities of Humana, including persons and entities who purchased or otherwise acquired common stock and call options or who sold put options, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, and/or control person of Humana during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Humana's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

603.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Humana's common stock was actively traded on the NYSE, an open and efficient market, under the symbol "HUM."

As of September 30, 2024, there were more than 120 million shares of Humana common stock outstanding. Record owners and other Class members can be identified from records maintained by Humana or its transfer agent(s) and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

604.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

605.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

606.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (i) whether the Exchange Act was violated by Defendants' acts as alleged herein; (ii) whether statements made by Defendants to the investing public during the Class Period contained material misrepresentations and/or omitted to disclose material facts; (iii) whether and to what extent the market price of Humana common stock and call options was artificially inflated or artificially maintained, and whether and to what extent the market price of Humana put options was artificially deflated, during the Class Period due to the material misrepresentations and/or omissions alleged herein; (iv) whether Defendants acted with the requisite level of scienter; (v) whether the Individual Defendants were controlling persons of the Company; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

607.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X.    A PRESUMPTION OF RELIANCE APPLIES

608.    At all relevant times, the market for Humana's securities was efficient for the following reasons, among others: (i) Humana's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (ii) as a regulated issuer, Humana filed periodic public reports with the SEC; (iii) Humana regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and (iv) Humana was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

609.    As a result of the foregoing, the market for Humana securities reasonably and promptly digested current information regarding Humana from all publicly available sources and reflected such information in the prices of Humana securities, including Humana common stock, call options and put options. Under these circumstances, all purchasers and acquirers of Humana common stock and call options at artificially inflated prices and all sellers of put options at

artificially deflated prices during the Class Period suffered similar injury through their transactions in Humana securities, and the presumption of reliance applies.

610.    Further, at all relevant times, Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Plaintiff and other Class members would not have purchased or otherwise acquired Humana common stock and call options at artificially inflated prices or sold put options at artificially deflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

611.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

612.    To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements,

any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

613.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants knew the statement was false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XII.   CAUSES OF ACTION

<u>COUNT I</u>
<u>For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5</u>
<u>Promulgated Thereunder Against All Defendants</u>

614.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

615.    Plaintiff asserts this Count on behalf of themself and all other members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

616.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the Class; and (ii) cause Plaintiff and the Class to purchase or otherwise acquire Humana common stock or call options at artificially inflated prices or sell put options at artificially deflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

617.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements

not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Humana common stock and call options and sellers of put options in an effort to maintain artificially high or deflated market prices thereof in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

618.    During the Class Period, Defendants made the false statements specified above, which they knew or severely recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

619.    Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Humana's true condition from the investing public and to support the artificially inflated prices of Humana common stock and call options and artificially deflated prices of Humana put options.

620.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Humana common stock and call options at inflated prices or sold put options at deflated prices. Plaintiff and the Class would not have purchased or otherwise acquired Humana common stock and call options or sold put options at such prices, or at all, had they been aware that the market prices for Humana common stock had been artificially inflated by Defendants' fraudulent course of conduct.

621.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of Humana common stock and call options and sales of put options during the Class Period. As alleged herein, when the true facts were subsequently disclosed, or the risks concealed by Defendants' public

statements materialized, the price of Humana's common stock declined precipitously, and Plaintiff and the other members of the Class were harmed and damaged as a direct and proximate result of their acquisitions of the Company's common stock and call options at artificially inflated prices or sale of put options at artificially deflated prices.

622.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

623.    This claim is timely within the applicable statute of limitations and repose.

<u>COUNT II</u>
<u>For Violation Of Section 20(a) Of The Exchange Act Against The Individual</u>
<u>Defendants</u>

624.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

625.    Plaintiff asserts this Count on behalf of themself, and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

626.    The Individual Defendants acted as controlling persons of Humana within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of Humana, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

212

statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

627.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Humana and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

628.    As described above, Humana and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock and call options or sale of put options during the Class Period.

629.    This claim is timely within the applicable statutes of limitations and repose.

## XIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

213

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 20, 2024

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**

*/s/ Gregory V. Varallo*
Gregory V. Varallo (DE Bar ID #2242)
Andrew Blumberg (DE Bar ID #6744)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3600
greg.varallo@blbglaw.com
andrew.blumberg@blbglaw.com

-and-

Robert F. Kravetz (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Robert.kravetz@blbglaw.com

*Liaison Counsel for Lead Plaintiff SEB Investment Management AB*

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Jamie M. McCall (*pro hac vice*)
Johnston de Forest Whitman, Jr. (*pro hac vice*)
Joshua E. D'Ancona (*pro hac vice*)
Joshua A. Materese (*pro hac vice*)
Nathan A. Hasiuk (*pro hac vice*)
Nathaniel C. Simon (*pro hac vice*)

214

Farai Vyamucharo-Shawa (DE Bar ID #7002)
Aubrie L. Kent (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmccall@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
jmaterese@ktmc.com
nhasiuk@ktmc.com
nsimon@ktmc.com
fshawa@ktmc.com
akent@ktmc.com

*Counsel for Lead Plaintiff SEB Investment Management AB and Lead Counsel for the Class*